**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BI3, Inc., an Illinois Corporation, and**     ) <br> **Kenneth C. Tola, Jr., an Illinois Resident,** ) <br>     ) <br>     **Plaintiffs,**     ) <br>     ) <br>     **vs.**     ) <br>     ) <br> **Alan B. Hamor, a New Jersey Resident,** ) <br> **WK Networks, Inc., a Delaware**     ) <br> **Corporation, and CampaignLocal, Inc.,** ) <br> **a Delaware Corporation,**     ) <br>     ) <br>     **Defendants.**     ) | ```FILED: APRIL 25, 2008``` <br> ```08 CV 2384   JH``` <br> ```JUDGE DER-YEGHIAYAN``` <br> ```MAGISTRATE JUDGE KEYS``` |

**COMPLAINT FOR DAMAGES, EQUITABLE AND DECLATORY RELIEF**

     BI3, Inc., an Illinois corporation, and Kenneth C. Tola, Jr., an Illinois resident, by counsel, Zaknoen & Zaknoen LLC, for their Complaint against Defendants Alan B. Hamor, WK Networks, Inc., and CampaignLocal, Inc., allege as follows:

**PARTIES AND BACKGROUND**

     1.    Kenneth C. Tola, Jr., ("Tola"), is a resident and citizen of the State of Illinois, currently residing at 220 West Scott Street, in the City of Chicago, Cook County, Illinois.

     2.    Tola is an information technology expert with over 15 years experience in providing multi-tiered, distributed solutions. Tola's area of expertise include, but are not limited to, network engineering, applications development, systems integration, deep programming, and enterprise architecture.

3.      BI3, Inc., ("BI3"), is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 220 West Scott Street, Chicago, Illinois.

4.      Tola is the President and sole stockholder of BI3.

5.      Alan B. Hamor, ("Hamor"), is a citizen and resident of the State of New Jersey, residing at 22 Meadow Lane, Pennington, New Jersey.

6.      WK Networks, Inc., ("WK Networks"), is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 22 Meadow Lane, Pennington, New Jersey.

7.      Hamor is the Chairman and CEO of WK Networks.  On information and belief, Hamor owns a controlling and majority interest in WK Networks.  On information and belief, Hamor is in control of the affairs of WK Networks.

8.      CampaignLocal, Inc., ("CampaignLocal"), is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 22 Meadow Lane, Pennington, New Jersey.

9.      Hamor also is the Chairman and CEO of CampaignLocal.  On information and belief, Hamor owns a controlling and majority interest in CampaignLocal.  On information and belief, Hamor is in control of the affairs of CampaignLocal, Inc.

10.     Non-party Auto Bid Systems, Inc., ("ABS"), is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 503 Carlisle Drive, Suite 100, Herndon, Virginia.

11.     From its inception in or around December 2005 until January 2007, Hamor also was the Chairman, CEO and a Director of ABS.

12.    ABS was in the business of owning and operating an internet website known as "AutomoBids.com." BI3's understanding of ABS's AutomoBids.com website was that it was a bidding platform that would be linked to automobile dealer websites that would allow prospective car purchasers viewing a dealer's website to click to ABS's bidding platform to bid on actual dealer vehicles against the dealer's hidden reserve price.

13.    Non-party, Nimble Communications, LLC, ("Nimble Communications"), is a Virginia limited liability company, with its principal place of business located at 13382 Point Rider Lane, Herndon, Virginia.

## JURISDICTION AND VENUE

14.    Subject matter jurisdiction exists by virtue of 28 U.S.C. § 1332, diversity jurisdiction, in that this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

15.    Personal jurisdiction exists over the Defendants in that each defendant has sufficient minimum contacts with the State of Illinois as set forth more fully below. All defendants engaged in extensive telephone and e-mail communications with Illinois citizens and residents, Tola and BI3. Defendant WK Networks entered into contracts with BI3, an Illinois citizen and resident. Defendants WK Networks and CampaignLocal received the benefits of services provided by Illinois residents, BI3 and Tola. All defendants engaged in conduct they knew would cause harm to Illinois citizens and residents, Tola and BI3.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims occurred in this district.

## COMMON FACTUAL ALLEGATIONS

17.    In July 2006, BI3 was contacted by Nimble Communications to perform some relatively minor tasks for Nimble Communications relating to ABS' AutomoBids.com website.

18.    On or about July 31, 2006, BI3 entered into a written Subcontractor Agreement and a written Non-Disclosure Agreement with Nimble Communications.

19.    Pursuant to the terms of the Subcontractor Agreement, BI3 agreed to perform certain work and services for Nimble Communications related to transforming graphics and images provided or generated by Nimble Communications into web pages that developers at ABS could incorporate into certain websites owned or operated by ABS, including AutomoBids.com.

20.    Tola, on behalf of BI3, also executed a written Non-Disclosure Agreement with ABS dated August 7, 2006.

21.    While BI3 was performing services under the Subcontractor Agreement with Nimble Communications, in July and August of 2006, Tola began to interact with ABS' CEO, Hamor, and had several discussions with him by telephone and by e-mail. Hamor began to discuss with Tola other projects and work unrelated to BI3's contract with Nimble Communications and the possibility of a direct contract between BI3 and either ABS or WK Networks.  Hamor referred to WK Networks as one of his other companies.

22.    During this time period, Hamor represented to Tola that ABS' efforts to develop certain additional technology and websites had failed and that Hamor was taking over the technological development effort for ABS.

23.     Specifically, Hamor represented that ABS was attempting to develop a website to be known as "AutomoAds.com," which would allow an automobile dealer wishing to list vehicles for sale on the internet to create a list of keywords that would be used in an online Search Engine Marketing ("SEM") Campaign.    A prospective automobile purchaser who conducted an internet search for a vehicle, would "hit" or land upon an advertisement for that dealer's vehicle if the prospective purchaser had used one of the keywords that were selected by the dealer as part of that dealer's SEM Campaign.

24.     BI3's work on the AutomoAds.com project would consist of creating a database and web-based interface that provided custom tools which allowed a user to generate a list of geographically based keywords for the automotive industry.  The user would utilize different automobile industry terms, such as selecting makes and models of cars, and would select different geographic locations.  This tool would then output an exhaustive list of keywords that a user could then include in an online Search Engine Marketing ("SEM") campaign through a separate manual process beyond the scope of the AutomoAds.com effort.

25.     By way of example, to aid the Court's understanding, an automobile dealer in Falls Church, Virginia, who was seeking to list model year 2006 Chevrolet Malibu for sale on the internet, would use the AutomoAds.com website to generate keywords such as "Falls Church Malibu," "Virginia Chevrolet," "Malibu 2006 Falls Church," or the like, which the automobile dealer would include in an internet advertisement for such vehicles.  A prospective automobile purchaser searching for a vehicle on the internet might then input terms such as "Chevy Malibu Falls Church,

Virginia," into a Search Engine such as Google or Yahoo and would then hit that dealer's advertisement because it included the search terms.

26.     Hamor in New Jersey represented to Tola in Illinois in late September 2006, by telephone, that AutomoBids.com was going to run SEM campaigns using keywords generated from AutomoAds.com to point advertisements to ABS's bidding platform.    AutomoBids.com was a landing page system for SEM advertisements. Conceptually, an automobile dealer would use the AutomoAds.com tool to generate the list of geographically-based keywords.    A dealer would then create a separate SEM Campaign outside the scope of AutomoAds using the keywords generated.    This SEM Campaign would use advertisements that pointed to the AutomoBids landing page system.

27.     Hamor further represented to Tola that ABS was seeking a developer with the requisite skill set to work with ABS' in-house technology staff to develop the AutomoAds.com website and related technology on ABS' behalf.    Hamor represented that BI3 would be appropriate to play that role, given Tola's expertise in information technology development.    Hamor actively recruited BI3 for that task.

