**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BI3, INC., an Illinois corporation and<br>KENNETH C. TOLA, JR., an Illinois resident | ) | |
| | ) | |
| Plaintiffs, | ) | **08-CV-2384** |
| v. | ) | |
| | ) | **Judge Samuel Der-Yeghiayan** |
| ALAN B. HAMOR, a New Jersey resident, | ) | |
| WK NETWORKS, INC., a Delaware corporation, | ) | **Magistrate Judge Arlander Keys** |
| and CAMPAIGNLOCAL, INC., a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS ALAN B. HAMOR, WK NETWORKS, INC., AND
CAMPAIGNLOCAL INC.'S ANSWER TO PLAINTIFFS' COMPLAINT,
<u>AFFIRMATIVE DEFENSES, AND COUNTERCLAIM</u>**

Defendants, Alan B. Hamor ("Hamor"), WK Networks, Inc. ("WK Networks") and

CampaignLocal Inc. ("CampaignLocal") (collectively, "Defendants"), by their undersigned

attorneys, as and for their answer to Plaintiffs, Kenneth C. Tola, Jr. ("Tola") and BI3, Inc.'s

("BI3") Complaint for Damages, Equitable and Declaratory Relief (the "Complaint"),

Affirmative Defenses, and Counterclaim, hereby state as follows:

## ANSWER TO PLAINTIFFS' COMPLAINT

### Parties And Background

1.　　Kenneth C. Tola, Jr., ("Tola"), is a resident and citizen of the State of Illinois, currently residing at 220 West Scott Street, in the City of Chicago, Cook County, Illinois.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in Paragraph 1 of the Complaint.

2.　　Tola is an information technology expert with over 15 years experience in providing multi-tiered, distributed solutions. Tola's area of expertise include, but are not limited to, network engineering, applications development, systems integration, deep programming, and enterprise architecture.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in Paragraph 2 of the Complaint.

3.　　BI3, Inc., ("BI3"), is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 220 West Scott Street, Chicago, Illinois.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in Paragraph 3 of the Complaint.

4.　　Tola is the President and sole stockholder of BI3.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in Paragraph 4 of the Complaint.

5.　　Alan B. Hamor, ("Hamor"), is a citizen and resident of the State of New Jersey, residing at 22 Meadow Lane, Pennington, New Jersey.

**Answer:** Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6.　　WK Networks, Inc., ("WK Networks"), is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 22 Meadow Lane, Pennington, New Jersey.

**Answer:** Defendants admit the allegations contained in Paragraph 6 of the Complaint.

7.    Hamor is the Chairman and CEO of WK Networks.  On information and belief, Hamor owns a controlling and majority interest in WK Networks.  On information and belief, Hamor is in control of the affairs of WK Networks.

**Answer:**  Defendants admit the allegations contained in Paragraph 7 of the Complaint.

8.    CampaignLocal, Inc. ("CampaignLocal"), is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 22 Meadow Lane, Pennington, New Jersey.

**Answer:**  Defendants admit the allegations contained in Paragraph 8 of the Complaint.

9.    Hamor also is the Chairman and CEO of CampaignLocal.  On information and belief, Hamor owns a controlling and majority interest in CampaignLocal.  On information and belief, Hamor is in control of the affairs of CampaignLocal, Inc.

**Answer:**  With respect to the allegations contained in Paragraph 9 of the Complaint, Defendants admit only that Hamor is the Chairman and CEO of CampaignLocal and that, as such, Hamor maintains control over the affairs of CampaignLocal.  Defendants deny the remaining allegations contained in Paragraph 9 of the Complaint.

10.    Non-party Auto Bid Systems, Inc. ("ABS"), is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 503 Carlisle Drive, Suite 100, Herndon, Virginia.

**Answer:**  With respect to the allegations contained in Paragraph 10 of the Complaint, Defendants admit only that non-party Auto Bid Systems, Inc. ("ABS") is a corporation organized and existing under the laws of the State of Delaware.  Defendants deny the remaining allegations contained in Paragraph 10 of the Complaint.

11.    From its inception in or around December 2005 until January 2007, Hamor also was the Chairman, CEO and a Director of ABS.

**Answer:**  Defendants admit the allegations contained in Paragraph 11 of the Complaint.

12.    ABS was in the business of owning and operating an internet website known as "AutomoBids.com."  BI3's understanding of ABS's AutomoBids.com website was that it was a bidding platform that would be linked to automobile dealer websites that would allow prospective car purchasers viewing a dealer's website to click to ABS's bidding platform to bid on actual dealer vehicles against the dealer's hidden reserve price.

3

**Answer:**  With respect to the allegations contained in Paragraph 12 of the Complaint, Defendants admit only that ABS owned and operated an internet website called "AutomoBids.com."  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 12 of the Complaint.

13.    Non-party, Nimble Communications, LLC, ("Nimble Communications"), is a Virginia limited liability company, with its principal place of business located at 13382 Point Rider Lane, Herndon, Virginia.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 of the Complaint.

**Jurisdiction And Venue**

14.    Subject matter jurisdiction exists by virtue of 28 U.S.C. § 1332, diversity jurisdiction, in that this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

**Answer:**  Defendants neither admit nor deny the allegations contained in Paragraph 14 of the Complaint to the extent they consist of conclusions of law rather than allegations of fact, as no response is required.  With respect to the allegations of fact contained in Paragraph 14 of the Complaint, Defendants admit only that, upon information and belief, this is an action between citizens of different states and that the amount in controversy exceeds $75,000.  Defendants deny that Plaintiffs have been damaged in any amount.

15.    Personal jurisdiction exists over the Defendants in that each defendant has sufficient minimum contacts with the State of Illinois as set forth more fully below.  All defendants engaged in extensive telephone and e-mail communications with Illinois citizens and residents, Tola and BI3.  Defendant Wk Networks entered into contracts with BI3, an Illinois citizen and resident.  Defendants WK Networks and CampaignLocal received the benefits of services provided by Illinois residents, BI3 and Tola.  All defendants engaged in conduct they knew would cause harm to Illinois citizens and residents, Tola and BI3.

**Answer:**  Defendants neither admit nor deny the allegations contained in Paragraph 15 of the Complaint to the extent they consist of conclusions of law rather than allegations of fact, as

no response is required. With respect to the allegations of fact contained in Paragraph 15 of the Complaint, Defendants admit only that Defendant Hamor engaged in telephone calls and e-mail communications with Tola, that Defendant WK Networks entered into the contract attached to the Complaint with BI3, and that BI3 and Tola provided certain technological services to WK Networks. Defendants deny the remaining allegations of fact contained in Paragraph 15 of the Complaint.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims occurred in this district.

**Answer:** Defendants neither admit nor deny the allegations contained in Paragraph 15 of the Complaint to the extent they consist of conclusions of law rather than allegations of fact, as no response is required. To the extent that Paragraph 15 of the Complaint contains allegations of fact, Defendants deny each and every allegation of fact contained in Paragraph 15 of the Complaint.

### Common Factual Allegations

17.    In July 2006, BI3 was contacted by Nimble Communications to perform some relatively minor tasks for Nimble Communications relating to ABS' AutomoBids.com website.

**Answer:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint.

18.    On or about July 31, 2006, BI3 entered into a written Subcontractor Agreement and a written Non-Disclosure Agreement with Nimble Communications.

**Answer:** With respect to the allegations contained in Paragraph 18 of the Complaint, Defendants admit only that, upon information and belief, BI3 entered into a written Subcontractor Agreement and Non-Disclosure Agreement with Nimble Communications. Defendants deny the remaining allegations contained in Paragraph 18 of the Complaint.

19.     Pursuant to the terms of the Subcontractor Agreement, BI3 agreed to perform certain work and services for Nimble Communications related to transforming graphics and images provided or generated by Nimble Communications into web pages that developers at ABS could incorporate into certain websites owned or operated by ABS, including AutomoBids.com.

**Answer:**  With respect to the allegations contained in Paragraph 19 of the Complaint, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations that BI3 agreed to perform certain work and services for Nimble Communications pursuant to the terms of its Subcontractor Agreement.   Defendants deny the remaining allegations contained in Paragraph 19 of the Complaint.

20.     Tola, on behalf of BI3, also executed a written Non-Disclosure Agreement with ABS dated August 7, 2006.

**Answer:**  Defendants admit the allegations contained in Paragraph 20 of the Complaint.

21.     While BI3 was performing services under the Subcontractor Agreement with Nimble Communications, in July and August of 2006, Tola began to interact with ABS' CEO, Hamor, and had several discussions with him by telephone and by e-mail.  Hamor began to discuss with Tola other projects and work unrelated to BI3's contract with Nimble Communications and the possibility of a direct contract between BI3 and either ABS or WK Networks.  Hamor referred to WK Networks as one of his other companies.

**Answer:**  With respect to the allegations contained in Paragraph 21 of the Complaint, Defendants admit only that, in August of 2006, Tola began to interact with Defendant Hamor and communicate with him by telephone and by e-mail and that Hamor began to discuss with Tola the possibility of a direct contract between BI3 and either ABS or WK Networks. Defendants deny the remaining allegations contained in Paragraph 21 of the Complaint.

22.     During this time period, Hamor represented to Tola that ABS' efforts to develop certain additional technology and websites had failed and that Hamor was taking over the technological development effort for ABS.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 22 of the Complaint.

23.    Specifically, Hamor represented that ABS was attempting to develop a website to be known as "AutomoAds.com," which would allow an automobile dealer wishing to list vehicles for sale on the internet to create a list of keywords that would be used in an online Search Engine Marketing ("SEM") Campaign.  A prospective automobile purchaser who conducted an internet search for a vehicle, would "hit" or land upon an advertisement for that dealer's vehicle if the prospective purchaser had used one of the keywords that were selected by the dealer as part of that dealer's SEM Campaign.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 23 of the Complaint.

24.    BI3's work on the AutomoAds.com project would consist of creating a database and web-based interface that provided custom tools which allowed a user to generate a list of geographically based keywords for the automotive industry.  The user would utilize different automobile industry terms, such as selecting makes and models of cars, and would select different geographic locations.  This tool would then output an exhaustive list of keywords that a user could then include in an online Search Engine Marketing ("SEM") campaign through a separate manual process beyond the scope of the AutomoAds.com effort.

**Answer:**  With respect to the allegations contained in Paragraph 24 of the Complaint, Defendants admit only that the AutomoAds.com project would consist of creating a database and web-based interface that provided custom tools which allowed a user to generate a list of geographically based keywords for the automotive industry.  The user would utilize different automobile industry terms, such as selecting makes and models of cars, and would select different geographic locations.  This tool would then output an exhaustive list of keywords that a user could then include in an online Search Engine Marketing campaign.  Defendants deny each and every remaining allegations contained in Paragraph 24 of the Complaint, including those discussing the separate manual process.

25.    By way of example, to aid the Court's understanding, an automobile dealer in Falls Church, Virginia, who was seeking to list model year 2006 Chevrolet Malibus for sale on the internet, would use the AutomoAds.com website to generate keywords such as "Falls Church Malibu," "Virginia Chevrolet," "Malibu 2006 Falls Church," or the like, which the automobile dealer would include in an internet advertisement for such vehicles.  A prospective automobile purchaser searching for a vehicle on the internet might then input terms such as "Chevy Malibu Falls Church, Virginia," into a Search Engine such as Google or Yahoo and would then hit that dealer's advertisement because it included the search terms.

**Answer:** Defendants neither admit nor deny the allegations contained in Paragraph 25 of the Complaint as Paragraph 25 does not contain allegations of fact but merely a purported illustrative hypothetical scenario to which no response is required.

26.    Hamor in New Jersey represented to Tola in Illinois in late September 2006, by telephone, that AutomoBids.com was going to run SEM campaigns using keywords generated from AutomoAds.com to point advertisements to ABS's bidding platform. AutomoBids.com was a landing page system for SEM advertisements. Conceptually, an automobile dealer would use the AutomoAds.com tool to generate the list of geographically-based keywords. A dealer would then create a separate SEM Campaign outside the scope of AutomoAds using the keywords generated. This SEM Campaign would use advertisements that pointed to the AutomoBids landing page system.

**Answer:** With respect to the allegations contained in Paragraph 26 of the Complaint, Defendants admit only that, under the AutomoBids.com concept, an automobile dealer could use the AutomoAds.com tool to generate a list of geographically-based keywords. With respect to those statements contained in Paragraph 26 that are not allegations of fact but, rather hypothetical statements, Defendants neither admit nor deny those statements. Defendants deny each and every remaining allegation of fact contained in Paragraph 26 of the Complaint.

27.    Hamor further represented to Tola that ABS was seeking a developer with the requisite skill set to work with ABS' in-house technology staff to develop the AutomoAds.com website and related technology on ABS' behalf. Hamor represented that BI3 would be appropriate to play that role, given Tola's expertise in information technology development. Hamor actively recruited BI3 for that task.

**Answer:** With respect to the allegations contained in Paragraph 27 of the Complaint, Defendants admit only that Hamor represented to Tola that ABS was seeking a developer with the requisite skill set to develop AutomoAds.com and related technology on ABS' behalf. Defendants deny each and every remaining allegation contained in Paragraph 27 of the Complaint.

28.     In furtherance of ABS' and/or WK Networks' desire to have BI3 contract directly with one of those two companies, Hamor negotiated a Release with Nimble Communications, to release BI3 from its Subcontractor Agreement with Nimble Communications.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 28 of the Complaint.

29.     During August and September of 2006, BI3 received and reviewed various draft contracts to be entered into between BI3 and ABS.

**Answer:**  With respect to the allegations contained in Paragraph 29 of the Complaint, Defendants admit only that Hamor forwarded at least one draft contract to BI3.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 29 of the Complaint.

30.     On or about August 21, 2006, Glen Gulyas, the Chief Operating Officer of ABS, sent to Tola, in Illinois, an e-mail containing a draft contract to be entered into between BI3 and ABS.  Gulyas requested that Tola work with ABS' Chief Technology Officer, Todd Gagorik, to develop an appropriate scope of work for the contract between BI3 and ABS.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint.

31.     In early September 2006, Hamor interceded and instructed Tola that all further contract negotiations between BI3 and ABS should be conducted with Hamor.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 31 of the Complaint.

32.     Thereafter, Tola, on behalf of BI3, proposed modifications to the draft contract to Hamor by e-mail.

**Answer:**  Defendants admit the allegations contained in Paragraph 32 of the Complaint.

33.     On or about September 5, 2006, Hamor sent a revised contract to be entered into between ABS and BI3.

**Answer:**  Defendants admit the allegations contained in Paragraph 33 of the Complaint.

34.     On or about September 6, 2006, Tola, on behalf of BI3, again proposed revisions to the contract and returned it to Hamor by e-mail.

**Answer:**  Defendants admit the allegations contained in Paragraph 34 of the Complaint.

35.     Discussions continued regarding the proposed contract between ABS and BI3 during September 2006.

**Answer:**  Defendants admit the allegations contained in Paragraph 35 of the Complaint.

36.     In a series of telephone conversations between September 26 and September 29, 2006, Hamor informed Tola, that ABS and WK Networks had decided that the AutomoAds.com development effort should be done through WK Networks, rather than ABS.  Hamor represented that, to this end, ABS and WK Networks had agreed that BI3 should contract directly with WK Networks for the development of AutomoAds.com.  Hamor further represented that the two companies had agreed that WK Networks would own the technology related to the AutomoAds.com development which BI3 was going to create.  Hamor instructed Tola that BI3 should not execute the contract with ABS, instead BI3 would execute a contract with WK Networks.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 36 of the

Complaint.

37.     Hamor further represented that WK Networks owned stock in ABS and he described ABS as a WK Networks "investment project." At that time Hamor was Chairman and CEO of both ABS and WK Networks.

**Answer:**     With respect to the allegations contained in Paragraph 37 of the

Complaint, Defendants admit only that Hamor was Chairman and CEO of both ABS and WK

Networks in September 2006.  Defendants deny the remaining allegations contained in

Paragraph 37 of the Complaint.

38.     Tola reasonably believed that Hamor had the authority to speak on behalf of both ABS and WK Networks as CEO of both companies.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in Paragraph 38 of the Complaint.

39.     Pursuant to this telephone conversation, Hamor, on September 29, 2006, sent Tola by e-fax, a Consulting Agreement to be entered into between BI3 and WK Networks.