28.     In furtherance of ABS' and/or WK Networks' desire to have BI3 contract directly with one of those two companies, Hamor negotiated a Release with Nimble Communications, to release BI3 from its Subcontractor Agreement with Nimble Communications.

29.     During August and September of 2006, BI3 received and reviewed various draft contracts to be entered into between BI3 and ABS.

30.     On or about August 21, 2006, Glen Gulyas, the Chief Operating Officer of ABS, sent to Tola, in Illinois, an e-mail containing a draft contract to be entered into between BI3 and ABS.  Gulyas requested that Tola work with ABS' Chief Technology Officer, Todd Gagorik, to develop an appropriate scope of work for the contract between BI3 and ABS.

31.     In early September 2006, Hamor interceded and instructed Tola that all further contract negotiations between BI3 and ABS should be conducted with Hamor.

32.     Thereafter, Tola, on behalf of BI3, proposed modifications to the draft contract to Hamor by e-mail.

33.     On or about September 5, 2006, Hamor sent a revised contract to be entered into between ABS and BI3.

34.     On or about September 6, 2006, Tola, on behalf of BI3, again proposed revisions to the contract and returned it to Hamor by e-mail.

35.     Discussions continued regarding the proposed contract between ABS and BI3 during September 2006.

36.     In a series of telephone conversations between September 26 and September 29, 2006, Hamor informed Tola, that ABS and WK Networks had decided that the AutomoAds.com development effort should be done through WK Networks, rather than ABS.  Hamor represented that, to this end, ABS and WK Networks had agreed that BI3 should contract directly with WK Networks for the development of AutomoAds.com.  Hamor further represented that the two companies had agreed that WK Networks would own the technology related to the AutomoAds.com development which

BI3 was going to create.  Hamor instructed Tola that BI3 should not execute the contract with ABS, instead BI3 would execute a contract with WK Networks.

37.    Hamor further represented that WK Networks owned stock in ABS and he described ABS as a WK Networks "investment project."  At that time Hamor was Chairman and CEO of both ABS and WK Networks.

38.    Tola reasonably believed that Hamor had the authority to speak on behalf of both ABS and WK Networks as CEO of both companies.

39.    Pursuant to this telephone conversation, Hamor, on September 29, 2006, sent Tola by e-fax, a Consulting Agreement to be entered into between BI3 and WK Networks.

40.    On September 29, 2006, Tola, on behalf of BI3, executed the written Consulting Agreement with WK Networks relating to the AutomoAds.com project, dated August 1, 2006, and faxed it back to Hamor.  The Consulting Agreement also contained provisions relating to payment for work BI3 already had performed relating to AutomoBids.com.  A true and accurate copy of the Consulting Agreement is attached hereto, incorporated herein and marked for reference as Exhibit A.

41.    On or about October 2, 2006, Hamor executed the Consulting Agreement on behalf of WK Networks and returned it to Tola.

42.    Tola and BI3 reasonably relied on Hamor's representations that there was an agreement between ABS and WK Networks for WK Networks to develop AutomoAds to the mutual benefit of ABS and WK Networks and that BI3 would develop AutomoAds under a direct contract with WK Networks.  At this time, Hamor was CEO and Chairman of both ABS and WK Networks.

43.    Hamor, acting as CEO and Chairman of both ABS and WK Networks instructed Tola and BI3 that, pursuant to the terms of the Confidentiality provisions of the Consulting Agreement, all communications between ABS and Tola or BI3 should be only with Hamor as CEO and Chairman of both companies. Hamor further directed Tola and BI3 that if they received inquires from ABS personnel or even from Nimble Communications personnel, Tola and BI3 should inform Hamor of the inquiry or communication and Hamor would direct the appropriate response.

44.    Tola and BI3 adhered to the restrictions Hamor placed on communications with ABS and others.

45.    As compensation for the work performed pursuant to the Consulting Agreement with WK Networks, BI3 was to receive approximately $3,250 for services provided relating to AutomoBids.com, which was to be included in the bills submitted by Nimble Communications, and approximately $20,875, for services provided from August 1, 2006 through September 10, 2006. Thereafter, BI3 was to be compensated at a weekly rate of $3,000, per week.

46.    Despite the fact that contract documents were not fully executed until October 2, 2006, BI3 began work on the projects in early August 2006.

47.    On or about October 19, 2006, Tola conducted a demonstration of the AutomoAds.com tool for a company known as the JAR Group. The demonstration occurred by teleconference and included an internet-based demonstration of the website's functionality. Tola, Hamor, Jason Coyle and A.J. Lawrence from the JAR Group participated in the demonstration.

48.    After the demonstration, the JAR Group informed Hamor and Tola that, while the AutomoAds tool was interesting, it was not valuable to them because the tool did not perform Search Engine Marketing management functions.

49.    In early November 2006, as a result of the meeting with the JAR Group, Hamor requested that BI3 cease work on the AutomoAds.com project.

50.    Shortly thereafter, in November of 2006, Hamor, as CEO of WK Networks, represented to BI3 that WK Networks had decided to redirect efforts from AutomoAds to building a new Search Engine Marketing management platform to be called CampaignLocal, in part to address the comments made by the JAR Group who were experts in the SEM management field.

51.    Hamor, as CEO of WK Networks, informed BI3 that CampaignLocal would be owned by WK Networks and ABS would be merely a re-seller of CampaignLocal's services.  Hamor further represented to BI3 that ABS would receive up to 5% ownership of CampaignLocal based on ABS investing up to $50,000, in CampaignLocal.

52.    The CampaignLocal effort underwent several major revisions.  The initial focus of CampaignLocal was to provide a custom set of online tools that allowed users to easily create SEM campaigns for different types of automobiles.

53.    BI3 began work on the various CampaignLocal efforts in November 2006 with the understanding that, pursuant to the Consulting Agreement dated August 1, 2006, BI3 would be compensated at the weekly rate of $3,000, per week.

54.    Throughout August-November of 2006, BI3 sent invoices to Hamor, as CEO of WK Networks, for work related to the AutomoAds.com project and the CampaignLocal project, based on a weekly rate of $3,000, per week.

55.    WK Networks, and sometimes ABS on behalf of WK Networks, made sporadic payments at best to BI3. ABS made payments to BI3 on October 1, 2006, for $10,000; on October 16, 2006, for $7,500; and on December 6, 2006, for $8,000. WK Networks made one payment through its CampaignLocal entity on December 21, 2006, for $7,500.

56.    On or about November 11, 2006, Hamor informed BI3 by e-mail that he no longer wanted to receive invoices directly from BI3. In a subsequent telephone conversation on that date, Tola expressed concern about non-payment to BI3 and Hamor stated that he knew the payment amounts and was working to get the past due amounts paid.

57.    BI3 performed work on the CampaignLocal projects through the end of December 2006.

58.    Despite the sporadic payments made by ABS and WK Networks, WK Networks owed BI3 $39,125, at the end of December 2006.

59.    In late December 2006, on or about December 27, 2006, in a telephone conversation between Tola and Hamor, BI3 informed WK Networks that it was going to cease all work for WK Networks due to severe non-payment.

60.    Hamor, on behalf of WK Networks, implored BI3 to develop a proposal that would provide WK Networks some short term relief from the amounts owed to BI3

and would give BI3 some long term benefit satisfactory to BI3 such that BI3 would continue working on the various WK Networks projects, including CampaignLocal.

61.    Over the next two days, BI3 and WK Networks engaged in various discussions by telephone regarding the terms of a proposed contract modification.

62.    On January 8, 2007, Tola, on behalf of BI3, e-mailed to Hamor, on behalf of WK Networks a set of Terms and Conditions under which BI3 would be willing to continue working for WK Networks on its various projects, including CampaignLocal.