**Answer:**  With respect to the allegations contained in Paragraph 39 of the Complaint, Defendants admit only that Hamor sent Tola a Consulting Agreement to be entered into by BI3 and WK Networks.  Defendants deny the remaining allegations contained in Paragraph 39 of the Complaint.

40.     On September 29, 2006, Tola, on behalf of BI3, executed the written Consulting Agreement with WK Networks relating to the AutomoAds.com project, dated August 1, 2006, and faxed it back to Hamor.  The Consulting Agreement also contained provisions relating to payment for work BI3 already had performed relating to AutomoBids.com.  A true and accurate copy of the Consulting Agreement is attached hereto, incorporated herein and marked for reference as Exhibit A.

**Answer:**  With respect to the allegations contained in Paragraph 40 of the Complaint, Defendants admit only that on September 29, 2006, Tola executed the written Consulting Agreement with WK Networks, dated August 1, 2006, on behalf of BI3, and faxed it to Hamor, the terms of said Consulting Agreement speak for themselves.  Defendants deny the remaining allegations contained in Paragraph 40 of the Complaint.

41.     On or about October 2, 2006, Hamor executed the Consulting Agreement on behalf of WK Networks and returned it to Tola.

**Answer:**  Defendants admit the allegations contained in Paragraph 41 of the Complaint.

42.     Tola and BI3 reasonably relied on Hamor's representations that there was an agreement between ABS and WK Networks for WK Networks to develop AutomoAds to the mutual benefit of ABS and WK Networks and that BI3 would develop AutomoAds under a direct contract with WK Networks.  At this time, Hamor was CEO and Chairman of both ABS and WK Networks.

**Answer:**  With respect to the allegations contained in Paragraph 42 of the Complaint, Defendants admit only that Hamor was CEO and Chairman of both ABS and WK Networks on October 2, 2006.  Defendants deny the remaining allegations contained in Paragraph 42 of the Complaint.

43.     Hamor, acting as CEO and Chairman of both ABS and WK Networks instructed Tola and BI3 that, pursuant to the terms of the Confidentiality provisions of the Consulting

Agreement, all communications between ABS and Tola or BI3 should be only with Hamor as CEO and Chairman of both companies. Hamor further directed Tola and BI3 that if they received inquires [sic] from ABS personnel or even from Nimble Communications personnel, Tola and BI3 should inform Hamor of the inquiry or communication and Hamor would direct the appropriate response.

**Answer:** Defendants deny each and every allegation contained in Paragraph 43 of the Complaint.

44.    Tola and BI3 adhered to the restrictions Hamor placed on communications with ABS and others.

**Answer:** Defendants deny each and every allegation contained in Paragraph 44 of the Complaint.

45.    As compensation for the work performed pursuant to the Consulting Agreement with WK Networks, BI3 was to receive approximately $3,250 for services provided relating to AutomoBids.com, which was to be included in the bills submitted by Nimble Communications, and approximately $20,875, for services provided from August 1, 2006 through September 10, 2006. Thereafter, BI3 was to be compensated at a weekly rate of $3,000, per week.

**Answer:** With respect to the allegations contained in Paragraph 45 of the Complaint, Defendants admit only that BI3 was to be compensated for work performed under the Consulting Agreement at a weekly rate of $3,000 per week pursuant to the Consulting Agreement. Defendants deny each and every remaining allegation contained in Paragraph 45 of the Complaint.

46.    Despite the fact that contract documents were not fully executed until October 2, 2006, BI3 began work on the projects in early August 2006.

**Answer:** Upon information and belief, Defendants admit the allegations contained in Paragraph 46 of the Complaint.

47.    On or about October 19, 2006, Tola conducted a demonstration of the AutomoAds.com tool for a company known as the JAR Group. The demonstration occurred by teleconference and included an internet-based demonstration of the website's functionality. Tola, Hamor, Jason Coyle and A.J. Lawrence from the JAR Group participated in the demonstration.

**Answer:**  With respect to the allegations contained in Paragraph 47 of the Complaint, Defendants admit only that a demonstration of the AutomoAds.com tool took place for a company known as the JAR Group, that the demonstration took place over the telephone and included an internet-based demonstration for the website's functionality and that Tola, Hamor, Jason Coyle and A.J. Lawrence of the JAR Group participated in the demonstration.  Defendants deny each and every remaining allegation contained in Paragraph 47 of the Complaint and specifically deny that the demonstration took place on October 19, 2006.

48.    After the demonstration, the JAR Group informed Hamor and Tola that, while the AutomoAds tool was interesting, it was not valuable to them because the tool did not perform Search Engine Marketing management functions.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 48 of the Complaint.

49.    In early November 2006, as a result of the meeting with the JAR Group, Hamor requested that BI3 cease work on the AutomoAds.com project.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 49 of the Complaint.

50.    Shortly thereafter, in November of 2006, Hamor, as CEO of WK Networks, represented to BI3 that WK Networks had decided to redirect efforts from AutomoAds to building a new Search Engine Marketing management platform to be called CampaignLocal, in part to address the comments made by the JAR Group who were experts in the SEM management field.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 50 of the Complaint.

51.    Hamor, as CEO of WK Networks, informed BI3 that CampaignLocal would be owned by WK Networks and ABS would be merely a re-seller of CampaignLocal's services. Hamor further represented to BI3 that ABS would receive up to 5% ownership of CampaignLocal based on ABS investing up to $50,000, in CampaignLocal.

**Answer:**  Defendants admit the allegations contained in Paragraph 51 of the Complaint, except Defendants state that to the extent that, by the order of the Paragraphs of the Complaint, Plaintiffs allege or imply that the events contained in the allegations of Paragraph 51 of the Complaint took place in November of 2006, Defendants deny any such allegation and/or implication.

52.    The CampaignLocal effort underwent several major revisions.  The initial focus of CampaignLocal was to provide a custom set of online tools that allowed users to easily create SEM campaigns for different types of automobiles.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 52 of the Complaint.

53.    BI3 began work on the various CampaignLocal efforts in November 2006 with the understanding that, pursuant to the Consulting Agreement dated August 1, 2006, BI3 would be compensated at the weekly rate of $3,000, per week.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 53 of the Complaint.

54.    Throughout August-November of 2006, BI3 sent invoices to Hamor, as CEO of WK Networks, for work related to the AutomoAds.com project and the CampaignLocal project, based on a weekly rate of $3,000, per week.

**Answer:**  With respect to the allegations contained in Paragraph 54 of the Complaint, Defendants admit only that BI3 sent some invoices to Hamor, during the period of August-November of 2006, based on a weekly rate of $3,000 per week.  Defendants deny each and every remaining allegation contained in Paragraph 54 of the Complaint.

55.    WK Networks, and sometimes ABS on behalf of WK Networks, made sporadic payments at best to BI3.  ABS made payments to BI3 on October 1, 2006, for $10,000; on October 16, 2006, for $7,500; and on December 6, 2006, for $8,000.  WK Networks made one payment through its CampaignLocal entity on December 21, 2006, for $7,500.

**Answer:**  With respect to the allegations contained in Paragraph 55 of the Complaint, Defendants admit only that payments were made to BI3 in the amounts of $10,000, $7,500 and

$8,000.  Defendants deny each and every remaining allegation contained in Paragraph 55 of the Complaint.

56.    On or about November 11, 2006, Hamor informed BI3 by e-mail that he no longer wanted to receive invoices directly from BI3.  In a subsequent telephone conversation on that date, Tola expressed concern about non-payment to BI3 and Hamor stated that he knew the payment amounts and was working to get the past due amounts paid.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 56 of the Complaint.

57.    BI3 performed work on the CampaignLocal projects through the end of December 2006.

**Answer:**  With respect to the allegations contained in Paragraph 57 of the Complaint, Defendants admit only that BI3 performed certain work through the end of December 2006. Defendants deny each and every remaining allegation contained in Paragraph 54 of the Complaint.

58.    Despite the sporadic payments made by ABS and WK Networks, WK Networks owed BI3 $39,125, at the end of December 2006.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 58 of the Complaint.

59.    In late December 2006, on or about December 27, 2006, in a telephone conversation between Tola and Hamor, BI3 informed WK Networks that it was going to cease all work for WK Networks due to severe non-payment.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 59 of the Complaint.

60.    Hamor, on behalf of WK Networks, implored BI3 to develop a proposal that would provide WK Networks some short term relief from the amounts owed to BI3 and would give BI3 some long term benefit satisfactory to BI3 such that BI3 would continue working on the various WK Networks projects, including CampaignLocal.

**Answer:**   Defendants deny each and every allegation contained in Paragraph 60 of the Complaint.

61.     Over the next two days, BI3 and WK Networks engaged in various discussions by telephone regarding the terms of a proposed contract modification.

**Answer:**   Defendants deny each and every allegation contained in Paragraph 61 of the Complaint.

62.     On January 8, 2007, Tola, on behalf of BI3, e-mailed to Hamor, on behalf of WK Networks a set of Terms and Conditions under which BI3 would be willing to continue working for WK Networks on its various projects, including CampaignLocal.

**Answer:**   Defendants deny each and every allegation contained in Paragraph 62 of the Complaint.

63.     BI3 proposed to continue work on CampaignLocal during 2007 and to defer payment for the first three months of 2007 if WK Networks agreed to pay the total amounts past due by the end of March 2007; to compensate BI3 for the work on a monthly basis such that BI3 would achieve a fee of $250,000 for 2007; and to grant to Ken Tola a 20% interest in CampaignLocal, Inc.

**Answer:**   Defendants deny each and every allegation contained in Paragraph 63 of the Complaint.

64.     Shortly after the January 8, 2007 e-mail, Hamor in New Jersey called Tola in Illinois on the telephone and agreed to the terms and conditions set forth in the January 8, 2007 e-mail, on behalf of WK Networks.  WK Networks agreed to pay the $39,125 past due by the end of March 2007, and a fee of $250,000 for 2007 paid in monthly installments beginning in April 2007.  Hamor also agreed to grant Tola a 20% interest in CampaignLocal under a new ownership agreement to be worked out between the parties.

**Answer:**   Defendants deny each and every allegation contained in Paragraph 64 of the Complaint.

65.     Unbeknownst to Tola and BI3, during the last quarter of 2006, Hamor and ABS began having serious disputes regarding WK Networks' ownership of the technology BI3 was creating for the AutomoAds.com and CampaignLocal projects.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 65 of the Complaint.

66.    In early January 2007, Hamor informed Tola that he was engaged in a dispute with the ABS Board of Directors and likely was going to be replaced as CEO.  Shortly thereafter, Hamor informed Tola that he had in fact been terminated as CEO of ABS and likely was going to be sued by ABS.

**Answer:**  With respect to the allegations contained in Paragraph 66 of the Complaint, Defendants admit only that Hamor informed Tola in early January 2007 that he was engaged in a dispute with ABS.  Defendants deny each and every remaining allegation contained in Paragraph 66 of the Complaint.

67.    In early January 2007, Hamor also informed Tola that that he wanted to change the focus of CampaignLocal from an SEM submission company to a multi-media campaign management company whose potential customers would not be limited to the automobile industry.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 67 of the Complaint.

68.    Tola immediately expressed concern to Hamor regarding the dispute with ABS and whether Tola personally or BI3 were at risk as a result of the work being performed.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 68 of the Complaint.

69.    Hamor assured Tola that neither Tola nor BI3 could be sued by ABS because BI3 was a subcontractor of WK Networks.  Hamor informed Tola that BI3 was obligated to continue its work under the Consulting Agreement with WK Networks.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 69 of the Complaint.

70.    As a result of Hamor's desire to change the focus of CampaignLocal, as stated above, BI3 made numerous proprietary modifications to the earlier version of CampaignLocal. BI3 wanted to ensure that nothing related to the earlier version of CampaignLocal or AutomoAds was used in the development of this new version of CampaignLocal due to the dispute with ABS. BI3 therefore created an entirely new codebase, built from the ground up, that was only remotely

connected to the original version of CampaignLocal through some basic, non-proprietary, SEM-related concepts.

**Answer:**  Defendants deny the allegation that states "As a result of Hamor's desire to change the focus of CampaignLocal, as stated above."  Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegation contained in Paragraph 70 of the Complaint

71.    During January-March 2007, BI3 continued working on the various CampaignLocal projects.

**Answer:**  Defendants admit the allegations contained in Paragraph 71 of the Complaint.

72.    In February 2007, in addition to working on the CampaignLocal projects for WK Networks, Hamor requested that BI3 begin working on another project called TargetIQ.  This project focused on the use of manually uploaded data from customers visually displayed on local maps to help customers visualize their local markets.  BI3 successfully completed the entire infrastructure for this project when WK Networks terminated the effort to create the actual maps in May 2007.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 72 of the Complaint.

73.    During April 2007, WK Networks made 3 payments to BI3 totaling only $18,000 and provided to Tola a "CAP Chart," ostensibly showing a 17.1% ownership interest in CampaignLocal for Tola, although neither Tola nor BI3 had any knowledge of the organization or incorporation surrounding CampaignLocal, Inc. When queried, Hamor asserted that he could not honor the agreed-upon 20% ownership due to what he termed "shareholder restrictions."

**Answer:**  Defendants deny each and every allegation contained in Paragraph 73 of the Complaint.

74.    In March 2007, ABS filed a lawsuit against Hamor, WK Networks, CampaignLocal, BI3 and Tola in the United States District Court for the Eastern District of Virginia alleging breach of fiduciary duty, usurpation of corporate opportunity, theft of trade secrets and business conspiracy.  That suit was later dismissed by ABS and filed in state court in the Circuit Court of Fairfax County, Virginia in May 2007 under Case No.  2007 CL 5112 ("the ABS lawsuit.") Tola and BI3 first became aware of the ABS lawsuit in early April 2007.

**Answer:**  With respect to the allegations contained in Paragraph 74 of the Complaint, Defendants admit only that ABS filed a lawsuit against Hamor, WK Networks, CampaignLocal, BI3 and Tola in the United States District Court for the Eastern District of Virginia in March 2007, and that that suit was later dismissed by ABS and filed in state court in the Circuit Court of Fairfax County, Virginia in May 2007, the complaints in those actions speak for themselves. Defendants deny each and every remaining allegation contained in Paragraph 74 of the Complaint.

75.    The ABS lawsuit alleged, in part, that Tola and BI3 conspired with Hamor and WK Networks to deprive ABS of the work product BI3 had created for AutomoBids.com and AutomoAds.com and to direct opportunities and potential clients and customers related to AutomoAds.com to WK Networks and CampaignLocal.

**Answer:**  Defendants admit the existence of the ABS lawsuit, the contents of which speak for itself.  Defendants deny each and every remaining allegation contained in Paragraph 75 of the Complaint.

76.    The allegations of the ABS lawsuit directly contradicted Hamor's earlier representations to Tola and BI3 that ABS and WK Networks had agreed to develop AutomoAds.com through a direct contract between BI3 and WK Networks.

**Answer:**  Defendants admit the existence of the ABS lawsuit, the contents of which speaks for itself.  Defendants deny each and every remaining allegation contained in Paragraph 76 of the Complaint.

77.    Upon receiving the ABS Complaint in early April 2007, Tola immediately called Hamor on the telephone and told Hamor that he wanted to contact ABS directly to discuss the allegations of the lawsuit because neither Tola nor BI3 had conspired with Hamor or WK Networks or engaged in any improper conduct.

**Answer:**  With respect to the allegations contained in Paragraph 77 of the Complaint, Defendants admit only that Tola called Hamor on the telephone after receiving the ABS

complaint.  Defendants deny each and every remaining allegation contained in Paragraph 77 of the Complaint.

78.     Hamor represented to Tola during this telephone conversation that Tola and BI3 were not allowed to speak to ABS regarding the lawsuit because BI3 was a subcontractor of WK Networks and bound by the Confidentiality provisions of the Consulting Agreement.  Tola informed Hamor that he had no intent of disclosing confidential information to ABS but Hamor told him that this did not matter.  Hamor told Tola that if Tola spoke to ABS and if it all damaged Hamor's position in the ABS lawsuit, Hamor would sue him for breach of the Consulting Agreement.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 78 of the Complaint.

79.     Tola expressed disbelief at this.  Hamor then told Tola that if Tola did not believe him, Tola could ask attorney Scott Kaliko, whom Hamor had retained to serve as counsel regarding the ABS lawsuit.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 79 of the Complaint.