63.    BI3 proposed to continue work on CampaignLocal during 2007 and to defer payment for the first three months of 2007 if WK Networks agreed to pay the total amounts past due by the end of March 2007; to compensate BI3 for the work on a monthly basis such that BI3 would achieve a fee of $250,000 for 2007; and to grant to Ken Tola a 20% interest in CampaignLocal, Inc.

64.    Shortly after the January 8, 2007 e-mail, Hamor in New Jersey called Tola in Illinois on the telephone and agreed to the terms and conditions set forth in the January 8, 2007 e-mail, on behalf of WK Networks.  WK Networks agreed to pay the $39,125 past due by the end of March 2007, and a fee of $250,000 for 2007 paid in monthly installments beginning in April 2007.  Hamor also agreed to grant Tola a 20% interest in CampaignLocal under a new ownership agreement to be worked out between the parties.

65.    Unbeknownst to Tola and BI3, during the last quarter of 2006, Hamor and ABS began having serious disputes regarding WK Networks' ownership of the technology BI3 was creating for the AutomoAds.com and CampaignLocal projects.

66.    In early January 2007, Hamor informed Tola that he was engaged in a dispute with the ABS Board of Directors and likely was going to be replaced as CEO.

Shortly thereafter, Hamor informed Tola that he had in fact been terminated as CEO of ABS and likely was going to be sued by ABS.

67.    In early January 2007, Hamor also informed Tola that that he wanted to change the focus of CampaignLocal from an SEM submission company to a multi-media campaign management company whose potential customers would not be limited to the automobile industry.

68.    Tola immediately expressed concern to Hamor regarding the dispute with ABS and whether Tola personally or BI3 were at risk as a result of the work being performed.

69.    Hamor assured Tola that neither Tola nor BI3 could be sued by ABS because BI3 was a subcontractor of WK Networks. Hamor informed Tola that BI3 was obligated to continue its work under the Consulting Agreement with WK Networks.

70.    As a result of Hamor's desire to change the focus of CampaignLocal, as stated above, BI3 made numerous proprietary modifications to the earlier version of CampaignLocal. BI3 wanted to ensure that nothing related to the earlier version of CampaignLocal or AutomoAds was used in the development of this new version of CampaignLocal due to the dispute with ABS. BI3 therefore created an entirely new codebase, built from the ground up, that was only remotely connected to the original version of CampaignLocal through some basic, non-proprietary, SEM-related concepts.

71.    During January-March 2007, BI3 continued working on the various CampaignLocal projects.

72.    In February 2007, in addition to working on the CampaignLocal projects for WK Networks, Hamor requested that BI3 begin working on another project called

TargetIQ.  This project focused on the use of manually uploaded data from customers visually displayed on local maps to help customers visualize their local markets.  BI3 successfully completed the entire infrastructure for this project when WK Networks terminated the effort to create the actual maps in May 2007.

73.    During April 2007, WK Networks made 3 payments to BI3 totaling only $18,000 and provided to Tola a "CAP Chart," ostensibly showing a 17.1% ownership interest in CampaignLocal for Tola, although neither Tola nor BI3 had any knowledge of the organization or incorporation surrounding CampaignLocal, Inc.  When queried, Hamor asserted that he could not honor the agreed-upon 20% ownership due to what he termed "shareholder restrictions."

74.    In March 2007, ABS filed a lawsuit against Hamor, WK Networks, CampaignLocal, BI3 and Tola in the United States District Court for the Eastern District of Virginia alleging breach of fiduciary duty, usurpation of corporate opportunity, theft of trade secrets and business conspiracy.  That suit was later dismissed by ABS and filed in state court in the Circuit Court of Fairfax County, Virginia in May 2007 under Case No. 2007 CL 5112 ("the ABS lawsuit.")  Tola and BI3 first became aware of the ABS lawsuit in early April 2007.

75.    The ABS lawsuit alleged, in part, that Tola and BI3 conspired with Hamor and WK Networks to deprive ABS of the work product BI3 had created for AutomoBids.com and AutomoAds.com and to direct opportunities and potential clients and customers related to AutomoAds.com to WK Networks and CampaignLocal.

76.    The allegations of the ABS lawsuit directly contradicted Hamor's earlier representations to Tola and BI3 that ABS and WK Networks had agreed to develop AutomoAds.com through a direct contract between BI3 and WK Networks.

77.    Upon receiving the ABS Complaint in early April 2007, Tola immediately called Hamor on the telephone and told Hamor that he wanted to contact ABS directly to discuss the allegations of the lawsuit because neither Tola nor BI3 had conspired with Hamor or WK Networks or engaged in any improper conduct.

78.    Hamor represented to Tola during this telephone conversation that Tola and BI3 were not allowed to speak to ABS regarding the lawsuit because BI3 was a subcontractor of WK Networks and bound by the Confidentiality provisions of the Consulting Agreement.    Tola informed Hamor that he had no intent of disclosing confidential information to ABS but Hamor told him that this did not matter.    Hamor told Tola that if Tola spoke to ABS and if it all damaged Hamor's position in the ABS lawsuit, Hamor would sue him for breach of the Consulting Agreement.

79.    Tola expressed disbelief at this.    Hamor then told Tola that if Tola did not believe him, Tola could ask attorney Scott Kaliko, whom Hamor had retained to serve as counsel regarding the ABS lawsuit.

80.    Kaliko reinforced Hamor's assertions that Tola and BI3 were not allowed to contact ABS to discuss the lawsuit.    Kaliko informed Tola that if he spoke to ABS he would be exposing himself and BI3 to liability to Hamor and his companies.

81.    Kaliko, at Hamor's direction, began representing all defendants in the ABS lawsuit, including Tola and BI3, despite the obvious potential conflict of interest in the joint representation.

82.    As a result of the conversations with Hamor and Kaliko, Tola and BI3 believed they did not have the right to obtain their own counsel and pursue their own defense to the ABS lawsuit. Rather, Tola and BI3 believed they had no options other than to continue working under the Consulting Agreement and to leave the defense of the ABS lawsuit to Hamor.

83.    Hamor began using the ABS lawsuit as leverage against Tola and BI3 in May 2007. When BI3 requested further monthly payments, Hamor represented that WK Networks did not have funds available to pay BI3 because of the ABS lawsuit.

84.    In addition, Hamor used the ABS lawsuit as a means of extracting further work from BI3 without making any payments to BI3. Hamor told BI3 that if BI3 failed to keep CampaignLocal running and its clients satisfied that CampaignLocal would go bankrupt and BI3 would be liable for breach of the Consulting Agreement.

85.    In addition to the development work being performed under the contracts, BI3 became responsible for client management functions, running the SEM campaigns, serving in essence as the Chief Technology Officer for CampaignLocal, and performing a myriad of other information technology related tasks that were not required by the contracts.

86.    Hamor also informed BI3 that, without the revenue from CampaignLocal, BI3 would have to start paying attorney's fees to Kaliko for defending the ABS lawsuit despite the fact that BI3 and Tola were led to believe that they could not choose their own counsel for the lawsuit.

87.    Hamor told Tola that he had to become a Director and Secretary of CampaignLocal in order to keep CampaignLocal operational. Again, Hamor represented

to BI3 that failure to keep CampaignLocal operational would result in BI3 having to pay to defend the ABS lawsuit and expose BI3 to liability for breach of the Consulting Agreement.

88.    During this time, Hamor also was placing extreme time deadlines on BI3 to complete various projects, threatening that CampaignLocal would go bankrupt if these projects were not completed on time, although there were never any time deadlines set forth in the contracts.  This precluded BI3 from obtaining other clients.

89.    BI3 continued and completed the various projects for WK Networks, including those projects related to CampaignLocal.  BI3's last task for WK Networks was completed in August 2007.

90.    WK Networks failed to make any monthly payments to BI3 during 2007, except for the payments during April 2007, totaling $18,000.