80.     Kaliko reinforced Hamor's assertions that Tola and BI3 were not allowed to contact ABS to discuss the lawsuit.  Kaliko informed Tola that if he spoke to ABS he would be exposing himself and BI3 to liability to Hamor and his companies.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 80 of the Complaint.

81.     Kaliko, at Hamor's direction, began representing all defendants in the ABS lawsuit, including Tola and BI3, despite the obvious potential conflict of interest in the joint representation.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 81 of the Complaint.

82.     As a result of the conversations with Hamor and Kaliko, Tola and BI3 believed they did not have the right to obtain their own counsel and pursue their own defense to the ABS lawsuit.  Rather, Tola and BI3 believed they had no options other than to continue working under the Consulting Agreement and to leave the defense of the ABS lawsuit to Hamor.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 82 of the Complaint.

83.    Hamor began using the ABS lawsuit as leverage against Tola and BI3 in May 2007.  When BI3 requested further monthly payments, Hamor represented that WK Networks did not have funds available to pay BI3 because of the ABS lawsuit.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 83 of the Complaint.

84.    In addition, Hamor used the ABS lawsuit as a means of extracting further work from BI3 without making any payments to BI3.  Hamor told BI3 that if BI3 failed to keep CampaignLocal running and its clients satisfied that CampaignLocal would go bankrupt and BI3 would be liable for breach of the Consulting Agreement.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 84 of the Complaint.

85.    In addition to the development work being performed under the contracts, BI3 became responsible for client management functions, running the SEM campaigns, serving in essence as the Chief Technology Officer for CampaignLocal, and performing a myriad of other information technology related tasks that were not required by the contracts.

**Answer:**  With respect to the allegations contained in Paragraph 85 of the Complaint, Defendants admit only that Plaintiffs were involved in technology-related tasks and some client management functions for CampaignLocal.  Defendants deny each and every remaining allegation contained in Paragraph 85 of the Complaint.

86.    Hamor also informed BI3 that, without the revenue from CampaignLocal, BI3 would have to start paying attorney's fees to Kaliko for defending the ABS lawsuit despite the fact that BI3 and Tola were led to believe that they could not choose their own counsel for the lawsuit.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 86 of the Complaint.

87.    Hamor told Tola that he had to become a Director and Secretary of CampaignLocal in order to keep CampaignLocal operational.  Again, Hamor represented to BI3

that failure to keep CampaignLocal operational would result in BI3 having to pay to defend the ABS lawsuit and expose BI3 to liability for breach of the Consulting Agreement.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 87 of the

Complaint.

88.    During this time, Hamor also was placing extreme time deadlines on BI3 to complete various projects, threatening that CampaignLocal would go bankrupt if these projects were not completed on time, although there were never any time deadlines set forth in the contracts.  This precluded BI3 from obtaining other clients.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 88 of the

Complaint.

89.    BI3 continued and completed the various projects for WK Networks, including those projects related to CampaignLocal.  BI3's last task for WK Networks was completed in August 2007.

**Answer:**  With respect to the allegations contained in Paragraph 89 of the Complaint,

Defendants admit only that BI3's last task for WK Networks was completed in August 2007.

Defendants deny each and every remaining allegation contained in Paragraph 89 of the

Complaint.

90.    WK Networks failed to make any monthly payments to BI3 during 2007, except for the payments during April 2007, totaling $18,000.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 90 of the

Complaint.

91.    Between August 2006, when BI3 began performing services on the AutomoBids.com and AutomoAds.com projects, and August 2007, when BI3 completed its last task for WK Networks, BI3 received approximately $50,000 in payments from ABS, WK Networks, or CampaignLocal.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 91 of the

Complaint.

92.    During previous years, BI3's average income was in the $250,000 range.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92 of the Complaint.

93.    BI3 was devastated financially by reason of its engagement with Hamor and WK Networks.  During this time period, the demands placed on BI3 precluded it from seeking other work.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 93 of the Complaint.

94.    There is currently due and owing under the Consulting Agreement and the January 8, 2007, contract, a total sum of $271,125 from WK Networks to BI3 for the work performed under the contracts.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 94 of the Complaint.

95.    There is currently due and owing under the Consulting Agreement and the January 8, 2007, contract, a total sum of $271,125 from WK Networks to BI3 for the work performed under the contracts.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 95 of the Complaint.

96.    Kaliko eventually withdrew from representing the defendants in the ABS lawsuit due to a payment dispute and was replaced by attorneys Jenice Malecki and Daniel Ball, who likewise represented all defendants in the ABS lawsuit.

**Answer:**  Defendants admit the allegations contained in Paragraph 96 of the Complaint.

97.    In October 2007, Malecki and Ball informed Tola that they were no longer able to continue representing him and BI3 in the ABS lawsuit due to conflicts of interest.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 97 of the Complaint.

98.    BI3 and Tola believed this now gave them the freedom to obtain counsel of their own choice to defend themselves in the ABS lawsuit and did in fact secure counsel of their own choice.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 of the Complaint.

99.    Malecki and Ball withdrew entirely from the ABS lawsuit in late December 2007, due to the prior conflict of interest in the joint representation of all defendants.

**Answer:**  With respect to the allegations contained in Paragraph 99 of the Complaint, Defendants admit only that Malecki and Ball withdrew from the ABS lawsuit in late December 2007.  Defendants deny each and every remaining allegation contained in Paragraph 77 of the Complaint.

100.    Tola and BI3 were dismissed from the ABS lawsuit on or about February 22, 2008.

**Answer:**  With respect to the allegations contained in Paragraph 100 of the Complaint, Defendants admit only that an Order of Nonsuit of Claims was entered by the Circuit Court of Fairfax County, Virginia on February 22, 2008 and that the claims against Tola and BI3 were nonsuited and dismissed from the ABS lawsuit without prejudice.

101.    As a result of BI3's reliance on Hamor's representations that there was an agreement between WK Networks and ABS for BI3 to contract directly with WK Networks and as a result of BI3's work on the various projects under its contracts with WK Networks, BI3 and Tola became defendants in the ABS lawsuit and were forced to incur attorney's fees and costs to defend themselves in an amount to be proven at trial.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 101 of the Complaint.

102.    On or about January 24, 2008, counsel for Tola and BI3 sent correspondence to counsel for Hamor, WK Networks, and CampaignLocal, demanding payment on behalf of BI3. To date, no response has been received from Hamor, WK Networks, or CampaignLocal.

**Answer:**  With respect to the allegations contained in Paragraph 102 of the Complaint, Defendants admit only that counsel for Tola and BI3 sent correspondence dated January 24,

2008 to counsel for Defendants, the contents of which speak for itself, and that they have not provided counsel for Tola and BI3 with a response to the correspondence.

### Count I: Breach Of Contract And Quantum Meruit Against WK Networks

103.    BI3 incorporates by reference herein the allegations of Paragraphs 1-102 of this Complaint as if the same were fully set forth herein.

**Answer:**    Defendants repeat and incorporate their responses to Paragraphs 1-102 as though fully set forth herein.

104.    BI3 entered into certain contracts with WK Networks related to AutomoAds, CampaignLocal, and TargetIQ.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 104 of the Complaint.

105.    BI3 completed all the work required of it under the contracts.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 105 of the Complaint.

106.    WK Networks has failed and refused to pay BI3 according to the terms of the contracts.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 106 of the Complaint.

107.    BI3 has made demand upon WK Networks for payment but WK Networks has failed and refused to pay.

**Answer:**    With respect to the allegations contained in Paragraph 107 of the Complaint, Defendants admit only that BI3 has made certain demands upon WK Networks for payments and that WK Networks properly has refused to pay any demand for payment in excess of the amount properly owed to BI3.    Defendants deny each and every remaining allegation contained in Paragraph 107 of the Complaint.

108.    BI3 performed additional work for WK Networks outside the scope of the contracts.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 108 of the Complaint.

109.    BI3 has not received any compensation for the additional work it performed for WK Networks.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 109 of the Complaint.

110.    It would be inequitable for WK Networks to retain the benefits of the additional work without paying for the reasonable value of the services provided.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 110 of the Complaint.

111.    The reasonable value of the additional services provided by BI3 is not less than $75,000.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 111 of the Complaint.

### Count II: Unjust Enrichment/
### Quantum Meruit Against WK Networks And CampaignLocal

112.    BI3 incorporates by reference herein the allegations of Paragraphs 1-111 of this Complaint, as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-111 as though fully set forth herein.

113.    BI3 conferred a benefit upon WK Networks and CampaignLocal by providing valuable services related to the various WK Networks and CampaignLocal projects as alleged above.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 113 of the Complaint.

114.    These services were provided at the direction and request and with the knowledge of WK Networks and CampaignLocal.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 114 of the Complaint.

115.    WK Networks and CampaignLocal knew that BI3 was conferring a benefit on it by providing services and WK Networks and CampaignLocal have accepted and retained the benefit.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 115 of the Complaint.

116.    It would be inequitable for WK Networks and CampaignLocal to retain the benefits conferred by BI3 without paying for the same.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 116 of the Complaint.

117.    BI3 has requested payment from WK Networks and CampaignLocal but WK Networks and CampaignLocal have failed and refused to pay.

**Answer:**    With respect to the allegations contained in Paragraph 117 of the Complaint, Defendants admit only that BI3 has requested payment from Defendants for amounts purportedly owed and that Defendants properly have refused to pay any demand for payment in excess of the amount properly owed to BI3.  Defendants deny each and every remaining allegation contained in Paragraph 117 of the Complaint.

118.    WK Networks and CampaignLocal are obligated to pay for the reasonable value of the services it accepted from BI3.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 118 of the Complaint.

119.    The reasonable value of the services provided by BI3 and accepted and retained by WK Networks and CampaignLocal is at least $346,125.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 119 of the Complaint.

### Count III: Fraud By WK Networks And Hamor

120.    BI3 incorporates by reference herein the allegations Paragraphs 1-119 of this Complaint as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-119 as though fully set forth herein.

121.    Hamor, as CEO and Chairman of WK Networks, represented to BI3 that there was an agreement between ABS and WK Networks, related to the development of AutomoAds, whereby ABS had agreed that BI3 should contract directly with WK Networks to develop AutomoAds.  This representation occurred in a series of telephone conversations between September 26, 2006, and September 29, 2006, between Hamor in New Jersey and Tola in Illinois.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 121 of the Complaint.

122.    This representation was false - ABS never agreed with WK Networks to have BI3 contract directly with WK Networks to develop AutomoAds.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 122 of the Complaint.

123.    Had BI3 known that this representation was false, BI3 never would have contracted with WK Networks.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 123 of the Complaint.

124.    BI3 reasonably relied on Hamor's false representations and entered into the contract with WK Networks.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 124 of the Complaint.

125.    BI3 reasonably believed that Hamor had authority to speak for both ABS and WK Networks as, at that time, he was CEO of both companies.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 125 of the Complaint.

126.    In reliance on Hamor's false representations, BI3 provided services to WK Networks for which WK Networks has yet to pay BI3.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 126 of the Complaint.

127.    In reliance on Hamor's false representations, BI3 was sued by ABS in Virginia and had to engage its own counsel to defend itself, incurred legal fees and costs.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 127 of the Complaint.

128.    As a result of BI3's reasonable reliance on Hamor's false representations, BI3 has suffered damages including the value of the services for which WK Networks has not paid, legal fees and costs incurred in defending the Virginia lawsuit, and loss of other business opportunities.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 128 of the Complaint.

129.    Hamor knew or should have known that his representations that ABS and WK Networks had agreed that BI3 should contract directly with WK Networks to develop AutomoAds was false.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 129 of the Complaint.

130.    Hamor intended for BI3 to rely on this representation and BI3 did in fact rely on the representation to its detriment.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 130 of the Complaint.

131.    Hamor's and WK Networks' conduct was willful, wanton, extreme and outrageous, and warrants the imposition of punitive damages.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 131 of the

Complaint.

### Count IV: Fraud - Rescission Of Assignment - Punitive
### Damages Against Hamor And CampaignLocal

132.    Tola incorporates by reference the allegations of Paragraphs 1-131, of this Complaint as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-131 as

though fully set forth herein.

133.    During February 2007, Tola and non-party Earl K. Grant-Lawrence, a citizen and resident of the State of Texas, conceived of a new piece of technology that would allow website tracking across sites and over extended periods of time, which they eventually came to call "Data Trender."

**Answer:**  Defendants deny each and every allegation contained in Paragraph 133 of the

Complaint.

134.    The Data Trender idea was unrelated to the business of ABS, WK Networks, or CampaignLocal and was unrelated to BI3's contracts with WK Networks.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 134 of the

Complaint.

135.    Tola gratuitously and without any duty to do so, introduced the Data Trender idea to Hamor in late February 2007, informing Hamor that he wanted to cut back on the work he was doing for BI3 related to WK Networks' and CampaignLocal's projects, in order to develop the Data Trender idea with Grant-Lawrence.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 135 of the

Complaint.

136.    Hamor immediately began scheming to fraudulently obtain a controlling interest in this new technology.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 136 of the Complaint.

137.    Within a few days of Tola introducing the Data Trender idea to Hamor, Hamor called Tola and Grant-Lawrence on the telephone and represented to them that he had discussed the idea in general terms with certain "high-level contacts" he had at Yahoo, Microsoft, and Google.  Hamor represented that these alleged high-level contacts were interested in purchasing or licensing Data Trender.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 137 of the Complaint.

138.    Hamor also represented that these alleged high-level contacts at Yahoo, Microsoft, and Google, wanted to see a prototype of Data Trender.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 138 of the Complaint.

139.    Hamor further represented that these alleged high-level contacts at Yahoo, Microsoft, and Google, only wanted to deal with Hamor or one of Hamor's companies and that their potential interest in Data Trender and in dealing with Hamor was due in part to the "general excitement" surrounding the formation of CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 139 of the Complaint.

140.    Hamor represented to Tola and Grant-Lawrence that he could quickly arrange for a sale or license of the Data Trender invention based on the conversations he had with his high level contacts.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 140 of the Complaint.

141.    Hamor informed Tola and Grant-Lawrence that they needed to move quickly in developing the prototype and to draft a provisional patent application so that they could sell or license the invention.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 141 of the Complaint.

142.    Hamor intended for Tola and Grant-Lawrence to rely on these representations.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 142 of the Complaint.

143.    Tola and Grant-Lawrence did in fact rely on these representations.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 143 of the Complaint.

144.    In reliance on Hamor's representations, Tola and Grant-Lawrence expended great time and energy in developing a prototype of Data Trender and Tola expended great time and effort in drafting a Provisional Patent Application.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 144 of the Complaint.

145.    Hamor's representations that: (1) he had "high level contacts" at Yahoo, Microsoft, and Google; (2) he had discussed the Data Trender idea generally with these contacts; (3) his contacts were very interested in purchasing or licensing Data Trender; (4) his contacts wanted to see a prototype; and (5) his contacts wanted to deal only with Hamor or one of his companies, were false.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 145 of the Complaint.

146.    Hamor knew these representations were false when he made the representations.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 146 of the Complaint.

147.    Hamor made these false representations as part of a fraudulent scheme to deceive Tola and Grant-Lawrence and to deprive them of their rights to the Data Trender invention.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 147 of the Complaint.

148.    In furtherance of his scheme to defraud, Hamor sent to Tola and Grant-Lawrence a document entitled "Assignment" for them to execute purportedly transferring their rights in Data Trender to CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 148 of the Complaint.

149.    Upon receiving the Assignment document, Grant-Lawrence called Tola on the telephone to discuss the same, whereupon Tola and Grant-Lawrence then called Hamor.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 149 of the Complaint relating to conversations between Tola and Grant-Lawrence.  Defendants deny each and every remaining allegation contained in Paragraph 149 of the Complaint.

150.    During this conversation, Tola and Grant-Lawrence questioned Hamor as to why they should assign their rights as inventors, including inventors' rights of ownership and control of the patent asset, to CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 150 of the Complaint.

151.    Hamor assured them that they were not in fact relinquishing any rights as inventors to the Data Trender invention and represented that the language of the Assignment was just "legalese" or "legal talk" necessary to allow CampaignLocal, Inc. to file the Provisional Patent Application.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 151 of the Complaint.

152.    Tola and Grant-Lawrence were still unconvinced, so Hamor offered to connect one of his intellectual property attorneys, Jeffrey Brandt on the telephone.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 149 of the Complaint relating to the mental impressions of Tola and Grant-Lawrence.  Defendants deny each and every remaining allegation contained in Paragraph 152 of the Complaint.