91.    Between August 2006, when BI3 began performing services on the AutomoBids.com and AutomoAds.com projects, and August 2007, when BI3 completed its last task for WK Networks, BI3 received approximately $50,000 in payments from ABS, WK Networks, or CampaignLocal.

92.    During previous years, BI3's average income was in the $250,000 range.

93.    BI3 was devastated financially by reason of its engagement with Hamor and WK Networks.  During this time period, the demands placed on BI3 precluded it from seeking other work.

94.    There is currently due and owing under the Consulting Agreement and the January 8, 2007, contract, a total sum of $271,125 from WK Networks to BI3 for the work performed under the contracts.

95.    BI3 never received any additional compensation for the extra-contractual work it performed.

96.    Kaliko eventually withdrew from representing the defendants in the ABS lawsuit due to a payment dispute and was replaced by attorneys Jenice Malecki and Daniel Ball, who likewise represented all defendants in the ABS lawsuit.

97.    In October 2007, Malecki and Ball informed Tola that they were no longer able to continue representing him and BI3 in the ABS lawsuit due to conflicts of interest.

98.    BI3 and Tola believed this now gave them the freedom to obtain counsel of their own choice to defend themselves in the ABS lawsuit and did in fact secure counsel of their own choice.

99.    Malecki and Ball withdrew entirely from the ABS lawsuit in late December 2007, due to the prior conflict of interest in the joint representation of all defendants.

100.    Tola and BI3 were dismissed from the ABS lawsuit on or about February 22, 2008.

101.    As a result of BI3's reliance on Hamor's representations that there was an agreement between WK Networks and ABS for BI3 to contract directly with WK Networks and as a result of BI3's work on the various projects under its contracts with WK Networks, BI3 and Tola became defendants in the ABS lawsuit and were forced to incur attorney's fees and costs to defend themselves in an amount to be proven at trial.

102.    On or about January 24, 2008, counsel for Tola and BI3 sent correspondence to counsel for Hamor, WK Networks, and CampaignLocal, demanding

payment on behalf of BI3. To date, no response has been received from Hamor, WK Networks, or CampaignLocal.

## COUNT I:  BREACH OF CONTRACT AND QUANTUM MERUIT AGAINST WK NETWORKS

103. BI3 incorporates by reference herein the allegations of Paragraphs 1-102 of this Complaint as if the same were fully set forth herein.

104. BI3 entered into certain contracts with WK Networks related to AutomoAds, CampaignLocal, and TargetIQ.

105. BI3 completed all the work required of it under the contracts.

106. WK Networks has failed and refused to pay BI3 according to the terms of the contracts.

107. BI3 has made demand upon WK Networks for payment but WK Networks has failed and refused to pay.

108. BI3 performed additional work for WK Networks outside the scope of the contracts.

109. BI3 has not received any compensation for the additional work it performed for WK Networks.

110. It would be inequitable for WK Networks to retain the benefits of the additional work without paying for the reasonable value of the services provided.

111. The reasonable value of the additional services provided by BI3 is not less than $75,000.

**WHEREFORE**, BI3 requests judgment in its favor and against Defendant WK Networks on Count I of this Complaint, in the amount of $271,125 due and owing on the contracts, for the reasonable value of the additional services provided outside the

contracts which amount is not less than $75,000, for prejudgment interest as permitted by law, for a declaration of the rights of the parties under the contracts, for costs, and for all other just and proper relief.

## COUNT II:  UNJUST ENRICHMENT/
## QUANTUM MERUIT AGAINST WK NETWORKS AND CAMPAIGNLOCAL

112.    BI3 incorporates by reference herein the allegations of Paragraphs 1-111 of this Complaint, as if the same were fully set forth herein.

113.    BI3 conferred a benefit upon WK Networks and CampaignLocal by providing valuable services related to the various WK Networks and CampaignLocal projects as alleged above.

114.    These services were provided at the direction and request and with the knowledge of WK Networks and CampaignLocal.

115.    WK Networks and CampaignLocal knew that BI3 was conferring a benefit on it by providing services and WK Networks and CampaignLocal have accepted and retained the benefit.

116.    It would be inequitable for WK Networks and CampaignLocal to retain the benefits conferred by BI3 without paying for the same.

117.    BI3 has requested payment from WK Networks and CampaignLocal but WK Networks and CampaignLocal have failed and refused to pay.

118.    WK Networks and CampaignLocal are obligated to pay for the reasonable value of the services it accepted from BI3.

119.    The reasonable value of the services provided by BI3 and accepted and retained by WK Networks and CampaignLocal is at least $346,125.

**WHEREFORE**, BI3 requests judgment in its favor and against Defendants WK Networks and CampaignLocal on Count II of this Complaint for the reasonable value of the services provided, which amount is not less than $346,125, for prejudgment interest as permitted by law, for a declaration of the rights of the parties, for costs, and for all other just and proper relief.

## COUNT III:  FRAUD BY WK NETWORKS AND HAMOR

120.    BI3 incorporates by reference herein the allegations Paragraphs 1-119 of this Complaint as if the same were fully set forth herein.

121.    Hamor, as CEO and Chairman of WK Networks, represented to BI3 that there was an agreement between ABS and WK Networks, related to the development of AutomoAds, whereby ABS had agreed that BI3 should contract directly with WK Networks to develop AutomoAds.  This representation occurred in a series of telephone conversations between September 26, 2006, and September 29, 2006, between Hamor in New Jersey and Tola in Illinois.

122.    This representation was false – ABS never agreed with WK Networks to have BI3 contract directly with WK Networks to develop AutomoAds.

123.    Had BI3 known that this representation was false, BI3 never would have contracted with WK Networks.

124.    BI3 reasonably relied on Hamor's false representations and entered into the contract with WK Networks.

125.    BI3 reasonably believed that Hamor had authority to speak for both ABS and WK Networks as, at that time, he was CEO of both companies.

126.    In reliance on Hamor's false representations, BI3 provided services to WK Networks for which WK Networks has yet to pay BI3.

127.    In reliance on Hamor's false representations, BI3 was sued by ABS in Virginia and had to engage its own counsel to defend itself, incurred legal fees and costs.

128.    As a result of BI3's reasonable reliance on Hamor's false representations, BI3 has suffered damages including the value of the services for which WK Networks has not paid, legal fees and costs incurred in defending the Virginia lawsuit, and loss of other business opportunities.

129.    Hamor knew or should have known that his representations that ABS and WK Networks had agreed that BI3 should contract directly with WK Networks to develop AutomoAds was false.

130.    Hamor intended for BI3 to rely on this representation and BI3 did in fact rely on the representation to its detriment.

131.    Hamor's and WK Networks' conduct was willful, wanton, extreme and outrageous, and warrants the imposition of punitive damages.

**WHEREFORE**, BI3 requests judgment in its favor and against Defendants Hamor and WK Networks on Count III of this Complaint in the amount of $346,125, plus reasonable attorney's fees and costs incurred in the defense of the ABS lawsuit, for punitive damages, for prejudgment interest as permitted by law, for a declaration of the rights of the parties, for costs, and for all other just and proper relief.

### COUNT IV:  FRAUD – RESCISSION OF ASSIGNMENT – PUNITIVE DAMAGES AGAINST HAMOR AND CAMPAIGNLOCAL

132.    Tola incorporates by reference the allegations of Paragraphs 1-131, of this Complaint as if the same were fully set forth herein.

133.    During February 2007, Tola and non-party Earl K. Grant-Lawrence, a citizen and resident of the State of Texas, conceived of a new piece of technology that would allow website tracking across sites and over extended periods of time, which they eventually came to call "Data Trender."

134.    The Data Trender idea was unrelated to the business of ABS, WK Networks, or CampaignLocal and was unrelated to BI3's contracts with WK Networks.

135.    Tola gratuitously and without any duty to do so, introduced the Data Trender idea to Hamor in late February 2007, informing Hamor that he wanted to cut back on the work he was doing for BI3 related to WK Networks' and CampaignLocal's projects, in order to develop the Data Trender idea with Grant-Lawrence.