153.    Hamor then put Tola and Grant-Lawrence on hold to call Jeffrey Brandt and after about 10 minutes, Hamor and Brandt joined Tola and Grant-Lawrence on the telephone.

**Answer:**  With respect to the allegations contained in Paragraph 153 of the Complaint, Defendants admit only that a brief telephone conversation between Defendant Hamor, Tola, and Grant-Lawrence took place relating to the assignments of rights.  Defendants deny each and every remaining allegation contained in Paragraph 153 of the Complaint.

154.    Brandt represented on the telephone with Tola, Grant-Lawrence, and Hamor, that Tola and Grant-Lawrence were not in fact relinquishing their rights as inventors to Data Trender. Brandt represented to Tola and Grant-Lawrence during this telephone conversation that they needed to have a corporation to file the Provisional Patent Application.  Brandt stated in effect that that was how things were done before the Patent & Trademark Office.  Brandt further represented that individuals could not file patent applications; that it had to be done by a corporation.  Brandt further stated that if Tola and Grant-Lawrence wanted to form their own corporation to file the Provisional Patent Application it would take a lot of time and cost thousands of dollars for them to do it.  Brandt and Hamor assured Tola and Grant-Lawrence that they should rely on Brandt's statements because he had extensive patent experience and that Tola and Grant-Lawrence 'didn't know what [they] were doing,' when it came to filing patent applications or provisional patent applications.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 154 of the Complaint.

155.    Tola had never filed a patent application before and therefore had no experience in pursuing patent applications before the Patent & Trademark Office.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 155 of the Complaint.

156.    Finally, after nearly five hours on the telephone with Hamor and Brandt, Hamor and Brandt were able to convince Tola and Grant-Lawrence that by signing the Assignment they were merely allowing CampaignLocal, Inc., to file a Provisional Patent Application with the United States Patent & Trademark Office and that Tola and Grant-Lawrence were not in fact relinquishing their rights as inventors of Data Trender.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 156 of the Complaint.

157.    This telephone conversation occurred on or about April 18, 2007.

34

**Answer:**  Defendants deny each and every allegation contained in Paragraph 157 of the Complaint.

158.    On information and belief, Brandt owned a 2.7% interest in CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 158 of the Complaint.

159.    Previously, during March and the first half of April 2007, Tola wrote and revised various drafts of the Data Trender Provisional Patent Application, while he also worked to develop a prototype of the invention with Grant-Lawrence.  On these drafts, Tola and Grant-Lawrence were listed as inventors.

**Answer:**  With respect to the allegations contained in Paragraph 159 of the Complaint, Defendants admit only that Tola helped to write revise various drafts of the DataTrender Provisional Patent Application during March and the first half of April 2007.  Defendants deny the remaining allegations contained in Paragraph 159 of the Complaint.

160.    The Data Trender Provisional Patent Application was ultimately filed with the USPTO on or about April 17, 2007, under Application Number 6091223.

**Answer:**  With respect to the allegations contained in Paragraph 160 of the Complaint, Defendants admit only that the DataTrender Provisional Patent Application was ultimately filed with the USPTO on or about April 17, 2007.  Defendants deny the remaining allegations contained in Paragraph 160 of the Complaint, specifically that the Application Number is 6091223.

161.    The last version of the Provisional Patent Application which Tola reviewed prior to filing again listed only Tola and Grant-Lawrence as inventors.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 161 of the Complaint.

162.    At the last moment prior to filing, Hamor, without notice to Tola or Grant-Lawrence, had his name inserted on the Provisional Patent Application as the primary inventor,

although he did not provide the original named inventors any evidence of a substantial contribution to the invention.

**Answer:** Defendants deny each and every allegation contained in Paragraph 162 of the Complaint.

163.    Tola became aware of this fact only after the Provisional Patent Application was filed.

**Answer:** Defendants deny each and every allegation contained in Paragraph 163 of the Complaint.

164.    When questioned by Tola as to why he was listed as the primary inventor, Hamor responded that he had to be listed as the primary inventor because he was the CEO of the Assignee, CampaignLocal, Inc., and that was 'how things were done.'

**Answer:** Defendants deny each and every allegation contained in Paragraph 164 of the Complaint.

165.    Neither Tola nor Grant-Lawrence agreed to collaborate with Hamor for purposes of inventorship.

**Answer:** Defendants deny each and every allegation contained in Paragraph 165 of the Complaint.

166.    After the Provisional Patent Application was filed, Hamor arranged for some presentations of the Data Trender invention to be made with small companies.  Hamor told Tola and Grant-Lawrence that these presentations were "dry runs" to work out any "kinks" in the presentation prior to the invention being presented to his high level contacts at Google, Yahoo, and Microsoft.

**Answer:** With respect to the allegations contained in Paragraph 166 of the Complaint, Defendants admit only that Hamor arranged for some presentations of the Data Trender invention to be made with various companies after the Provisional Patent Application was filed. Defendants deny the remaining allegations contained in Paragraph 166 of the Complaint.

167.    Tola and Grant-Lawrence did conduct these "dry run" presentations, but Hamor failed to arrange any meetings or presentations with his supposed high level contacts at Google, Microsoft, or Yahoo, as promised.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 167 of the Complaint.

168.    Tola, by counsel, sent correspondence to counsel for Hamor and CampaignLocal on or about January 24, 2008, rescinding the purported assignment of Data Trender and demanding that Hamor and CampaignLocal acknowledge the rescission.

**Answer:**  With respect to the allegations contained in Paragraph 168 of the Complaint, Defendants admit only that counsel for Tola and BI3 sent correspondence dated January 24, 2008 to counsel for Defendants relating to the subject matter of this lawsuit.  Defendants further answer that this correspondence speaks for itself.

169.    Hamor and CampaignLocal have failed and refused to respond to said demand.

**Answer:**  With respect to the allegations contained in Paragraph 169 of the Complain, Defendants admit only that, to date, they have provided no response to counsel for Tola and BI3 regarding the correspondence.

170.    The Data Trender Provisional Patent Application expired on or about April 17, 2008, unless further action was taken to convert the Provisional Application into a Patent Application.

**Answer:**  To the extent the statements made in Paragraph 170 do not contain allegations of fact, Defendants provide no response to such statements.  To the extent Paragraph 170 contains allegation of fact, Defendants admit only that the DataTrender Provisional Patent Application was to expire on or about April 17, 2008 and that further action was taken to prevent the expiration of the Provisional Patent Application.

171.    By virtue of the Assignment, Tola and Grant-Lawrence were prohibited from taking any action in their own names with respect to the Provisional Patent Application to prevent it from lapsing.

**Answer:**  To the extent the allegations of Paragraph 171 contain legal conclusions, Defendants provide no response.  To the extent the allegations of Paragraph 171 contain

allegations of fact, Defendants deny each and every allegation of fact contained in Paragraph 171.

172.    Tola is without knowledge or information as to whether CampaignLocal, Inc, or Hamor have taken the necessary steps to file a Patent Application such that the priority filing date of the Provisional Patent Application is not lost.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 172 of the Complaint.

173.    Since the priority date is used to determine the validity of any patent that ultimately may issue, loss of the priority date creates a material risk to the value of the patent asset.

**Answer:**  To the extent the allegations of Paragraph 173 contain legal conclusions, Defendants provide no response.  To the extent the allegations of Paragraph 173 contain allegations of fact, Defendants deny each and every allegation of fact contained in Paragraph 173.

174.    The conduct of Hamor and CampaignLocal was willful, wanton, extreme and outrageous and warrants the imposition of punitive damages.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 174 of the Complaint.

### Count V: Rescission - Lack Of Consideration

175.    Tola incorporates herein by reference the allegations of Paragraphs 1-174 of this Complaint as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-174 as though fully set forth herein.

176.    Tola in fact never received any consideration from CampaignLocal, Inc., Hamor, or any other source, in exchange for executing the purported Assignment of his rights in the Data Trender invention to CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 176 of the Complaint.

## Count VI: Failure Of Consideration

177.    Tola incorporates herein by reference the allegations of Paragraphs 1-176 of this Complaint as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-176 as though fully set forth herein.

178.    Hamor and CampaignLocal promised that they would be able to sell or license Data Trender quickly through Hamor's high level contacts at Google, Yahoo and Microsoft and represented that these companies only wanted to deal with Hamor or one of his companies.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 178 of the Complaint.

179.    Hamor and CampaignLocal further promised that once Data Trender was sold or licensed, Tola would be compensated and a new compensation or ownership agreement with CampaignLocal, Inc., would be worked out.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 179 of the Complaint.

180.    Tola requested on a number of occasions to work out the new compensation or ownership agreement with Hamor, on behalf of CampaignLocal, Inc., but Hamor refused to discuss the same with him.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 180 of the Complaint.

181.    Hamor and CampaignLocal were not able to fulfill their promise to sell or license Data Trender and Tola therefore never received any compensation.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 181 of the Complaint.

### Count VII: Breach Of Duty

182.    Tola incorporates herein by reference the allegations of Paragraphs 1-181 of this Complaint as if the same were fully set forth herein.

**Answer:**    Defendants repeat and incorporate their responses to Paragraphs 1-181 as though fully set forth herein.

183.    As a result of Hamor's and Brandt's representations to To1a that the purported Assignment to CampaignLocal, Inc., was necessary to enable the Provisional Patent Application to be filed, and as a result of Hamor's promises to compensate Tola for the sale or licensing of Data Trender, Hamor voluntarily undertook a duty to preserve and protect the Data Trender Provisional Patent Application.

**Answer:**    Defendants deny each and every allegation contained in Paragraph 183 of the Complaint.

184.    Tola is without knowledge or information as to whether Hamor and CampaignLocal have taken any action to ensure that the Provisional Patent Application did not lapse or expire.

**Answer:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 184 of the Complaint.

185.    If Hamor and CampaignLocal have allowed the Provisional Patent Application to expire, the priority of the filing date will be lost.  Since the priority date is used to determine the validity of any patent that ultimately may issue, loss of this priority date creates a material risk to the value of the patent asset.

**Answer:**    As Paragraph 185 of the Complaint does not contain any allegations of fact but, rather, merely speculative statements and purported conclusions of law, Defendants neither admit nor deny the statements contained in Paragraph 185.  To the extent Paragraph 185 of the Complaint contains allegations of fact, Defendants deny each and every allegation contained therein.

186.    If Hamor and CampaignLocal have failed to preserve the Provisional Patent Application, Tola will suffer damages in the form of increased expense in pursuing the Provisional Patent Application and the potential loss of an earlier priority date.

**Answer:**  As Paragraph 186 of the Complaint does not contain any allegations of fact but, rather, merely speculative statements and purported conclusions of law, Defendants neither admit nor deny the statements contained in Paragraph 186.  To the extent Paragraph 186 of the Complaint contains allegations of fact, Defendants deny each and every allegation contained therein.

### Count VIII: Conversion

187.     Tola incorporates herein by reference the allegations of Paragraphs 1-186 of this Complaint as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-186 as though fully set forth herein.

188.     Tola and Grant-Lawrence as inventors of Data Trender have the right to ownership of Data Trender and to the immediate, absolute, unconditional possession of the same.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 188 of the Complaint.

189.     Hamor and CampaignLocal by reason of Hamor's fraudulent representations inducing Tola and Grant-Lawrence to assign their rights to the Data Trender invention to CampaignLocal, Inc., have wrongfully assumed control and ownership over the invention.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 189 of the Complaint.

190.     Hamor also obtained rights in the Data Trender invention by naming himself as the primary inventor although Tola and Grant-Lawrence did not agree to collaborate with him for purposes of inventorship.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 190 of the Complaint.

191.     Tola has made demand on Hamor and CampaignLocal, Inc. for return of the invention but Hamor and CampaignLocal, Inc. have failed and refused to return the same.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 191 of the Complaint.

192.    Tola has suffered damages by reason of the unlawful conversion of Data Trender by Hamor and CampaignLocal, Inc., in that he has lost control and ownership of the property and has lost the ability to sell, license or patent this valuable asset.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 192 of the Complaint.

### Count IX: Breach Of Fiduciary Duty

193.    Tola incorporates herein by reference the allegations of Paragraphs 1-192 of this Complaint as if the same were fully set forth herein.

**Answer:**  Defendants repeat and incorporate their responses to Paragraphs 1-192 as though fully set forth herein.

194.    If the Court decides that the Assignment of the Data Trender Provisional Patent Application should not be rescinded, then the same is an asset of CampaignLocal, Inc.

**Answer:**  As Paragraph 194 of the Complaint does not contain any allegations of fact but, rather, merely speculative statements and purported conclusions of law, Defendants neither admit nor deny the statements contained in Paragraph 194.  To the extent that Paragraph 185 contains any allegation of fact, Defendants admit only that the DataTrender Provisional Patent Application is an asset of CampaignLocal.  Defendants deny each and every remaining allegation contained in Paragraph 194 of the Complaint.

195.    Hamor, as the CEO of CampaignLocal, Inc., owed a duty to CampaignLocal, Inc., and the shareholders, to preserve and protect the assets of the corporation from waste.

**Answer:**  As Paragraph 195 of the Complaint does not contain allegations of fact but, rather, conclusions of law, Defendants provide no response to the conclusions stated in Paragraph 195 of the Complaint.

196.    At the relevant times herein, Tola owned a 17.1% interest in CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 196 of the Complaint.

197.   Tola is without knowledge or information as to whether Hamor or CampaignLocal, Inc., have taken the necessary actions to preserve the Data Trender Provisional Patent Application by filing the necessary Patent Application within the time allowed by law.

**Answer:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 197 of the Complaint.

198.   This information is uniquely within the knowledge of Hamor as CEO of CampaignLocal, Inc.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 198 of the Complaint.

199.   Tola has never received any shareholder communication from CampaignLocal, Inc., regarding the status of this corporate asset.

**Answer:**  Defendants admit the allegations contained in Paragraph 199 of the Complaint.

200.   Any demand by Tola would be futile as Hamor has failed and refused to respond to any of Tola's previous demands.  Further, for all practical purposes, Hamor owns, on information and belief, between 70-80% of the stock in CampaignLocal, Inc., and is the CEO.  It would be futile for Tola to demand that CampaignLocal, Inc., sue Hamor for corporate waste as the affairs of CampaignLocal are entirely controlled by Hamor.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 200 of the Complaint.

## Count X: Quantum Meruit/Unjust Enrichment Related To DataTrender

201.   Tola incorporates herein by reference the allegations of Paragraphs 1-200 of this Complaint as if the same were fully set forth herein.

**Answer:**   Defendants repeat and incorporate their responses to Paragraphs 1-200 as though fully set forth herein.

43

202.    Tola never received compensation from CampaignLocal, Inc., for the work he performed in developing the Data Trender prototype and drafting the Data Trender Provisional Patent Application.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 202 of the Complaint.

203.    The work done to develop the Data Trender prototype and to draft the Provisional Patent Application were outside BI3's contractual obligations under the Consulting Agreement with WK Networks dated August 1, 2006, or the January 8, 2007, modification thereof.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 203 of the Complaint.

204.    Tola conferred a valuable benefit on CampaignLocal, Inc., by developing the Data Trender prototype and drafting the Provisional Patent Application, with the knowledge of CampaignLocal.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 204 of the Complaint.

205.    It would be inequitable to allow CampaignLocal, Inc., to retain the benefits of Tola's services in this regard without paying for the same.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 205 of the Complaint.

206.    The reasonable value of the services Tola provided is at least $75,000.

**Answer:**  Defendants deny each and every allegation contained in Paragraph 206 of the Complaint.

WHEREFORE, Defendants plead for judgment in this action in their favor, costs, attorney fees, and any other relief the court deems proper and just.

## AFFIRMATIVE DEFENSES OF ALAN B. HAMOR,
## WK NETWORKS, INC. AND CAMPAIGNLOCAL INC.

Defendants Alan B. Hamor, WK Networks, Inc., and CampaignLocal Inc. ("Defendants") as and for their Affirmative Defenses to BI3, Inc. and Kenneth C. Tola's ("Plaintiffs") Complaint, state as follows:

### General Statement Applicable To All Defenses

Defendants set forth the following matters to apprise Plaintiffs of certain potentially applicable defenses pursuant to Rule 8(c) of the Federal Rules of Civil Procedure. By listing any matter as an Affirmative Defense, Defendants do not assume the burden of proving any matter upon which Plaintiffs bear the burden of proof under the applicable law. Defendants reserve their rights to amend and/or supplement their Affirmative Defenses based upon additional disclosure of facts, a determination of controlling law, and/or other developments in this action.