136.    Hamor immediately began scheming to fraudulently obtain a controlling interest in this new technology.

137.    Within a few days of Tola introducing the Data Trender idea to Hamor, Hamor called Tola and Grant-Lawrence on the telephone and represented to them that he had discussed the idea in general terms with certain "high-level contacts" he had at Yahoo, Microsoft, and Google.  Hamor represented that these alleged high-level contacts were interested in purchasing or licensing Data Trender.

138.    Hamor also represented that these alleged high-level contacts at Yahoo, Microsoft, and Google, wanted to see a prototype of Data Trender.

139.    Hamor further represented that these alleged high-level contacts at Yahoo, Microsoft, and Google, only wanted to deal with Hamor or one of Hamor's companies and that their potential interest in Data Trender and in dealing with Hamor was due in part to the "general excitement" surrounding the formation of CampaignLocal, Inc.

140.    Hamor represented to Tola and Grant-Lawrence that he could quickly arrange for a sale or license of the Data Trender invention based on the conversations he had with his high level contacts.

141.    Hamor informed Tola and Grant-Lawrence that they needed to move quickly in developing the prototype and to draft a provisional patent application so that they could sell or license the invention.

142.    Hamor intended for Tola and Grant-Lawrence to rely on these representations.

143.    Tola and Grant-Lawrence did in fact rely on these representations.

144.    In reliance on Hamor's representations, Tola and Grant-Lawrence expended great time and energy in developing a prototype of Data Trender and Tola expended great time and effort in drafting a Provisional Patent Application.

145.    Hamor's representations that: (1) he had "high level contacts" at Yahoo, Microsoft, and Google; (2) he had discussed the Data Trender idea generally with these contacts; (3) his contacts were very interested in purchasing or licensing Data Trender; (4) his contacts wanted to see a prototype; and (5) his contacts wanted to deal only with Hamor or one of his companies, were false.

146.    Hamor knew these representations were false when he made the representations.

147.    Hamor made these false representations as part of a fraudulent scheme to deceive Tola and Grant-Lawrence and to deprive them of their rights to the Data Trender invention.

148.    In furtherance of his scheme to defraud, Hamor sent to Tola and Grant-Lawrence a document entitled "Assignment" for them to execute purportedly transferring their rights in Data Trender to CampaignLocal, Inc.

149.    Upon receiving the Assignment document, Grant-Lawrence called Tola on the telephone to discuss the same, whereupon Tola and Grant-Lawrence then called Hamor.

150.    During this conversation, Tola and Grant-Lawrence questioned Hamor as to why they should assign their rights as inventors, including inventors' rights of ownership and control of the patent asset, to CampaignLocal, Inc.

151.    Hamor assured them that they were not in fact relinquishing any rights as inventors to the Data Trender invention and represented that the language of the Assignment was just "legalese" or "legal talk" necessary to allow CampaignLocal, Inc. to file the Provisional Patent Application.

152.    Tola and Grant-Lawrence were still unconvinced, so Hamor offered to connect one of his intellectual property attorneys, Jeffrey Brandt on the telephone.

153.    Hamor then put Tola and Grant-Lawrence on hold to call Jeffrey Brandt and after about 10 minutes, Hamor and Brandt joined Tola and Grant-Lawrence on the telephone.

154.    Brandt represented on the telephone with Tola, Grant-Lawrence, and Hamor, that Tola and Grant-Lawrence were not in fact relinquishing their rights as inventors to Data Trender.  Brandt represented to Tola and Grant-Lawrence during this telephone conversation that they needed to have a corporation to file the Provisional Patent Application.  Brandt stated in effect that that was how things were done before the

Patent & Trademark Office.  Brandt further represented that individuals could not file patent applications; that it had to be done by a corporation.  Brandt further stated that if Tola and Grant-Lawrence wanted to form their own corporation to file the Provisional Patent Application it would take a lot of time and cost thousands of dollars for them to do it.  Brandt and Hamor assured Tola and Grant-Lawrence that they should rely on Brandt's statements because he had extensive patent experience and that Tola and Grant-Lawrence 'didn't know what [they] were doing,' when it came to filing patent applications or provisional patent applications.

155.    Tola had never filed a patent application before and therefore had no experience in pursuing patent applications before the Patent & Trademark Office.

156.    Finally, after nearly five hours on the telephone with Hamor and Brandt, Hamor and Brandt were able to convince Tola and Grant-Lawrence that by signing the Assignment they were merely allowing CampaignLocal, Inc., to file a Provisional Patent Application with the United States Patent & Trademark Office and that Tola and Grant-Lawrence were not in fact relinquishing their rights as inventors of Data Trender.

157.    This telephone conversation occurred on or about April 18, 2007.

158.    On information and belief, Brandt owned a 2.7% interest in CampaignLocal, Inc.

159.    Previously, during March and the first half of April 2007, Tola wrote and revised various drafts of the Data Trender Provisional Patent Application, while he also worked to develop a prototype of the invention with Grant-Lawrence.  On these drafts, Tola and Grant-Lawrence were listed as inventors.

160.    The Data Trender Provisional Patent Application was ultimately filed with the USPTO on or about April 17, 2007, under Application Number 6091223.

161.    The last version of the Provisional Patent Application which Tola reviewed prior to filing again listed only Tola and Grant-Lawrence as inventors.

162.    At the last moment prior to filing, Hamor, without notice to Tola or Grant-Lawrence, had his name inserted on the Provisional Patent Application as the primary inventor, although he did not provide the original named inventors any evidence of a substantial contribution to the invention.

163.    Tola became aware of this fact only after the Provisional Patent Application was filed.

164.    When questioned by Tola as to why he was listed as the primary inventor, Hamor responded that he had to be listed as the primary inventor because he was the CEO of the Assignee, CampaignLocal, Inc., and that was 'how things were done.'

165.    Neither Tola nor Grant-Lawrence agreed to collaborate with Hamor for purposes of inventorship.

166.    After the Provisional Patent Application was filed, Hamor arranged for some presentations of the Data Trender invention to be made with small companies. Hamor told Tola and Grant-Lawrence that these presentations were "dry runs" to work out any "kinks" in the presentation prior to the invention being presented to his high level contacts at Google, Yahoo, and Microsoft.

167.    Tola and Grant-Lawrence did conduct these "dry run" presentations, but Hamor failed to arrange any meetings or presentations with his supposed high level contacts at Google, Microsoft, or Yahoo, as promised.

27

168.    Tola, by counsel, sent correspondence to counsel for Hamor and CampaignLocal on or about January 24, 2008, rescinding the purported assignment of Data Trender and demanding that Hamor and CampaignLocal acknowledge the rescission.

169.    Hamor and CampaignLocal have failed and refused to respond to said demand.

170.    The Data Trender Provisional Patent Application expired on or about April 17, 2008, unless further action was taken to convert the Provisional Application into a Patent Application.

171.    By virtue of the Assignment, Tola and Grant-Lawrence were prohibited from taking any action in their own names with respect to the Provisional Patent Application to prevent it from lapsing.

172.    Tola is without knowledge or information as to whether CampaignLocal, Inc, or Hamor have taken the necessary steps to file a Patent Application such that the priority filing date of the Provisional Patent Application is not lost.

173.    Since the priority date is used to determine the validity of any patent that ultimately may issue, loss of the priority date creates a material risk to the value of the patent asset.

174.    The conduct of Hamor and CampaignLocal was willful, wanton, extreme and outrageous and warrants the imposition of punitive damages.

**WHEREFORE**, Tola requests judgment in his favor and against Defendants Hamor and CampaignLocal on Count IV of this Complaint, for a declaration rescinding the purported Assignment of Data Trender to CampaignLocal on the grounds that the

Assignment was induced by fraud; requiring Hamor and CampaignLocal, Inc., to appear and answer as to what steps were taken, if any, to file a Patent Application such that the priority filing date of the Provisional Patent Application was not lost; for punitive damages; for costs; and for all other just and proper relief.