### First Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that Plaintiffs' Complaint fails to state a cause of action upon which relief can be granted.

### Second Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that Plaintiffs failed to name all necessary and indispensable parties to this action, including but not limited to, Auto Bid Systems, Inc., and Earl Grant-Lawrence.

### Third Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, based upon the doctrines of estoppel, waiver, or unclean hands.

### Fourth Affirmative Defense

Plaintiffs' Complaint should be dismissed or the matter transferred to the extent that venue in the Northern District of Illinois is improper for their claims.

### Fifth Affirmative Defense

Plaintiffs' Complaint should be dismissed or the matter transferred to the extent that forum in the Northern District of Illinois is improper based on grounds of *forum non conveneins*.

### Sixth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that Plaintiffs' claims are based upon work Plaintiffs allege to have performed that they, in fact, failed to perform in accordance with the agreement(s) of the parties, including but not limited to, the Consulting Agreement attached to Plaintiffs' Complaint as Exhibit A.

### Seventh Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent Plaintiffs have been fully compensated for all work for which they have been contracted to perform and for which they have performed.

### Eighth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, based on the statute of frauds.

### Ninth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, based upon the terms, conditions and provisions of the Consulting Agreement that is attached as Exhibit A to Plaintiffs' Complaint.

### Tenth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that Plaintiffs' alleged damages were the result of the acts and/or omissions of parties over which Defendants exercised no control.

### Eleventh Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that Plaintiffs failed to avoid, minimize, or mitigate any of Plaintiffs' alleged damages.

### Twelfth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that any alleged damages arise from Plaintiffs' actions, omissions, or other conduct that is or was in violation of federal, state, and/or local law, statutes, regulations, or public policy or that was not in compliance with law or Defendants' obligations thereunder.

### Thirteenth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent Plaintiffs' allege derivative rights of CampaignLocal, insofar as they failed to provide proper notice of such claim, have failed to make the necessary demand, verification, and/or otherwise satisfy any precondition to suit.

### Fourteenth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, to the extent that Plaintiffs' alleged damages resulted from their own acts, omissions, conduct, statements, or negligence.

## Fifteenth Affirmative Defense

Plaintiffs' claims against Defendants may be barred, in whole or in part, by Plaintiffs' failure to perform or failure to perform properly their obligations and duties.

## Sixteenth Affirmative Defense

Plaintiffs' claims against Defendants are barred, in whole or in part, to the extent Plaintiffs rely upon any allegation that Defendants failed to protect any Plaintiff's patent interests.  Defendants have secured a revival of the Patent Application for DataTrender and such Patent Application is in good standing.

WHEREFORE, Defendants plead for judgment in this action in their favor, costs, attorney fees, and any other relief the court deems proper and just.

### COUNTERCLAIMS OF ALAN B. HAMOR,
### WK NETWORKS, INC. AND CAMPAIGNLOCAL INC. AGAINST
### COUNTER-DEFENDANTS BI3, INC. AND KENNETH C. TOLA, JR.

Defendants/Counter-Plaintiffs Alan B. Hamor, WK Networks, Inc. and CampaignLocal Inc. ("Counter-Plaintiffs"), as and for their Counterclaims against Plaintiffs/Counter-Defendants BI3, Inc. and Kenneth C. Tola, Jr. ("Counter-Defendants") state as follows:

### PARTIES AND BACKGROUND

1.      Alan B. Hamor ("Hamor") is a citizen of the State of New Jersey and resides at 22 Meadow Lane, Pennington, New Jersey, 08534.

2.      For approximately the past ten years, Hamor has been an entrepreneur with a focus on innovative technologies in the Web and marketing areas.  Prior to that, he was a corporate finance and strategic advisory consultant for small and middle market companies.

3.      WK Networks, Inc. ("WK") is, and was at all relevant times, a corporation duly formed under the laws of the State of Delaware with a principal place of business at 22 Meadow Lane, Pennington, New Jersey, 08534.

4.      WK is an intellectual property creation, development, and licensing entity that currently holds issued and pending patents, domain names, trademarks, copyrights, and trade secret information and technology relating to Internet and web-based applications.  Hamor is the Chairman and CEO of WK.

5.      CampaignLocal Inc. ("CL") is, and was at all relevant times, a corporation duly formed under the laws of the State of Delaware with a principal place of business at 22 Meadow Lane, Pennington, New Jersey, 08534.

6.      Formed in September 2006, CL provides Web marketing and reporting services with an emphasis on geo-targeting of advertising campaigns.

7.     Upon information and belief, Kenneth C. Tola, Jr. ("Tola") is a resident and citizen of the state of Illinois and currently resides at 220 West Scott Street, in the City of Chicago, Cook County, Illinois.

8.     Upon information and belief, BI3, Inc. ("BI3") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 220 West Scott Street, Chicago, Illinois.

9.     Upon information and belief, Tola is the President and sole stockholder of BI3.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction exists by virtue of 28 U.S.C. § 1332, diversity jurisdiction, in that this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

11.     Personal jurisdiction exists over the Counter-Defendants in that both are residents of Chicago, Illinois.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1392, in that a substantial part of the events giving rise to the claims occurred in this district and because Counter-Defendants are, upon information and belief, current residents of Chicago, Illinois.

## COMMON FACTUAL ALLEGATIONS

13.     In 2006, Hamor was Chairman and CEO of an internet and web-based application related company, Auto Bid Systems, Inc. ("ABS").  ABS was formed in 2006 for the sole purpose of deploying certain technologies owned by WK, called 1ShotBids, in the retail automotive space in the United States and Canada.  The bid/offer technological application to be developed at ABS was called AutomoBids.

14.    At the time, ABS was using a graphics design firm, Nimble Communications, for the design work on its web site and the web-based bidding application AutomoBids.  On or around July 31, 2006, Tola was introduced to ABS by Nimble Communications as a possible developer for the bidding/offer application AutomoBids and for the conversion of graphic files to web graphics.

15.    At this time, Hamor did not know of Tola.  Tola was introduced to Hamor by other parties at ABS as someone who might provide assistance in the development of a separate software platform called AutomoAds.

16.    Tola commenced working on the AutomoAds concept after he completed his work on the AutomoBids user interface.  Tola agreed that he would be paid by either or both of WK or ABS a set amount, $3,000 per week, for the going-forward services he was providing at that time.

17.    On or about August 28, 2006, Tola and Hamor discussed Tola's ownership interest in CL, the new entity being formed for the deployment of the software platform, including what was being called "AutomoAds," for the retail automotive industry.  Hamor, ABS, and Tola were all aware at this time that AutomoAds was to be a retail automotive marketing services component of an overall software platform.  In addition, they were each aware that CL was to provide service to more than just the retail automotive industry.  Tola agreed that he would be compensated at a rate of $3,000 per week going forward.

18.    At this same time, ABS and WK continued to negotiate their arrangement concerning CL and Tola continued his efforts on building the retail automotive part of the platform.

19.     On or about September 24, 2006, Hamor proposed to Tola an increase in Tola's prospective ownership of CL from 1% to 6%.  Tola and Hamor further discussed the imminent incorporation of CL and the prospect of Tola serving as an officer and director of the company. Tola was agreeable to fulfilling that role and later did so.

20.     ABS and WK ultimately reached an understanding and business arrangement concerning AutomoAds and CL.  On or around September 26, 2006, Glen Gulyas, Chief Operating Officer of ABS notified Tola that Tola's initial payment of $10,000 for services rendered would be sent from ABS and that subsequent payments would come from CL with possible participation from ABS.

21.     On or around September 29, 2006, BI3 and Tola, as BI3's President and sole shareholder, executed a Consulting Agreement with WK.  The Consulting Agreement has an effective date of August 1, 2006.  A copy of the Consulting Agreement is attached to these Counterclaims as Exhibit A.

22.     In the Consulting Agreement, WK agreed to retain BI3 and Tola as BI3's sole shareholder as a consultant to render services to and on behalf of WK.  BI3 and Tola agreed to render such services to WK.

23.     Provision 5 of the Consulting Agreement states that the agreement "shall commence on the date written above and shall continue indefinitely until such time as either Consultant or the Company terminates the Agreement as provided below."  BI3 and Tola have not provided written notice of termination of the Consulting Agreement.  At all times relevant to this Counterclaim, the Consulting Agreement was in effect.

24.    WK has performed all of its obligations under the terms of the Consulting Agreement, including but not limited to, compensating BI3 and Tola for all work performed under the Consulting Agreement.

25.    The Consulting Agreement contains a provision relating to "Confidential Information," Provision 7, which states, in pertinent part, as follows:

> 7.    <u>Confidential Information</u>.  "Confidential Information" means non-public information Company designates to Consultant as being confidential.  … Confidential Information includes, without limitation, information in tangible or intangible form relating to and/or including the Company's technology, know-how, marketing or promotional activities, business policies or practices, and information received from others that Company is obligated to treat as confidential.
>
> …
>
> Consultant shall: (i) refrain from disclosing any confidential Information of Company to third parties for seven (7) years following the date that Company first discloses such Confidential Information to Consultant; (ii) take reasonable security precautions, at least as great as the precautions Consultant takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information of the Company; and (iii) refrain from using, including without limitation disclosing, reproducing, summarizing and/or distributing, Confidential Information of Company except in pursuant of Consultant's business relationship with Company, and only as otherwise provided hereunder.
>
> …
>
> "Trade Secret Information" means that information which Company protects in accordance with state trade secret law and which has been identified by the owner as a trade secret.
>
> Consultant shall: (i) refrain from disclosing any Trade Secret Information to third parties for as long as the disclosing party maintains the trade secret; (ii) use no less than reasonable care to keep confidential the Trade Secret Information; and (iii) refrain from using for any purpose the Trade Secret Information except in pursuance of the business relationship between Company and Consultant, and only as otherwise provided hereunder.

26. The Consulting Agreement contains a provision regarding "Intellectual Property Rights," Provision 8, which states in pertinent part:

8. <u>Intellectual Property Rights</u>. Consultant shall make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company all right, title and interest in and to any inventions which Consultant, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to this Agreement, or that result from work done for the Company prior to or after the date of this Agreement (collectively, "Company Inventions"). Such Company Inventions shall be the exclusive property of the Company, whether patented or not.

Consultant acknowledges that all works of authorship developed in the course of work performed pursuant to this Agreement and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. Section 101 *et seq*.). To the extent that such works do not constitute works made for hire under operation of law, Consultant hereby assign all rights, title and interest in and to such works to the Company.

Consultant will provide the Company with all assistance reasonably requested by the Company to preserve its rights to the Company Inventions and to obtain and enforce United States and foreign proprietary rights relating to any and all such Company Inventions in any and all countries. To that end Consultant will, and/or will cause its employees to, execute, verify and deliver (A) such documents and perform such other acts (including appearing as a witness) as Consultant may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and/or the assignment thereof, and (B) assignments to the Company or its designee of such proprietary rights. Consultant's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue after the termination of this Agreement, so long as Consultant is compensated at then-standard rates. In the event the Company is unable for any reason, after reasonable effort, to secure Consultant and/or Consultant's employee(s) signature(s) on any document needed in connection with the actions specified hereinabove, Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultants and Consultant's employees(s) behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this section with the same legal force and effect as if executed by Consultant and/or Consultant's employee(s). Such appointment is coupled with an interest. Consultant hereby waives and quitclaims to the Company any and all claims of any nature whatsoever which Consultant now or may hereafter have for infringement of any proprietary rights assigned by Consultant to the Company.

27.    The Consulting Agreement further contains a provision relating to "Legal Relief," Provision 9, which states as follows:

> 9.    Legal Relief.  In the event Consultant breaches, or threatens to breach any of the covenants expressed herein, the damages to the Company will be difficult to quantify; therefore, the Company may apply to a court of competent jurisdiction for injunctive or other equitable relief to restrain such breach or threat of breach, without disentitling the Company from any other relief in either law or equity.

28.    The Consulting Agreement further contains a provision relating to "Indemnification," Provision 13, which states as follows:

> 13.    <u>Indemnification</u>.  Consultant shall defend, indemnify and hold harmless the Company and its officers, directors, employees, agents, parent, subsidiaries and other affiliates, from and against any and all damages, costs, liability and expense whatsoever (including attorneys' fees and related disbursements) incurred by reason of (a) any failure by Consultant to perform any covenant or agreement of Consultant set forth herein; (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement.  The Company shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this section.

29.    As evidenced by the Consulting Agreement, WK identifies and protects all of its confidential and proprietary technology and information, intellectual property, and trade secrets. CL also identifies and protects all of its confidential and proprietary technology and information, intellectual property, and trade secrets.  During all times relevant to these Counterclaims, Counter-Plaintiffs require all individuals coming into contact with such information to execute a non-disclosure agreement and/or a consulting agreement with provisions to protect Counter-Plaintiffs' confidential proprietary interests.

30.    At all times relevant to this Counterclaim, WK and CL advised BI3 and Tola of the proprietary and confidential nature of WK's and CL's technology, information, intellectual

property and trade secrets to which BI3 and Tola came into contact.  BI3 and Tola were aware that all work being performed by them for WK or at WK's direction for CL involved such proprietary and confidential technology, information, intellectual property and trade secrets.

31.    Ultimately, the CL automotive platform launched in early December 2006.  At that time, Tola was acting as an officer and director of CL.  Tola continued to act and/or serve as an officer and director of CL at all times relevant to these Counterclaims subsequent to December 2006.

32.    In December 2006, Hamor and Tola discussed potential additions to the CL automotive platform.  On or about December 15, 2006, Tola provided Hamor with a detailed project plan for the expansion of the platform.  A priority line item of the proposed project plan was the development of an integrated reporting program using the ClickTracks system that CL had licensed.  Tola intended to begin that development on January 1, 2007.

33.    Tola suggested that another developer, Earl Grant-Lawrence ("Grant-Lawrence"), be retained to perform the work necessary for the integrated reporting program using the ClickTracks system.  He introduced Grant-Lawrence to Hamor in late December 2006 and Hamor and Tola reached an agreement to contract with Grant-Lawrence to perform work for CL.

34.    Grant-Lawrence executed a Consulting Agreement with CL having an effective date of January 12, 2007.  A copy of the CL-Grant-Lawrence Agreement is attached to these Counterclaims as Exhibit B.  The Scope of Work provision of the Agreement was written by Tola and indicates that Grant-Lawrence was to build, on behalf of CL, a custom system that overcomes limitations in reporting and tracking of online data by ClickTracks.

35.    Thereafter, pursuant to the scope of work of the Agreement, Grant-Lawrence provided technical assistance to the ClickTracks data reporting system for CL.  On or near

January 19, 2007, Tola advised Hamor that Grant-Lawrence may have resolved certain persistent technical issues involving this ClickTracks system.

36.     On February 2, 2007, Grant-Lawrence, Hamor, and Tola discussed Grant-Lawrence's proposed solution for ClickTracks.  Based on these discussions, Hamor identified that the solution had potential to be patent and, subsequently, he and Tola agreed to proceed with a patent review.

37.     On February 12, 2007, Hamor started the patent review process for this solution. He first forwarded to Tola a network-level patent invented by WK to allow Tola to compare that patent to the CL tracking technology (later commercially referred to as DataTrender).  Tola performed this analysis, a copy of which was provided to both Hamor and Grant-Lawrence.

38.     The new tracking technology was conceived as, and clearly was, an integral part of the CL development strategy.  As such, it was and is an asset of CL.  At this time, the technology was being called "Transparent Tracking Solution."  The technology has since taken the name "DataTrender."

39.     The patent application process for the technology ultimately called DataTrender took place over approximately six weeks and concluded with the filing of the application on or about April 17, 2007.  Hamor, Tola, and Grant-Lawrence participated in the process in varying degrees, with Hamor and Tola performing most of the patent application work.

40.     The legal representation for this application was provided by JLB Consulting, a firm owned by Jeff Brandt, a renowned and accomplished patent counsel.  Until he passed away unexpectedly in May 2007, Mr. Brandt was a member of the Board of Directors of WK.

41.     Tola, Hamor, and Mr. Brandt previously had worked together on another patent application in the fall of 2006.  Notice of confirmation of that application's filing and assignment by Hamor and Tola to WK was forwarded to Tola on or about November 2, 2006.