### COUNT V:  RESCISSION – LACK OF CONSIDERATION

175.    Tola incorporates herein by reference the allegations of Paragraphs 1-174 of this Complaint as if the same were fully set forth herein.

176.    Tola in fact never received any consideration from CampaignLocal, Inc., Hamor, or any other source, in exchange for executing the purported Assignment of his rights in the Data Trender invention to CampaignLocal, Inc.

**WHEREFORE**, Tola requests judgment in his favor and against Defendant CampaignLocal on Count V of this Complaint for a declaration that the purported Assignment of his rights in the Data Trender invention is null and void due to a complete lack of consideration for the same, for costs, and for all other just and proper relief.

### COUNT VI:  FAILURE OF CONSIDERATION

177.    Tola incorporates herein by reference the allegations of Paragraphs 1-176 of this Complaint as if the same were fully set forth herein.

178.    Hamor and CampaignLocal promised that they would be able to sell or license Data Trender quickly through Hamor's high level contacts at Google, Yahoo and Microsoft and represented that these companies only wanted to deal with Hamor or one of his companies.

179.    Hamor and CampaignLocal further promised that once Data Trender was sold or licensed, Tola would be compensated and a new compensation or ownership agreement with CampaignLocal, Inc., would be worked out.

180.    Tola requested on a number of occasions to work out the new compensation or ownership agreement with Hamor, on behalf of CampaignLocal, Inc., but Hamor refused to discuss the same with him.

181.    Hamor and CampaignLocal were not able to fulfill their promise to sell or license Data Trender and Tola therefore never received any compensation.

**WHEREFORE**, Tola requests judgment in his favor and against Defendant CampaignLocal on Count VI of this Complaint for a declaration that the purported Assignment of his rights in the Data Trender invention is null and void due to a complete failure of consideration for the same, for costs, and for all other just and proper relief.

## COUNT VII:  BREACH OF DUTY

182.    Tola incorporates herein by reference the allegations of Paragraphs 1-181 of this Complaint as if the same were fully set forth herein.

183.    As a result of Hamor's and Brandt's representations to Tola that the purported Assignment to CampaignLocal, Inc., was necessary to enable the Provisional Patent Application to be filed, and as a result of Hamor's promises to compensate Tola for the sale or licensing of Data Trender, Hamor voluntarily undertook a duty to preserve and protect the Data Trender Provisional Patent Application.

184.    Tola is without knowledge or information as to whether Hamor and CampaignLocal have taken any action to ensure that the Provisional Patent Application did not lapse or expire.

185.    If Hamor and CampaignLocal have allowed the Provisional Patent Application to expire, the priority of the filing date will be lost.  Since the priority date is used to determine the validity of any patent that ultimately may issue, loss of this priority date creates a material risk to the value of the patent asset.

186.    If Hamor and CampaignLocal have failed to preserve the Provisional Patent Application, Tola will suffer damages in the form of increased expense in pursuing the Provisional Patent Application and the potential loss of an earlier priority date.

**WHEREFORE**, Tola demands judgment in his favor and against Defendants Hamor and CampaignLocal on Count VII of this Complaint requiring Hamor and CampaignLocal to appear and answer as to what steps they have taken, if any, to preserve the Provisional Patent Application, and, if none, for judgment in Tola's favor in an amount to be determined at trial to compensate him fairly for the increased expense he will suffer in attempting to preserve the value of the Provisional Patent Application, and damages flowing from the loss of the earlier priority date, if lost, for costs and for all other just and proper relief.

## COUNT VIII:  CONVERSION

187.    Tola incorporates herein by reference the allegations of Paragraphs 1-186 of this Complaint as if the same were fully set forth herein.

188.    Tola and Grant-Lawrence as inventors of Data Trender have the right to ownership of Data Trender and to the immediate, absolute, unconditional possession of the same.

189.    Hamor and CampaignLocal by reason of Hamor's fraudulent representations inducing Tola and Grant-Lawrence to assign their rights to the Data

31

Trender invention to CampaignLocal, Inc., have wrongfully assumed control and ownership over the invention.

190.    Hamor also obtained rights in the Data Trender invention by naming himself as the primary inventor although Tola and Grant-Lawrence did not agree to collaborate with him for purposes of inventorship.

191.    Tola has made demand on Hamor and CampaignLocal, Inc., for return of the invention but Hamor and CampaignLocal, Inc., have failed and refused to return the same.

192.    Tola has suffered damages by reason of the unlawful conversion of Data Trender by Hamor and CampaignLocal, Inc., in that he has lost control and ownership of the property and has lost the ability to sell, license or patent this valuable asset.

**WHEREFORE,** Tola demands judgment in his favor and against Defendants Hamor and CampaignLocal on Count VIII of this Complaint requiring Hamor and CampaignLocal to surrender the management and control of the asset to Tola for the benefit of the inventors, for damages in an amount to be proven at trial, for punitive damages, for costs and for all other just and proper relief.

## COUNT IX:  BREACH OF FIDUCIARY DUTY

193.    Tola incorporates herein by reference the allegations of Paragraphs 1-192 of this Complaint as if the same were fully set forth herein.

194.    If the Court decides that the Assignment of the Data Trender Provisional Patent Application should not be rescinded, then the same is an asset of CampaignLocal, Inc.

195.    Hamor, as the CEO of CampaignLocal, Inc., owed a duty to CampaignLocal, Inc., and the shareholders, to preserve and protect the assets of the corporation from waste.

196.    At the relevant times herein, Tola owned a 17.1% interest in CampaignLocal, Inc.

197.    Tola is without knowledge or information as to whether Hamor or CampaignLocal, Inc., have taken the necessary actions to preserve the Data Trender Provisional Patent Application by filing the necessary Patent Application within the time allowed by law.

198.    This information is uniquely within the knowledge of Hamor as CEO of CampaignLocal, Inc.

199.    Tola has never received any shareholder communication from CampaignLocal, Inc., regarding the status of this corporate asset.

200.    Any demand by Tola would be futile as Hamor has failed and refused to respond to any of Tola's previous demands.  Further, for all practical purposes, Hamor owns, on information and belief, between 70-80% of the stock in CampaignLocal, Inc., and is the CEO.  It would be futile for Tola to demand that CampaignLocal, Inc., sue Hamor for corporate waste as the affairs of CampaignLocal are entirely controlled by Hamor.

**WHEREFORE**, Tola demands judgment in favor of CampaignLocal, Inc., and against Defendant Hamor requiring Hamor to appear and answer as to what steps he has taken to protect and preserve the Data Trender Provisional Patent Application from lapsing, and, if none, for judgment against Hamor and in favor of CampaignLocal, Inc.,

for wasting corporate assets, in a just and appropriate amount to be determined at trial, that management and control of the asset be surrendered to Tola for the benefit of the inventors and/or the company, or, in the alternative, for the imposition of a constructive trust over the Data Trender Provisional Patent Application, for a declaration of Tola's rights as a stockholder in CampaignLocal, Inc., for removal of Hamor as an officer of the corporation, for costs, and for all other just and proper relief.

## COUNT X:  QUANTUM MERUIT/UNJUST ENRICHMENT RELATED TO DATA TRENDER

201.    Tola incorporates herein by reference the allegations of Paragraphs 1-200 of this Complaint as if the same were fully set forth herein.

202.    Tola never received compensation from CampaignLocal, Inc., for the work he performed in developing the Data Trender prototype and drafting the Data Trender Provisional Patent Application.

203.    The work done to develop the Data Trender prototype and to draft the Provisional Patent Application were outside BI3's contractual obligations under the Consulting Agreement with WK Networks dated August 1, 2006, or the January 8, 2007, modification thereof.