42.     On April 18, 2007, Intellevate, an IP managerial service used by Mr. Brandt, sent each of the inventors a form of an assignment of rights to the technology and instructions as to how to complete the assignment.  All parties executed their respective assignments and returned both a scanned version and the original notarized version of the document.  All costs of the legal work and filing were borne by CL.

43.     On May 10, 2007, Hamor forwarded to each of Tola and Grant-Lawrence the U.S. Patent and Trademark Office confirmation of the patent assignment, clearly showing that each of the three co-inventors was named.

44.     Tola was obligated to assign any interest he may have had in the technology to any assignee of WK's choosing under Tola's Consulting Agreement with WK.  Grant-Lawrence was obligated to assign any interest he may have had in the technology to CL under his Agreement with CL.  Neither Tola nor Grant-Lawrence voiced any objection to his assignment of rights of the technology.

45.     On April 17, 2008, new patent counsel filed a revival of the application and a missing parts document.  WK paid these expenses on behalf of CL.  The patent application currently is in good standing.

46.     On March 16, 2007, Tola added a description of this new DataTrender tracking system to the final version of CL's marketing material.  When the CL began looking for potential partners, licensees and acquirers, Hamor and Tola created an Overview of the technology, now called DataTrender, for use in typical commercial literature and on the Web.

47.    Early on in the development of the tracking software ultimately called "DataTrender," Tola took it upon himself to test the market for the tracking solution by contacting CL's largest customer, the Pivec Agency, Ltd. ("Pivec").  On or around February 13, 2007, Tola described the benefits of the new system to Jerome "Jay" Pivec, a vice president with the agency.  He also requested permission to test the tracking solution on the BuyAToyota website in use by Pivec's client, Central Atlantic Toyota Dealers Association.  On March 5, 2007, Tola again raised with Pivec the benefits of the new CL tracking solution and then the next day solicited Hamor's input to draft a careful response to Pivec's numerous questions about the solution so that no confidential information was disclosed.

48.    Counter-Plaintiffs have learned through email correspondence sent to the CL email administrator account, which had been previously administered by Tola, of Tola and BI3's use of confidential information, trade secrets, and other information proprietary to Counter-Plaintiffs that Tola and BI3 obtained while working at CampaignLocal for WK.

49.    Tola was using an email address that he had established with the Pivec on April 13, 2007 while working for WK at CL and providing service to Pivec as part of the scope of his Consulting Agreement with WK.

50.    After dealing exclusively with Tola on behalf of CL beginning on April 10, 2007, Pivec resigned its account with CL on July 17, 2007.

51.    On or about February 25, 2008, Counter-Plaintiffs received additional emails in the CL email administrator account demonstrating that Tola has been retained by Pivec to assume the search and banner ad marketing services for that firm effective February 15, 2008. This is the exact business of CL.

52.     Search management transition is a complicated process that takes months to complete so that new campaigns can be strategized, created, and implemented.  Given this correspondence dated mid-February 2008, Tola likely had been engaged in providing the analysis, creation and setup for these search management and banner ad services to Pivec, the exact search management services performed previously by CL, months prior to February 2008.

53.     Although Counter-Defendants developed and installed an operational retail automotive platform for CL, services for which they were properly compensated, Counter-Defendants later disassembled this operating platform of CL in favor of an all-industry platform.  Despite being compensated by WK and CL to do so, Counter-Defendants never completed this all-industry platform and never re-installed the previously operational retail automotive platform.

54.     As a result of these failures on the part of Counter-Defendants, CL is greatly hindered in its ability to provide media-generation marketing services to any customer.  CL's business has been greatly harmed in that its automated expert media-generation system allowed it to provide unique low-cost marketing services, resulting in a significant competitive advantage in the marketplace.  As a result of Counter-Defendants' actions and inactions, CL has lost its competitive advantage in the marketplace.  Counter-Defendants' actions and inactions have harmed CL's business and prevent CL from marketing its proprietary retail automotive platform.

55.     Despite being compensated to do so, Counter-Defendants never developed the DataTrender software to the point that it could be marketed by CL.

56.     Hamor has demanded that Tola return the demo software relating to DataTrender.  To date, Tola has refused to return the requested demo software to CL.

57.     Counter-Defendants' failure to fully develop DataTrender has damaged CL in that CL is unable to market DataTrender without being able to demonstrate the software.  In addition,

without being able to demonstrate and market DataTrender, CL is unable to license or divest DataTrender to a third party interested in putting the software into production.

58.    In addition to DataTrender, Counter-Defendants failed to develop other software applications for which they were compensated to do so, including but not limited to, TargetIQ.

59.    Because of Counter-Defendants' failure to complete the development of these additional software applications of CL, CL is unable to market these proprietary services. It is precisely these proprietary services, including the DataTrender concept, which provide CL with unique assets and a competitive advantage in the marketplace. Without the ability to market these applications, CL has lost existing and future business opportunities.

60.    Through Counter-Defendants' consulting engagement with WK and with CL at WK's direction, Counter-Defendants acquired CL's proprietary advertising campaign management knowledge, technology, and information and other trade secrets of CL relating to campaign strategy, creation and management. In addition, Counter-Defendants acquired the detailed knowledge of CL's tracking and results reporting mechanisms for their own benefit and for the detriment of CL.

61.    Counter-Defendants also obtained from CL its proprietary and confidential information, intellectual property, and trade secrets relating to banner and campaign management and tracking.

62.    CL has been damaged by Counter-Defendants in that Counter-Defendants have used the proprietary and confidential information, intellectual property, and trade secrets of CL to obtain at least one former customer of CL, Pivec. In addition, Counter-Defendants are attempting to gain a competitive advantage in the marketplace by using this confidential information of CL to acquire further potential customers.

63.    Counter-Defendants' actions have harmed and continue to harm business relationships the Counter-Plaintiffs have spent considerable time and expense to build.  This harm is irreparable because client relationships are delicate and cannot be easily repaired once damaged.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT

64.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 63 of this Counterclaim in Count I as if fully rewritten herein.

65.    Despite accepting the benefits of the Consulting Agreement, BI3 and Tola have breached, *inter alia*, the terms of the Confidential Information and Intellectual Property Rights provisions of the Consulting Agreement.

66.    Despite the clear terms of the Consulting Agreement, and upon information and belief, BI3 and Tola have and will continue to use trade secrets and other confidential and proprietary information and intellectual property owned by WK and WK's duly appointed designee, CL, for the benefit of BI3, Tola, and third parties.

67.    In addition, BI3 and Tola have alleged in their Complaint that the Consulting Agreement is invalid and that any assignment of rights thereunder was improper.  Counter-Plaintiffs deny these contentions.

68.    An actual and justiciable controversy now exists between all of the parties regarding their respective rights and obligations under the Consulting Agreement.  As such, Counter-Plaintiffs request that the Court declare the rights, status, and interests of the parties herein, and declare that the Consulting Agreement is valid and enforceable, that Counter-

Plaintiffs are entitled to temporary or permanent injunctive relief, and are entitled to any such other relief to be determined by the Court pursuant to the Consulting Agreement.

69.    The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

70.    The public interest will not be harmed by the injunctive relief requested.

WHEREFORE, Counter-Plaintiffs, WK, CL, and Hamor, respectfully request that this Court enter an order in their favor and against Counter-Defendants, BI3 and Tola declaring that:

A.    the Consulting Agreement is a valid and enforceable contract;

B.    BI3 and Tola, its sole shareholder, are obligated under the Consulting Agreement to refrain from taking action of any character or nature having the purpose or effect of disclosing, utilizing, disseminating or in any manner dealing with WK's and CL's confidential and proprietary information, intellectual property, and trade secrets or other property belonging to WK and CL;

C.    BI3 and Tola, its sole shareholder, are obligated to refrain from misappropriating in any way WK's and CL's confidential and proprietary information, intellectual property, and trade secrets or other property for their benefit or for the benefit of any other party;

D.    Tola's assignment of the provisional patent for DataTrender to CL was a proper and enforceable assignment of rights;

E.    granting WK, CL and Hamor their expenses incurred as a result of BI3 and Tola's actions, including attorneys' fees and costs of bringing this action; and

F.    granting such other and further relief as the Court deems equitable and just.

## COUNT II
## BREACH OF CONTRACT
### (The Consulting Agreement)

71.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 70 of this Counterclaim in Count II as if fully written herein.

72.    The Consulting Agreement, in Provision 7, prohibits BI3 and Tola from, among other things, disclosing confidential information of WK for seven (7) years following the date

WK first discloses such confidential information to BI3 and Tola and using, including without limitation disclosing, reproducing, summarizing and/or distributing, WK's confidential information except in pursuance of BI3 and Tola's business relationship with WK.

73.    The Consulting Agreement, in Provision 7, further obligates BI3 and Tola to take reasonable security precautions to keep confidential the confidential information of WK.

74.    The Consulting Agreement, in Provision 7, further obligates BI3 and Tola to notify WK immediately upon the discovery of any unauthorized use or disclosure of WK's confidential information or any breach of the Consulting Agreement by BI3 and WK and to cooperate with WK in its efforts to regain the possession of all confidential information.

75.    The Consulting Agreement, in Provision 7, further obligates BI3 and Tola to:  (a) refrain from disclosing any trade secret information to third parties for as long as the disclosing party maintains the trade secret; (b) use no less than reasonable care to keep confidential the trade secret information; and (c) refrain from using for any purpose trade secret information except in the pursuance of the business relationship between WK and BI3 and Tola.

76.    The Consulting Agreement, in Provision 8, further obligates BI3 and Tola to assign to WK, or WK's designee, all right, title and interest in and to any inventions which BI3 and WK, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to the Consulting Agreement, or that result from work done for WK prior to or after the date of the Consulting Agreement.

77.    The Consulting Agreement, in Provision 8, further obligates BI3 and Tola to assist the WK in preserving its rights to "Company Inventions" under that agreement.

78.     BI3 and Tola have breached its obligations to WK under the Consulting Agreement by, among other things, disseminating confidential and proprietary information, trade secrets, and intellectual property of WK and CL to third parties.

79.     WK performed all of its obligations to BI3 and Tola under the Consulting Agreement.

80.     All work performed by BI3 and Tola for CL was at the instruction and direction of WK and was done under the Consulting Agreement.

81.     The aforesaid breaches by BI3 and Tola are causing and will continue to cause Counter-Plaintiffs harm to their businesses, including, but not limited to, loss of revenue and profits, loss of business opportunities, the loss of their competitive advantage in the marketplace, and the loss of at least one customer.

82.     Hamor, WK, and CL have been damaged as a result of BI3 and Tola's conduct.

WHEREFORE, Counter-Plaintiffs, WK, CL, and Hamor respectfully request that this Court enter judgment in their favor and against Counter-Defendants BI3 and Tola, and enter an Order:

A.      awarding WK, CL, and Hamor compensatory damages;

B.      awarding WK, CL, and Hamor their expenses incurred as a result of BI3 and Tola's actions, including attorneys' fees and costs of bringing this action; and

C.      granting such other and further relief as the Court deems equitable and just.

### COUNT III
### INDEMNIFICATION
### (Consulting Agreement)

83.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 82 of this Counterclaim in Count III as if fully written herein.

84.    In Provision 13 of the Consulting Agreement, BI3 and Tola agree to defend, indemnify and hold harmless WK from any damages, costs, liability, and expense, including attorneys fees, incurred by WK by reason of, among other things, any failure on the part of BI3 and Tola to perform any covenant or agreement of the Consulting Agreement or any breach of the Consulting Agreement by BI3 or Tola.

85.    BI3 and Tola have breached the Consulting Agreement by, among other things, disseminating confidential and proprietary information, intellectual property, and trade secrets of WK and CL to third parties.

86.    Counter-Plaintiffs have been damaged as a result of BI3's and Tola's failure to perform the covenants and agreements of the Consulting Agreement and because of BI3's and Tola's breach of the Consulting Agreement.

87.    Pursuant to the Consulting Agreement, Counter-Plaintiffs are entitled to indemnification from BI3 and Tola, as well as payment of any and all damages suffered by Counter-Plaintiffs as a result of BI3's and Tola's failures, including but not limited to Counter-Plaintiffs' costs, expenses, and attorneys' fees incurred in defending BI3's and Tola's Complaint and prosecuting this Counterclaim.

WHEREFORE, Counter-Plaintiffs, WK, CL, and Hamor respectfully request that this Court enter judgment in their favor and against Counter-Defendants BI3 and Tola, and enter an Order:

A.    awarding WK, CL, and Hamor indemnity for their damages resulting from BI3's and Tola's failure to perform to the covenants and agreements of the Consulting Agreement;

B.    awarding WK, CL, and Hamor their expenses incurred as a result of BI3 and Tola's actions, including attorneys' fees and costs of bringing this action; and

C.    granting such other and further relief as the Court deems equitable and just.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS

88.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 87 of this Counterclaim in Count IV as if fully rewritten herein.

89.     At all relevant times, there was in full force and effect in the State of Illinois a statute known as the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq*. (the "ITSA").

90.     The ITSA defines a trade secret as:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

91.     BI3 and Tola have misappropriated or will inevitably use Counter-Plaintiffs' confidential and proprietary or other information which afforded Counter-Plaintiffs a commercial advantage.

92.     Such confidential and proprietary information is not known outside of Counter-Plaintiffs' business, is only known by employees, consultants, contractors, and others involved in Counter-Plaintiffs' business and is subject to measures to guard the secrecy of the information. The information has been developed with a substantial amount of effort and investment and cannot readily be acquired or duplicated by others.  The information is valuable to Counter-Plaintiffs' competitors.

93.    BI3 and Tola used and are continuing to use this confidential and proprietary information in breach of an agreement, confidence or duty, or as a result of discovery by improper means.

94.    BI3's and Tola's actions in using and disseminating Counter-Plaintiffs' confidential and proprietary trade secrets to third parties were willful and malicious.

95.    Counter-Plaintiffs have a protectable interest in ensuring the confidentiality of their trade secrets.

96.    Counter-Plaintiffs have been damaged as a result of BI3's and Tola's conduct. Moreover, Counter-Plaintiffs have suffered irreparable harm as a result of BI3's and Tola's conduct and will continue to suffer irreparable harm unless BI3 and Tola are enjoined from engaging in any such further conduct.

97.    Because of the nature of BI3's and Tola's misappropriation of Counter-Plaintiffs' trade secrets, Counter-Plaintiffs have no adequate remedy at law.

98.    The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

99.    The public interest will not be harmed by the injunctive relief requested.

WHEREFORE, Counter-Plaintiffs, WK, CL, and Hamor respectfully request that this Court enter judgment in their favor and against Counter-Defendant, BI3 and Tola, and enter an Order:

A.    awarding WK, CL, and Hamor compensatory damages;

B.    awarding WK, CL and Hamor exemplary damages for BI3's and Tola's intentional, deliberate and willful conduct;

C.    enjoining BI3 and Tola from taking action of any character or nature having the purpose or effect of disclosing, utilizing, disseminating or in any manner dealing with WK's and CL's confidential information and trade secrets or other property belonging to WK and CL;

D.    awarding WK, CL, and Hamor their expenses incurred as a result of BI3's and Tola's actions, including attorneys' fees and costs of bringing this action; and

E.    granting such other and further relief as the Court deems equitable and just.

### COUNT V
### BREACH OF FIDUCIARY DUTY TO CL
### (As To Counter-Defendant Tola)

100.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 99 of this Counterclaim in Count V as if fully rewritten herein.

101.    Tola owed a fiduciary duty of undivided loyalty to CL as a director and officer of CL.

102.    Upon information and belief, Tola breached his fiduciary duty to CL by improperly using CL's confidential business information and interfering and misappropriating CL's business relationships while a director and officer of CL.

103.    CL has been damaged as a result of Tola's conduct.

104.    Unless Tola is enjoined, he will continue to breach his fiduciary duty to CL by continuing to disseminate confidential and proprietary technology and information, intellectual property, and trade secrets of CL for his own pecuniary gain, which is causing damages to CL.

105.    CL has a protectable interest in preserving the confidential nature of its proprietary technology and information, intellectual property, and trade secrets.

106.    CL will suffer irreparable harm if the injunctive relief requested is not granted.

107.    CL has no adequate remedy at law.

108.    The benefits to CL of granting the injunctive relief sought by CL outweigh any potential injury to Counter-Defendants.