204.    Tola conferred a valuable benefit on CampaignLocal, Inc., by developing the Data Trender prototype and drafting the Provisional Patent Application, with the knowledge of CampaignLocal.

205.    It would be inequitable to allow CampaignLocal, Inc., to retain the benefits of Tola's services in this regard without paying for the same.

206.    The reasonable value of the services Tola provided is at least $75,000.

**WHEREFORE**, Tola prays for judgment in his favor and against CampaignLocal, Inc., on Count X of this Complaint for the reasonable value of the services he provided to CampaignLocal, Inc., in developing the Data Trender prototype and drafting the Provisional Patent Application, which amount shall be proven at trial but is not less than $75,000, for costs, and for all other just and proper relief.

Respectfully submitted,

/s/ Joseph J. Zaknoen
Joseph J. Zaknoen
Zaknoen & Zaknoen LLC
Attorneys for Plaintiffs

Joseph J. Zaknoen (Atty. No. 6208253)
Edward G. Zaknoen (Atty. No. 6239683)
Zaknoen & Zaknoen LLC
161 N. Clark St., Suite 4700
Chicago, Illinois 60601
(312) 523-2191
(312) 523-2001 (fax)

## JURY DEMAND

Plaintiffs, Kenneth C. Tola, Jr., and BI3, Inc., by counsel, Zaknoen & Zaknoen LLC hereby demand trial by jury on all claims triable to a jury.

Respectfully submitted,

/s/ Joseph J. Zaknoen
Joseph J. Zaknoen
Zaknoen & Zaknoen LLC
Attorneys for Plaintiffs

Joseph J. Zaknoen (Atty. No. 6208253)
Edward G. Zaknoen (Atty. No. 6239683)
Zaknoen & Zaknoen LLC
161 N. Clark St., Suite 4700
Chicago, Illinois 60601
(312) 523-2191
(312) 523-2001 (fax)

08 CV 2384

JUDGE DER-YEGHIAYAN

MAGISTRATE JUDGE KEYS

Confidential When Completed

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT is made as of this 1st day of August, 2006, by and between WK Networks, Inc., ("NETWORK VENDOR"), having a place of business at 22 Meadow Lane, Pennington, NJ 08534, ("Company"), and BI3, Inc. ("Consultant") an individual having a place of business at 220 W Scott Street Unit B, Chicago, IL 60610.

**Background**

The Company is engaged in the business of developing software for network-based bidding and commerce systems. Consultant has expertise and experience in areas beneficial to the Company and desires to consult with the Company in those areas of expertise. Based on Consultant's experience, the Company desires to retain the services of Consultant and Consultant desires to render such services on the terms and conditions set forth below.

IN CONSIDERATION of the foregoing and of the mutual terms set forth below, the parties, intending to be legally bound, agree as follows:

1. Retention as Consultant. The Company hereby retains Consultant, and Consultant hereby agrees to render consulting services to the Company, upon the terms and conditions set forth herein.

2. Duties. Consultant shall perform the services detailed in Appendix A, **Scope of Work**, incorporated *herein* in its entirety.

3. Independent Consultant Status. The parties recognize that Consultant is an independent Consultant and that the Company will not incur any liability as a result of Consultant's actions. Consultant shall at all times disclose that he is an independent Consultant of the Company. The Company shall not withhold any funds from Consultant's compensation for tax or other governmental purposes, and Consultant shall be responsible for the payment of same. Consultant shall not be entitled to receive any employment benefits offered to employees of the Company, including but not limited to: workers' compensation coverage; savings or profit sharing plans; stock option, incentive or other bonus plans; health, dental or life insurance coverage; and paid vacations. The Company shall not exercise control over Consultant.

4. Compensation. The Company shall pay to Consultant, as compensation for the services to be rendered, the amounts set out in Appendix B, **Compensation**, incorporated herein in its entirety.

Unless expressly agreed between the parties herein, the Company shall not be obligated to provide a minimum number of hours of work, nor shall Consultant be entitled to receive any compensation for hours not actually worked.

The Company shall reimburse Consultant for all ordinary and necessary expenses incurred in connection with the performance of his services hereunder, provided that timely notice of such expenses is sent to and approved by an appropriate officer or other authorized representative of the Company. Expenses totaling over five hundred dollars ($500) shall be pre-approved by the Company.

5. Term. This Agreement shall commence on the date written above and shall continue indefinitely until such time as either Consultant or the Company terminates the Agreement as provided belo

6. Termination. The parties agree that either the Company or Consultant through written notice may terminate Consultant's engagement under this Agreement at any time for any reason or for no reason. Upon termination, Consultant shall deliver all completed work and Company shall pay Consultant for completed work.

7. Confidential Information. "Confidential Information" means non-public information Company designates to Consultant as being confidential. Such designation of confidentiality shall be by writing or marking for written materials and verbally at the time of disclosure, or in a summary written document

*Exhibit A*

Confidential When Completed

following a verbal disclosure, for non-written materials. Confidential Information includes, without limitation, information in tangible or intangible form relating to and/or including the Company's technology, know-how, marketing or promotional activities, business policies or practices, and information received from others that Company is obligated to treat as confidential.

Confidential Information shall not include any information, however designated, that: (i) is or subsequently becomes publicly available without Consultant's breach of any obligation owed Company; (ii) became known to Consultant prior to Company's disclosure of such information to Consultant pursuant to the terms of this Agreement; (iii) is or subsequently becomes known to Consultant from a source other than Company other than by the breach of an obligation of confidentiality owed to Company; or (iv) is independently developed by Consultant.

Consultant shall: (i) refrain from disclosing any confidential Information of Company to third parties for seven (7) years following the date that Company first discloses such Confidential Information to Consultant; (ii) take reasonable security precautions, at least as great as the precautions Consultant takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information of the Company; and (iii) refrain from using, including without limitation disclosing, reproducing, summarizing and/or distributing, Confidential Information of Company except in pursuance of Consultant's business relationship with Company, and only as otherwise provided hereunder.

Notwithstanding the obligations herein, Consultant may disclose Confidential Information of Company in accordance with a judicial or other governmental order, provided that Consultant either: (i) gives Company reasonable notice prior to such disclosure to allow Company a reasonable opportunity to seek a protective order or equivalent, or (ii) obtains written assurance from the applicable judicial or governmental entity that it will afford the Confidential Information the highest level of protection afforded under applicable law or regulation.

Consultant may disclose Confidential Information to its affiliates, employees and consultants only on a need-to-know basis. Consultant will have executed or shall execute appropriate written agreements with its affiliates, employees and consultants sufficient to enable Consultant to enforce all the provisions of this Agreement.

Consultant shall notify Company immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this Agreement by Consultant and Consultant's employees and consultants, and will cooperate with Company in every reasonable way to help Company regain possession of the Confidential Information and prevent its further unauthorized use or disclosure.

Consultant shall, at Company's request, return all originals, copies, reproductions and summaries of Confidential Information and all other tangible materials and devices provided to the Consultant as Confidential Information, or at Company's option, certify destruction of the same.

"Trade Secret Information" means that information which Company protects in accordance with state trade secret law and which has been identified by the owner as a trade secret.

Consultant shall: (i) refrain from disclosing any Trade Secret Information to third parties for as long as the disclosing party maintains the trade secret; (ii) use no less than reasonable care, to keep confidential the Trade Secret Information; and (iii) refrain from using for any purpose the Trade Secret Information except in pursuance of the business relationship between Company and Consultant, and only as otherwise provided hereunder.

8. Intellectual Property Rights. Consultant shall make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company all right, title and interest in and to any inventions which Consultant, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to this Agreement, or that result from work done for the Company prior to or

Confidential When Completed

after the date of this Agreement (collectively, "Company Inventions"). Such Company Inventions shall be the exclusive property of the Company, whether patented or not.