109.    The public interest will not be harmed by the injunctive relief requested.

WHEREFORE, Counter-Plaintiff, CL respectfully requests that this Court enter judgment in its favor and against Counter-Defendant Tola, and enter an Order:

A.    awarding CL compensatory damages;

B.    awarding CL exemplary damages for BI3's and Tola's intentional, deliberate and willful conduct;

C.    enjoining Tola from taking action of any character or nature having the purpose or effect of disclosing, utilizing, disseminating or in any manner dealing with CL's confidential information and trade secrets or other property belonging to CL;

D.    awarding CL its expenses incurred as a result of Tola's actions, including attorneys' fees and costs of bringing this action; and

E.    granting such other and further relief as the Court deems equitable and just.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

110.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 109 of this Counterclaim in Count VI as if fully rewritten herein.

111.    At all times relevant to these Counterclaims, Counter-Plaintiffs had and have longstanding business relationships with customers and have expended significant time and money in developing and maintaining those customer relationships.  Consequently, Counter-Plaintiffs have a legitimate expectancy in maintaining those customer relationships.

112.    BI3 and Tola are aware of those relationships and Counter-Plaintiffs expectancy in maintaining its customer relationships.

113.    BI3 and Tola have maliciously and unjustly interfered with these relationships, causing breaches in and the termination of business relationships by using Counter-Plaintiffs' confidential information to induce customers to terminate their business relationships with Counter-Plaintiffs.

114.    Counter-Plaintiffs have been damaged as a direct and proximate result of BI3's and Tola's tortuous interference with Counter-Plaintiffs' business relationships with its customers.  Moreover, Counter-Plaintiffs will be irreparably harmed unless BI3 and Tola are enjoined from engaging in such conduct.

115.    Unless BI3 and Tola are enjoined, they will continue to interfere with Counter-Plaintiffs' business relationships by continuing to disseminate confidential and proprietary technology and information, intellectual property, and trade secrets of Counter-Plaintiffs for their own pecuniary gain, which is causing damages to Counter-Plaintiffs.

116.    Counter-Plaintiffs have a protectable interest in preserving the confidential nature of their proprietary technology and information, intellectual property, and trade secrets.

117.    Counter-Plaintiffs will suffer irreparable harm if the injunctive relief requested is not granted.

118.    Counter-Plaintiffs have no adequate remedy at law for BI3's and Tola's actions in interfering with Counter-Plaintiffs' business relationships which have been ongoing and have proximately caused irreparable harm to Counter-Plaintiffs and will continue to cause substantial, irreparable harm to Counter-Plaintiffs if allowed to continue.

119.    The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

120.    The public interest will not be harmed by the injunctive relief requested.

WHEREFORE, Counter-Plaintiff, WK, CL, and Hamor respectfully request that this Court enter judgment in their favor and against Counter-Defendants BI3 and Tola, and enter an Order:

A.    awarding WK, CL and Hamor compensatory damages;

B.    awarding WK, CL and Hamor exemplary damages for BI3's and Tola's intentional, deliberate and willful conduct;

C.    enjoining BI3 and Tola from taking action of any character or nature having the purpose or effect of disclosing, utilizing, disseminating or in any manner dealing with WK's and CL's confidential information and trade secrets or other property belonging to WK and CL;

D.    awarding WK, CL, and Hamor their expenses incurred as a result of BI3's and Tola's actions, including attorneys' fees and costs of bringing this action; and

E.    granting such other and further relief as the Court deems equitable and just.

## COUNT VII
## UNJUST ENRICHMENT

121.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 120 of this Counterclaim in Count VII as if fully rewritten herein.

122.    By BI3's and Tola's unlawful use of Counter-Plaintiffs' confidential and proprietary information, intellectual property, and trade secrets and the resulting interference with Counter-Plaintiffs' business relationships, BI3 and Tola are retaining the benefit associated with the work involved in the planning, development, marketing and goodwill of Counter-Plaintiffs' confidential information.  BI3 and Tola are retaining that benefit to the detriment of Counter-Plaintiffs in that Counter-Plaintiffs' customers and potential customers are and will be deterred from doing business with Counter-Plaintiffs to the benefit of BI3 and Tola.

123.    BI3's and Tola's retention of the benefit violates the principles of justice, equity and good conscience.

124.    Unless BI3 and Tola are enjoined, they will continue to interfere with Counter-Plaintiffs' business relationships by continuing to disseminate confidential and proprietary technology and information, intellectual property, and trade secrets of Counter-Plaintiffs for their own pecuniary gain, which is causing damages to Counter-Plaintiffs.

125.    Counter-Plaintiffs have a protectable interest in preserving the confidential nature of their proprietary technology and information, intellectual property, and trade secrets.

126.    Counter-Plaintiffs will suffer irreparable harm if the injunctive relief requested is not granted.

127.    Counter-Plaintiffs have no adequate remedy at law for BI3's and Tola's actions in interfering with Counter-Plaintiffs' business relationships which have been ongoing and have proximately caused irreparable harm to Counter-Plaintiffs and will continue to cause substantial, irreparable harm to Counter-Plaintiffs if allowed to continue.

128.    The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

129.    The public interest will not be harmed by the injunctive relief requested.

WHEREFORE, Counter-Plaintiff, WK, CL, and Hamor respectfully request that this Court enter judgment in their favor and against Counter-Defendants BI3 and Tola, and enter an Order:

A.    awarding WK, CL and Hamor compensatory damages;

B.    awarding WK, CL and Hamor exemplary damages for BI3's and Tola's intentional, deliberate and willful conduct;

C.    enjoining BI3 and Tola from taking action of any character or nature having the purpose or effect of disclosing, utilizing, disseminating or in any manner dealing with WK's and CL's confidential information and trade secrets or other property belonging to WK and CL;

D.    awarding WK, CL, and Hamor their expenses incurred as a result of BI3's and Tola's actions, including attorneys' fees and costs of bringing this action; and

E.    granting such other and further relief as the Court deems equitable and just.

Respectfully Submitted,


By:    /s/ James G. Argionis
       One of the Attorneys for Defendants
       Alan B. Hamor, WK Networks, Inc. and
       CampaignLocal Inc.


Scott M. Seaman (ARDC No. 6196630)
Jason R. Schulze (ARDC No. 6238043)
James G. Argionis (ARDC No. 6228773)
MECKLER BULGER & TILSON, LLP
123 N. Wacker Drive
Suite 1800
Chicago, IL 60606
(312) 474-7900


## JURY DEMAND

Counter-Plaintiffs, Alan B. Hamor, WK Networks, Inc., and CampaignLocal Inc. hereby

demand trial by jury on all claims triable to a jury.


Respectfully Submitted,


By:    /s/ James G. Argionis
       One of the Attorneys for Defendants
       Alan B. Hamor, WK Networks, Inc. and
       CampaignLocal Inc.


Scott M. Seaman (ARDC No. 6196630)
Jason R. Schulze (ARDC No. 6238043)
James G. Argionis (ARDC No. 6228773)
MECKLER BULGER & TILSON, LLP
123 N. Wacker Drive
Suite 1800
Chicago, IL 60606
(312) 474-7900
M:\12718\pleading\HamorAnswer.doc

# Exhibit A

Confidential When Completed

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT is made as of this 1st day of August 2006, by and between WK Networks, Inc., ("NETWORK VENDOR"), having a place of business at 22 Meadow Lane, Pennington, NJ 08534, ("Company"), and BI3, Inc. ("Consultant") an individual having a place of business at 220 W Scott Street Unit B, Chicago, IL 60610.

**Background**
The Company is engaged in the business of developing software for network-based bidding and commerce systems. Consultant has expertise and experience in areas beneficial to the Company and desires to consult with the Company in those areas of expertise. Based on Consultant's experience, the Company desires to retain the services of Consultant and Consultant desires to render such services on the terms and conditions set forth below.

IN CONSIDERATION of the foregoing and of the mutual terms set forth below, the parties, intending to be legally bound, agree as follows:

1. <u>Retention as Consultant.</u> The Company hereby retains Consultant, and Consultant hereby agrees to render consulting services to the Company, upon the terms and conditions set forth herein.

2. <u>Duties.</u> Consultant shall perform the services detailed in Appendix A. Scope of Work, incorporated herein in its entirety.

3. <u>Independent Consultant Status.</u> The parties recognize that Consultant is an independent Consultant and that the Company will not incur any liability as a result of Consultant's actions. Consultant shall at all times disclose that he is an independent Consultant of the Company. The Company shall not withhold any funds from Consultant's compensation for tax or other governmental purposes, and Consultant shall be responsible for the payment of same. Consultant shall not be entitled to receive any employment benefits offered to employees of the Company, including but not limited to: workers' compensation coverage; savings or profit sharing plans; stock option, incentive or other bonus plans; health, dental or life insurance coverage; and paid vacations. The Company shall not exercise control over Consultant.

4. <u>Compensation.</u> The Company shall pay to Consultant, as compensation for the services to be rendered, the amounts set out in Appendix B, **Compensation,** incorporated herein in its entirety.

Unless expressly agreed between the parties herein, the Company shall not be obligated to provide a minimum number of hours of work, nor shall Consultant be entitled to receive any compensation for hours not actually worked.
The Company shall reimburse Consultant for all ordinary and necessary expenses incurred in connection with the performance of his services hereunder, provided that timely notice of such expenses is sent to and approved by an appropriate officer or other authorized representative of the Company. Expenses totaling over five hundred dollars ($500) shall be pre-approved by the Company.

5. <u>Term.</u> This Agreement shall commence on the date written above and shall continue indefinitely until such time as either Consultant or the Company terminates the Agreement as provided belo

6. <u>Termination.</u> The parties agree that either the Company or Consultant through written notice may terminate Consultant's engagement under this Agreement at any time for any reason or for no reason. Upon termination, Consultant shall deliver all completed work and Company shall pay Consultant for completed work.

7. <u>Confidential Information.</u> "Confidential Information" means non-public information Company designates to Consultant as being confidential. Such designation of confidentiality shall be by writing or marking for written materials and verbally at the time of disclosure, or in a summary written document

*Exhibit A*

Confidential When Completed

following a verbal disclosure, for non-written materials. Confidential Information includes, without limitation, information in tangible or intangible form relating to and/or including the Company's technology, know-how, marketing or promotional activities, business policies or practices, and information received from others that Company is obligated to treat as confidential.

Confidential Information shall not include any information, however designated, that: (i) is or subsequently becomes publicly available without Consultant's breach of any obligation owed Company; (ii) became known to Consultant prior to Company's disclosure of such information to Consultant pursuant to the terms of this Agreement; (iii) is or subsequently becomes known to Consultant from a source other than Company other than by the breach of an obligation of confidentiality owed to Company; or (iv) is independently developed by Consultant.

Consultant shall: (i) refrain from disclosing any confidential Information of Company to third parties for seven (7) years following the date that Company first discloses such Confidential Information to Consultant; (ii) take reasonable security precautions, at least as great as the precautions Consultant takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information of the Company; and (iii) refrain from using, including without limitation disclosing, reproducing, summarizing and/or distributing, Confidential Information of Company except in pursuance of Consultant's business relationship with Company, and only as otherwise provided hereunder.

Notwithstanding the obligations herein, Consultant may disclose Confidential Information of Company in accordance with a judicial or other governmental order, provided that Consultant either: (i) gives Company reasonable notice prior to such disclosure to allow Company a reasonable opportunity to seek a protective order or equivalent, or (ii) obtains written assurance from the applicable judicial or governmental entity that it will afford the Confidential Information the highest level of protection afforded under applicable law or regulation.

Consultant may disclose Confidential Information to its affiliates, employees and consultants only on a need-to-know basis. Consultant will have executed or shall execute appropriate written agreements with its affiliates, employees and consultants sufficient to enable Consultant to enforce all the provisions of this Agreement.

Consultant shall notify Company immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this Agreement by Consultant and Consultant's employees and consultants, and will cooperate with Company in every reasonable way to help Company regain possession of the Confidential Information and prevent its further unauthorized use or disclosure.

Consultant shall, at Company's request, return all originals, copies, reproductions and summaries of Confidential Information and all other tangible materials and devices provided to the Consultant as Confidential Information, or at Company's option, certify destruction of the same.

"Trade Secret Information" means that information which Company protects in accordance with state trade secret law and which has been identified by the owner as a trade secret.

Consultant shall: (i) refrain from disclosing any Trade Secret Information to third parties for as long as the disclosing party maintains the trade secret; (ii) use no less than reasonable care, to keep confidential the Trade Secret Information; and (iii) refrain from using for any purpose the Trade Secret Information except in pursuance of the business relationship between Company and Consultant, and only as otherwise provided hereunder.

8. Intellectual Property Rights. Consultant shall make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company all right, title and interest in and to any inventions which Consultant, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to this Agreement, or that result from work done for the Company prior to or

Confidential When Completed

after the date of this Agreement (collectively. "Company Inventions"). Such Company Inventions shall be the exclusive property of the Company. whether patented or not.

Consultant acknowledges that all works of authorship developed in the course of work performed pursuant to this Agreement and which are protectable by copyright, are "works made for hire." as that term is defined in the United States Copyright Act (17 U.S.C. Section 101 *et seq.*). To the extent that such works do not constitute works made for hire under operation of law, Consultant hereby assign all rights. title and interest in and to such works to the Company.

Consultant will provide the Company with all assistance reasonably requested by the Company to preserve its rights to the Company Inventions and to obtain and enforce United States and foreign proprietary rights relating to any and all such Company Inventions in any and all countries. To that end Consultant will. and/or will cause its employees to, execute, verify and deliver (A) such documents and perform such other acts (including appearing as a witness) as Consultant may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and/or the assignment thereof, and (B) assignments to the Company or its designee of such proprietary rights. Consultant's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue after the termination of this Agreement. so long as Consultant is compensated at then-standard rates. In the event the Company is unable for any reason, after reasonable effort, to secure Consultant and/or Consultant's employee(s) signature(s) on any document needed in connection with the actions specified hereinabove, Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultants and Consultant's employee(s) behalf to execute. verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this section with the same legal force and effect as if executed by Consultant and/or Consultant's employee(s). Such appointment is coupled with an interest. Consultant hereby waives and quitclaims to the Company any and all claims of any nature whatsoever which Consultant now or may hereafter have for infringement of any proprietary rights assigned by Consultant to the Company.

9. Legal Relief. In the event Consultant breaches, or threatens to breach any of the covenants expressed herein. the damages to the Company will be difficult to quantify; therefore. the Company may apply to a court of competent jurisdiction for injunctive or other equitable relief to restrain such breach or threat of breach. without disentitling the Company from any other relief in either law or equity.

10. Export Regulations. Consultant acknowledges his obligations to control access to technical data under the U.S. Export Laws and Regulations and agrees to adhere to such laws and regulations with regard to any technical data received or developed under this Agreement.

11. Adherence to Laws. Consultant agrees that in carrying out his duties and responsibilities under this Agreement, he will neither undertake nor cause, nor permit to be undertaken, any activity which either (i) is illegal under any laws. decrees, rules, or regulations in effect in either the United States or any other country in which the Company has a business interest; or (ii) would have the effect of causing the Company to be in violation of any laws. decrees. rules, or regulations in effect in either the United States or any other country in which the Company has a business interest.

12. Warranties & Representations. Consultant hereby represents and warrants to Company that (1) Consultant has the right and authority to enter into this Agreement, (2) Consultant has no conflicts or other obligations which would prevent Consultant from performing under this Agreement, (3) all services. work and deliverables to be performed hereunder shall be performed by him in a professional and workmanlike manner. in accordance with the highest industry standards. and (4) all works of authorship and/or inventions shall be original unless expressly identified as otherwise by Consultant to Company.

13. Indemnification. Consultant shall defend, indemnify and hold harmless the Company and its officers, directors, employees, agents. parent. subsidiaries and other affiliates, from and against any and all damages. costs. liability, and expense whatsoever (including attorneys' fees and related disbursements) incurred by reason of (a) any failure by Consultant to perform any covenant or agreement of Consultant set

Confidential When Completed

forth herein; (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement. The Company shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this section.

14. Entire Agreement/Amendments. This Agreement replaces and supersedes all prior agreements, relating to the subject matter hereof, between the parties to this agreement. No alteration, modification, amendment or other change of this Agreement shall be binding on the parties unless in writing, approved and executed by Consultant and an authorized officer of the Company, whether by operation of law or otherwise.

15. Assignment. This Agreement is not assignable by Consultant, whether by operation of law or otherwise. This Agreement is freely assignable by Company.