Consultant acknowledges that all works of authorship developed in the course of work performed pursuant to this Agreement and which are protectable by copyright, are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. Section 101 *et seq.*). To the extent that such works do not constitute works made for hire under operation of law, Consultant hereby assign all rights, title and interest in and to such works to the Company.

Consultant will provide the Company with all assistance reasonably requested by the Company to preserve its rights to the Company Inventions and to obtain and enforce United States and foreign proprietary rights relating to any and all such Company Inventions in any and all countries. To that end Consultant will, and/or will cause its employees to, execute, verify and deliver (A) such documents and perform such other acts (including appearing as a witness) as Consultant may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and/or the assignment thereof, and (B) assignments to the Company or its designee of such proprietary rights. Consultant's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue after the termination of this Agreement, so long as Consultant is compensated at then-standard rates. In the event the Company is unable for any reason, after reasonable effort, to secure Consultant and/or Consultant's employee(s) signature(s) on any document needed in connection with the actions specified hereinabove, Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultants and Consultant's employee(s) behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this section with the same legal force and effect as if executed by Consultant and/or Consultant's employee(s). Such appointment is coupled with an interest. Consultant hereby waives and quitclaims to the Company any and all claims of any nature whatsoever which Consultant now or may hereafter have for infringement of any proprietary rights assigned by Consultant to the Company.

9. Legal Relief. In the event Consultant breaches, or threatens to breach any of the covenants expressed herein, the damages to the Company will be difficult to quantify; therefore, the Company may apply to a court of competent jurisdiction for injunctive or other equitable relief to restrain such breach or threat of breach, without disentitling the Company from any other relief in either law or equity.

10. Export Regulations. Consultant acknowledges his obligations to control access to technical data under the U.S. Export Laws and Regulations and agrees to adhere to such laws and regulations with regard to any technical data received or developed under this Agreement.

11. Adherence to Laws. Consultant agrees that in carrying out his duties and responsibilities under this Agreement, he will neither undertake nor cause, nor permit to be undertaken, any activity which either (i) is illegal under any laws, decrees, rules, or regulations in effect in either the United States or any other country in which the Company has a business interest; or (ii) would have the effect of causing the Company to be in violation of any laws, decrees, rules, or regulations in effect in either the United States or any other country in which the Company has a business interest.

12. Warranties & Representations. Consultant hereby represents and warrants to Company that (1) Consultant has the right and authority to enter into this Agreement, (2) Consultant has no conflicts or other obligations which would prevent Consultant from performing under this Agreement, (3) all services, work and deliverables to be performed hereunder shall be performed by him in a professional and workmanlike manner, in accordance with the highest industry standards, and (4) all works of authorship and/or inventions shall be original unless expressly identified as otherwise by Consultant to Company.

13. Indemnification. Consultant shall defend, indemnify and hold harmless the Company and its officers, directors, employees, agents, parent, subsidiaries and other affiliates, from and against any and all damages, costs, liability, and expense whatsoever (including attorneys' fees and related disbursements) incurred by reason of (a) any failure by Consultant to perform any covenant or agreement of Consultant set

Confidential When Completed

forth herein; (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement. The Company shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this section.

14. Entire Agreement/Amendments.    This Agreement replaces and supersedes all prior agreements, relating to the subject matter hereof, between the parties to this agreement. No alteration, modification, amendment or other change of this Agreement shall be binding on the parties unless in writing, approved and executed by Consultant and an authorized officer of the Company, whether by operation of law or otherwise.

15. Assignment. This Agreement is not assignable by Consultant, whether by operation of law or otherwise. This Agreement is freely assignable by Company.

16. Governing Law.    This Agreement shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of New York, excluding conflicts of laws principles, and both parties further consent to jurisdiction by the state and federal courts sitting in the State of New York.

17. Invalidity.    The terms of this Agreement shall be severable so that if any term, clause, or provision hereof shall be deemed invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining terms, clauses and provisions hereof, the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof, they would have executed an agreement containing the remaining terms, clauses and provisions of this Agreement.

18. Waiver of Breach. The waiver by either party hereto of any breach of the terms and conditions hereof will not be considered a modification of any provision, nor shall such a waiver act to bar the enforcement of any subsequent breach.

19 Background, Enumerations and Headings.  The "Background," enumerations and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

20. Company Property.  All Company property in the possession or control of Consultant will be returned by Consultant to the Company on demand, or at the termination of this Agreement, whichever shall come first.

21. Non-Solicitation.  Consultant agrees for a period of two (2) years following termination of this agreement not to solicit, offer to hire and/or hire any Company employee.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first written above.

For Consultant:

Name: Kenneth C. Tola, Jr.
Title: President
Company: BI3, Inc

For Company:

Name:  Alan B. Hamor
Title:  Chairman, CEO

Confidential When Completed

## Appendix A: Scope of Work

For the project AutmoBids.com, Consultant is to provide supporting services to assist Nimble Communications in implementing certain graphics elements into the web site.

For the project AutomoAds.com, Consultant is to provide the following services to the Company:

- Review of initial specification and preparation of a "wireframe" version of the site and application
- Creation of the base UI and supporting code for the campaign planning, keyword generation and targeting application
- Interface with applicable partners or API's
- Creation and coding of the base UI and report schema
- Testing of application
- Assistance in the installation of the application in a production environment

Confidential When Completed

## **Appendix B: Compensation**

For services provided regarding the AutomoBids.com project. Consultant is expected to bill approximately $3,250. which billing shall be included in the Nimble Communications billing. Total $3,250 (for weeks ending 8/6, 8/13).

For services provided regarding the AutomoAds.com project. Consultant is expected to bill approximately $20,000 according to the following schedule:

| | |
|---|---|
| Nimble Communications billing (for weeks ending 8/6, 8/13) | $4,875 |
| Week 1 and 2 ($4,000 each) (for weeks ending 8/20, 8/27) | $8,000 |
| Week 3 and 4 ($3,000 each) (for weeks ending 9/3, 9/10) | $6,000 |

All payments should be made to BI3. Inc within 30 days of the greater of the last date as detailed in the previous paragraph or the receipt of the invoice.

Additional services for other projects. should they occur in the future. will be accounted for under a separate SOW.

Confidential When Completed

forth herein, (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement. The Company shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this section.

14. **Entire Agreement/Amendments.** This Agreement replaces and supersedes all prior agreements relating to the subject matter hereof, between the parties to this agreement. No alteration, modification, amendment or other change of this Agreement shall be binding on the parties unless in writing, approved and executed by Consultant and an authorized officer of the Company, whether by operation of law or otherwise.

15. **Assignment.** This Agreement is not assignable by Consultant, whether by operation of law or otherwise. This Agreement is freely assignable by Company.

16. **Governing Law.** This Agreement shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of New York, excluding conflicts of laws principles, and both parties further consent to jurisdiction by the state and federal courts sitting in the State of New York.

17. **Invalidity.** The terms of this Agreement shall be severable so that if any term, clause, or provision hereof shall be deemed invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining terms, clauses and provisions hereof, the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof, they would have executed an agreement containing the remaining terms, clauses and provisions of this Agreement.

18. **Waiver of Breach.** The waiver by either party hereto of any breach of the terms and conditions hereof will not be considered a modification of any provision, nor shall such a waiver act as bar the enforcement of any subsequent breach.

19. **Background, Enumerations and Headings.** The "Background," enumerations and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

20. **Company Property.** All Company property in the possession or control of Consultant will be returned by Consultant to the Company on demand, or at the termination of this Agreement, whichever shall come first.

21. **Non-Solicitation.** Consultant agrees for a period of two (2) years following termination of this agreement not to solicit, offer to hire and/or hire any Company employee.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first written above.

For Consultant:

Name: Kenneth C. Tola, Jr.
Title: President
Company: BI3, Inc

For Company:

Name: Alan B. Hamor
Title: Chairman, CEO