16. Governing Law. This Agreement shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of New York, excluding conflicts of laws principles, and both parties further consent to jurisdiction by the state and federal courts sitting in the State of New York.

17. Invalidity. The terms of this Agreement shall be severable so that if any term, clause, or provision hereof shall be deemed invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining terms, clauses and provisions hereof, the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof, they would have executed an agreement containing the remaining terms, clauses and provisions of this Agreement.

18. Waiver of Breach. The waiver by either party hereto of any breach of the terms and conditions hereof will not be considered a modification of any provision, nor shall such a waiver act to bar the enforcement of any subsequent breach.

19 Background, Enumerations and Headings. The "Background," enumerations and headings contained in this Agreement are for convenience of reference only, and are not intended to have any substantive significance in interpreting this Agreement.

20. Company Property. All Company property in the possession or control of Consultant will be returned by Consultant to the Company on demand, or at the termination of this Agreement, whichever shall come first.

21. Non-Solicitation. Consultant agrees for a period of two (2) years following termination of this agreement not to solicit, offer to hire and/or hire any Company employee.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first written above.

For Consultant:

Name: Kenneth C. Tola, Jr.
Title: President
Company: BI3, Inc

For Company:

_____

Name: Alan B. Hamor
Title: Chairman, CEO

Confidential When Completed

forth herein; (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement. The Company shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this section.

14.  Entire Agreement/Amendments.  This Agreement replaces and supersedes all prior agreements relating to the subject matter hereof, between the parties to this agreement. No alteration, modification, amendment or other change of this Agreement shall be binding on the parties unless in writing, approved and executed by Consultant and an authorized officer of the Company, whether by operation of law or otherwise.

15.  Assignment.  This Agreement is not assignable by Consultant, whether by operation of law or otherwise. This Agreement is freely assignable by Company.

16.  Governing Law.  This Agreement shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of New York, excluding conflicts of laws principles, and both parties further consent to jurisdiction by the state and federal courts sitting in the State of New York.

17.  Invalidity.  The terms of this Agreement shall be severable so that if any term, clause, or provision hereof shall be deemed invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining terms, clauses and provisions hereof, the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof, they would have executed an agreement containing the remaining terms, clauses and provisions of this Agreement.

18.  Waiver of Breach.  The waiver by either party hereto of any breach of the terms and conditions hereof will not be considered a modification of any provision, nor shall such a waiver act to bar the enforcement of any subsequent breach.

19.  Background, Enumerations and Headings.  The "Background," enumerations and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

20.  Company Property.  All Company property in the possession or control of Consultant will be retained by Consultant to the Company on demand, or at the termination of this Agreement, whichever shall come first.

21.  Non-Solicitation.  Consultant agrees for a period of two (2) years following termination of this agreement not to solicit, offer to hire and/or hire any Company employee.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first written above.

For Consultant:                              For Company:

Name: Kenneth C. Tola, Jr.                   Name: Alan B. Hamor
Title: President                             Title: Chairman, CEO
Company: BI3, Inc.

Consulting Agreement                    4 of 5

Confidential When Completed

## **Appendix A: Scope of Work**

For the project AutmoBids.com, Consultant is to provide supporting services to assist Nimble Communications in implementing certain graphics elements into the web site.

For the project AutomoAds.com. Consultant is to provide the following services to the Company:

- Review of initial specification and preparation of a "wireframe" version of the site and application
- Creation of the base UI and supporting code for the campaign planning. keyword generation and targeting application
- Interface with applicable partners or API's
- Creation and coding of the base UI and report schema
- Testing of application
- Assistance in the installation of the application in a production environment

Confidential When Completed

## Appendix B: Compensation

For services provided regarding the AutomoBids.com project. Consultant is expected to bill approximately $3,250. which billing shall be included in the Nimble Communications billing.  Total $3.250 (for weeks ending 8/6, 8/13).

For services provided regarding the AutomoAds.com project. Consultant is expected to bill approximately $20,000 according to the following schedule:

| | |
|---|---|
| Nimble Communications billing (for weeks ending 8/6, 8/13) | $4,875 |
| Week 1 and 2 ($4,000 each) (for weeks ending 8/20, 8/27) | $8,000 |
| Week 3 and 4 ($3,000 each) (for weeks ending 9/3, 9/10) | $6,000 |

All payments should be made to BI3, Inc within 30 days of the greater of the last date as detailed in the previous paragraph or the receipt of the invoice.

Additional services for other projects. should they occur in the future. will be accounted for under a separate SOW.

# Exhibit B

Confidential When Completed

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT is made as of this 12th day of January, 2007, by and between CampaignLocal Inc., ("Company"), having a place of business at 22 Meadow Lane, Pennington, NJ 08534, ("Company"), and Earl Grant-Lawrence ("Consultant") an individual doing business as EKenDo, LLC and having a place of business at 4001 Fannin Street #4143, Houston, Texas 77004.

**Background**

The Company is engaged in the business of developing software for network-based bidding and commerce systems. Consultant has expertise and experience in areas beneficial to the Company and desires to consult with the Company in those areas of expertise. Based on Consultant's experience, the Company desires to retain the services of Consultant and Consultant desires to render such services on the terms and conditions set forth below.

IN CONSIDERATION of the foregoing and of the mutual terms set forth below, the parties, intending to be legally bound, agree as follows:

1. Retention as Consultant. The Company hereby retains Consultant, and Consultant hereby agrees to render consulting services to the Company, upon the terms and conditions set forth herein.

2. Duties. Consultant shall perform the services detailed in Appendix A, **Scope of Work**, incorporated herein in its entirety.

3. Independent Consultant Status. The parties recognize that Consultant is an independent Consultant and that the Company will not incur any liability as a result of Consultant's actions. Consultant shall at all times disclose that he is an independent Consultant of the Company. The Company shall not withhold any funds from Consultant's compensation for tax or other governmental purposes, and Consultant shall be responsible for the payment of same. Consultant shall not be entitled to receive any employment benefits offered to employees of the Company, including but not limited to: workers' compensation coverage; savings or profit sharing plans; stock option, incentive or other bonus plans; health, dental or life insurance coverage; and paid vacations. The Company shall not exercise control over Consultant.

4. Compensation. The Company shall pay to Consultant, as compensation for the services to be rendered, the amounts set out in Appendix B, **Compensation**, incorporated herein in its entirety.

Unless expressly agreed between the parties herein, the Company shall not be obligated to provide a minimum number of hours of work, nor shall Consultant be entitled to receive any compensation for hours not actually worked.

The Company shall reimburse Consultant for all ordinary and necessary expenses incurred in connection with the performance of his services hereunder, provided that timely notice of such expenses is sent to and approved by an appropriate officer or other authorized representative of the Company. Expenses totaling over two hundred and fifty dollars ($250) shall be pre-approved by the Company.

5. Term. This Agreement shall commence on the date written above and shall continue indefinitely until such time as either Consultant or the Company terminates the Agreement as provided below.

6. Termination. The parties agree that either the Company or Consultant through written notice may terminate Consultant's engagement under this Agreement at any time for any reason or for no reason. Upon termination, Consultant shall deliver all completed work and Company shall pay Consultant for completed work.

Confidential When Completed

7. <u>Confidential Information</u>. "Confidential Information" means non-public information Company designates to Consultant as being confidential. Such designation of confidentiality shall be by writing or marking for written materials and verbally at the time of disclosure, or in a summary written document following a verbal disclosure, for non-written materials. Confidential Information includes, without limitation, information in tangible or intangible form relating to and/or including the Company's technology, know-how, marketing or promotional activities, business policies or practices, and information received from others that Company is obligated to treat as confidential.

Confidential Information shall not include any information, however designated, that: (i) is or subsequently becomes publicly available without Consultant's breach of any obligation owed Company; (ii) became known to Consultant prior to Company's disclosure of such information to Consultant pursuant to the terms of this Agreement; (iii) is or subsequently becomes known to Consultant from a source other than Company other than by the breach of an obligation of confidentiality owed to Company: or (iv) is independently developed by Consultant.

Consultant shall: (i) refrain from disclosing any confidential Information of Company to third parties for seven (7) years following the date that Company first discloses such Confidential Information to Consultant; (ii) take reasonable security precautions, at least as great as the precautions Consultant takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information of the Company; and (iii) refrain from using, including without limitation disclosing, reproducing, summarizing and/or distributing, Confidential Information of Company except in pursuance of Consultant's business relationship with Company, and only as otherwise provided hereunder.

Notwithstanding the obligations herein, Consultant may disclose Confidential Information of Company in accordance with a judicial or other governmental order, provided that Consultant either: (i) gives Company reasonable notice prior to such disclosure to allow Company a reasonable opportunity to seek a protective order or equivalent, or (ii) obtains written assurance from the applicable judicial or governmental entity that it will afford the Confidential Information the highest level of protection afforded under applicable law or regulation.

Consultant may disclose Confidential Information to its affiliates, employees and consultants only on a need-to-know basis. Consultant will have executed or shall execute appropriate written agreements with its affiliates, employees and consultants sufficient to enable Consultant to enforce all the provisions of this Agreement.

Consultant shall notify Company immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this Agreement by Consultant and Consultant's employees and consultants, and will cooperate with Company in every reasonable way to help Company regain possession of the Confidential Information and prevent its further unauthorized use or disclosure.

Consultant shall, at Company's request, return all originals, copies, reproductions and summaries of Confidential Information and all other tangible materials and devices provided to the Consultant as Confidential Information, or at Company's option, certify destruction of the same.

"Trade Secret Information" means that information which Company protects in accordance with state trade secret law and which has been identified by the owner as a trade secret.

Consultant shall: (i) refrain from disclosing any Trade Secret Information to third parties for as long as the disclosing party maintains the trade secret; (ii) use no less than reasonable care, to keep confidential the Trade Secret Information; and (iii) refrain from using for any purpose the Trade Secret Information except in pursuance of the business relationship between Company and Consultant, and only as otherwise provided hereunder.

Confidential When Completed

8. Intellectual Property Rights. Consultant shall make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company all right, title and interest in and to any inventions which Consultant, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to this Agreement, or that result from work done for the Company prior to or after the date of this Agreement (collectively, "Company Inventions"). Such Company Inventions shall be the exclusive property of the Company, whether patented or not.

Consultant acknowledges that all works of authorship developed in the course of work performed pursuant to this Agreement and which are protectable by copyright, are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. Section 101 *et seq.*). To the extent that such works do not constitute works made for hire under operation of law, Consultant hereby assign all rights, title and interest in and to such works to the Company.

Consultant will provide the Company with all assistance reasonably requested by the Company to preserve its rights to the Company Inventions and to obtain and enforce United States and foreign proprietary rights relating to any and all such Company Inventions in any and all countries. To that end Consultant will, and/or will cause its employees to, execute, verify and deliver (A) such documents and perform such other acts (including appearing as a witness) as Consultant may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and/or the assignment thereof, and (B) assignments to the Company or its designee of such proprietary rights. Consultant's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue after the termination of this Agreement. In the event the Company is unable for any reason, after reasonable effort, to secure Consultant and/or Consultant's employee(s) signature(s) on any document needed in connection with the actions specified hereinabove, Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultants and Consultant's employee(s) behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this section with the same legal force and effect as if executed by Consultant and/or Consultant's employee(s). Such appointment is coupled with an interest. Consultant hereby waives and quitclaims to the Company any and all claims of any nature whatsoever which Consultant now or may hereafter have for infringement of any proprietary rights assigned by Consultant to the Company.

9. Legal Relief. In the event Consultant breaches, or threatens to breach any of the covenants expressed herein, the damages to the Company will be difficult to quantify; therefore, the Company may apply to a court of competent jurisdiction for injunctive or other equitable relief to restrain such breach or threat of breach, without disentitling the Company from any other relief in either law or equity.

10. Export Regulations. Consultant acknowledges his obligations to control access to technical data under the U.S. Export Laws and Regulations and agrees to adhere to such laws and regulations with regard to any technical data received or developed under this Agreement.

11. Adherence to Laws. Consultant agrees that in carrying out his duties and responsibilities under this Agreement, he will neither undertake nor cause, nor permit to be undertaken, any activity which either (i) is illegal under any laws, decrees, rules, or regulations in effect in either the United States or any other country in which the Company has a business interest; or (ii) would have the effect of causing the Company to be in violation of any laws, decrees, rules, or regulations in effect in either the United States or any other country in which the Company has a business interest.

12. Warranties & Representations. Consultant hereby represents and warrants to Company that (1) Consultant has the right and authority to enter into this Agreement, (2) Consultant has no conflicts or other obligations which would prevent Consultant from performing under this Agreement, (3) all services, work and deliverables to be performed hereunder shall be performed by him in a professional and workmanlike manner, in accordance with the highest industry standards, and (4) all works of authorship and/or inventions shall be original unless expressly identified as otherwise by Consultant to Company.

Confidential When Completed

13. **Indemnification.** Consultant shall defend, indemnify and hold harmless the Company and its officers, directors, employees, agents, parent, subsidiaries and other affiliates, from and against any and all damages, costs, liability, and expense whatsoever (including attorneys' fees and related disbursements) incurred by reason of (a) any failure by Consultant to perform any covenant or agreement of Consultant set forth herein; (b) injury to or death of any person or any damage to or loss of property which is due to the negligence and/or willful acts of Consultant; or (c) any breach by Consultant of any representation, warranty, covenant or agreement under this Agreement. The Company shall have the right to offset against any fees or commissions due Consultant under this Agreement the amount of any indemnity to which the Company is entitled under this section.

14. **Entire Agreement/Amendments.** This Agreement replaces and supersedes all prior agreements, relating to the subject matter hereof, between the parties to this agreement. No alteration, modification, amendment or other change of this Agreement shall be binding on the parties unless in writing, approved and executed by Consultant and an authorized officer of the Company, whether by operation of law or otherwise.

15. **Assignment.** This Agreement is not assignable by Consultant, whether by operation of law or otherwise. This Agreement is freely assignable by Company.

16. **Governing Law.** This Agreement shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of New York, excluding conflicts of laws principles, and both parties further consent to jurisdiction by the state and federal courts sitting in the State of New York.

17. **Invalidity.** The terms of this Agreement shall be severable so that if any term, clause, or provision hereof shall be deemed invalid or unenforceable for any reason by a court of competent jurisdiction, such invalidity or unenforceability shall not affect the remaining terms, clauses and provisions hereof, the parties intending that if any such term, clause or provision were held to be invalid prior to the execution hereof, they would have executed an agreement containing the remaining terms, clauses and provisions of this Agreement.

18. **Waiver of Breach.** The waiver by either party hereto of any breach of the terms and conditions hereof will not be considered a modification of any provision, nor shall such a waiver act to bar the enforcement of any subsequent breach.

19 **Background, Enumerations and Headings.** The "Background," enumerations and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

20. **Company Property.** All Company property in the possession or control of Consultant will be returned by Consultant to the Company on demand, or at the termination of this Agreement, whichever shall come first.

21. **Non-Solicitation.** Consultant agrees for a period of two (2) years following termination of this agreement not to solicit, offer to hire and/or hire any Company employee.

IN WITNESS WHEREOF, the parties have executed this Agreement effective the date first written above.

For Consultant:

Name: Earl K Grant L
Title: Software Engineer

For Company:

Name: ___ __ _____ __
Title: CEO

Consulting Agreement          4 of 6

Confidential When Completed

## Appendix A: Scope of Work

The Consultant shall be responsible for providing expertise in the general areas of client-side programming, .NET-based web and Windows coding and SQL Server 2005 data integration and Geospatial Information Services (GIS). In addition, it is expected that, over the course of the next two to three months, the Consultant shall acquire custom knowledge and expertise in order to develop the following solutions:

Tracking and Reporting

The Consultant shall obtain requirements to design and implement a tracking and central reporting solution that:

- Implements a custom daemon to track website visitor traffic on client sites – including the unique tracking of from submissions on said sites.
  - o The current ClickTracks functionality shall be used as a starting point for this functionality.
  - o The limitations discovered in ClickTracks shall be resolved in this custom solution.
- Provides the ability to integrate various sources of data into a central data SQL Server repository capable of supporting:
  - o Ad Hoc Reporting
  - o Data Mining
  - o Examples of data include Google, Yahoo, Call Source, etc…
  - o Reports should start with the current set of ClickTracks reports but expand from there.

Confidential When Completed

## **Appendix B: Compensation**

Consultant to be paid at the rate of $8,000 per month, billed in increments of $4,000 every two weeks.