## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **BI3, Inc., an Illinois Corporation, and** | ) | |
| **Kenneth C. Tola, Jr., an Illinois Resident,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 08 CV 2384** |
| | ) | |
| **Alan B. Hamor, a New Jersey Resident,** | ) | **JUDGE DER-YEGHIAYAN** |
| **WK Networks, Inc., a Delaware** | ) | |
| **Corporation, and CampaignLocal, Inc.,** | ) | **MASGISTRATE JUDGE KEYS** |
| **a Delaware Corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFFS/COUNTER-DEFENDANTS' BI3, INC., AND KENNETH C. TOLA'S ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIMS OF ALAN B. HAMOR, WK NETWORKS, INC., AND CAMPAIGNLOCAL,INC.

Plaintiffs/Counter-Defendants, BI3, Inc., and Kenneth C. Tola, by counsel, Joseph J. Zaknoen and Edward G. Zaknoen of Zaknoen & Zaknoen LLC for their Answer to the Counterclaims of Alan B. Hamor, WK Networks, Inc., and CampaignLocal, Inc., state as follows:

### ANSWER TO COUNTERCLAIMS

### PARTIES AND BACKGROUND

1.      Alan B. Hamor ("Hamor") is a citizen of the State of New Jersey and resides at 22 Meadow Lane, Pennington, New Jersey, 08534.

**ANSWER:**    Counter-Defendants admit the allegations of Paragraph 1.

2.      For approximately the past ten years, Hamor has been an entrepreneur with a focus on innovative technologies in the Web and marketing areas. Prior to that, he was a corporate finance and strategic advisory consultant for small and middle market companies.

**ANSWER:**     Counter-Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 2 and therefore deny the same.

3.     WK Networks, Inc. ("WK") is, and was at all relevant times, a corporation duly formed under the laws of the State of Delaware with a principal place of business at 22 Meadow Lane, Pennington, New Jersey, 08534.

**ANSWER:**     Counter-Defendants admit the allegations of Paragraph 3.

4.     WK is an intellectual property creation, development, and licensing entity that currently holds issued and pending patents, domain names, trademarks, copyrights, and trade secret information and technology relating to Internet and web-based applications. Hamor is the Chairman and CEO of WK.

**ANSWER:**     Counter-Defendants admit that Hamor is the Chairman and CEO of WK.  Counter-Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 4 and therefore deny the same.

5.     CampaignLocal Inc. ("CL") is, and was at all relevant times, a corporation duly formed under the laws of the State of Delaware with a principal place of business at 22 Meadow Lane, Pennington, New Jersey, 08534.

**ANSWER:**     Counter-Defendants admit the allegations of Paragraph 5.

6.     Formed in September 2006, CL provides Web marketing and reporting services with an emphasis on geo-targeting of advertising campaigns.

**ANSWER:**     Counter-Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 6 and therefore deny the same.

7.     Upon information and belief, Kenneth C. Tola, Jr. ("Tola") is a resident and citizen of the state of Illinois and currently resides at 220 West Scott Street, in the City of Chicago, Cook County, Illinois.

**ANSWER:**     Counter-Defendants admit that at relevant times, Tola was a resident and citizen of the State of Illinois residing at 220 West Scott Street, in the City of Chicago, Cook County, Illinois.

8.     Upon information and belief, BI3, Inc. ("BI3") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 220 West Scott Street, Chicago, Illinois.

**ANSWER:**     Counter-Defendants admit that at relevant times, BI3, Inc., was a corporation organized and existing under the laws of the State of Illinois with its principal place of business at 220 West Scott Street, Chicago, Illinois.

9.     Upon information and belief, Tola is the President and sole stockholder of BI3.

**ANSWER:**     Counter-Defendants admit the allegations of Paragraph 9.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction exists by virtue of 28 U.S.C. § 1332, diversity jurisdiction, in that this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

**ANSWER:**     Counter-Defendants admit that this is an action between citizens of different states.  Counter-Defendants deny that Counter-Plaintiffs have adequately pled damages in excess of $75,000, exclusive of costs and interest, and deny that Counter-Plaintiffs are entitled to any of the relief they seek.

11.     Personal jurisdiction exists over the Counter-Defendants in that both are residents of Chicago, Illinois.

**ANSWER:**     Counter-Defendants admit that personal jurisdiction exists over them for purposes of the Counterclaims.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1392, in that a substantial part of the events giving rise to the claims occurred in this district and because Counter-Defendants are, upon information and belief, current residents of Chicago, Illinois.

**ANSWER:**    Counter-Defendants admit that venue is proper in this

Court pursuant to 28 U.S.C. § 1392, in that a substantial part of the events giving rise to

the claims occurred in this district and because, at all relevant times herein, Counter-

Defendants were residents of Chicago, Illinois.

### COMMON FACTUAL ALLEGATIONS

13.    In 2006, Hamor was Chairman and CEO of an internet and web-based
application related company, Auto Bid Systems, Inc. ("ABS"). ABS was formed in 2006
for the sole purpose of deploying certain technologies owned by WK, called 1ShotBids,
in the retail automotive space in the United States and Canada. The bid/offer
technological application to be developed at ABS was called AutomoBids.

**ANSWER:**    Counter-Defendants admit that Hamor was the Chairman

and CEO of Auto Bid Systems, Inc., ("ABS").  Counter-Defendants admit that ABS was

developing certain technology known as AutomoBids which was a bid/offer

technological application. Counter-Defendants are without sufficient knowledge or

information to form a belief as to the truth of the remaining allegations of Paragraph 13

and therefore deny the same.

14.    At the time, ABS was using a graphics design firm, Nimble
Communications, for the design work on its web site and the web-based bidding
application AutomoBids. On or around July 31, 2006, Tola was introduced to ABS by
Nimble Communications as a possible developer for the bidding/offer application
AutomoBids and for the conversion of graphic files to web graphics.

**ANSWER:**    Counter-Defendants admit that ABS was using a graphics

design firm, Nimble Communications, for the design work on its web site and the web-

based bidding application AutomoBids.  Counter-Defendants admit that BI3 performed

the conversion of graphic files to web graphics pursuant to a contract with Nimble

Communications dated July 31, 2006.  Counter-Defendants admit that BI3 was being

considered by ABS as a possible developer for AutomoBids.  Counter-Defendants deny

any remaining allegations of Paragraph 14.

15.    At this time, Hamor did not know of Tola. Tola was introduced to Hamor by other parties at ABS as someone who might provide assistance in the development of a separate software platform called AutomoAds.

**ANSWER:**    Counter-Defendants admit that Tola did not know Hamor

prior to July 31, 2006, and that Tola was introduced to Hamor by other parties at ABS.

Counter-Defendants admit that BI3 was being considered by ABS to provide services in

the development of AutomoAds.  Counter-Defendants deny any remaining allegations of

Paragraph 15.

16.    Tola commenced working on the AutomoAds concept after he completed his work on the AutomoBids user interface. Tola agreed that he would be paid by either or both of WK or ABS a set amount, $3,000 per week, for the going-forward services he was providing at that time.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 16.

17.    On or about August 28, 2006, Tola and Hamor discussed Tola's ownership interest in CL, the new entity being formed for the deployment of the software platform, including what was being called "AutomoAds," for the retail automotive industry.  Hamor, ABS, and Tola were all aware at this time that AutomoAds was to be a retail automotive marketing services component of an overall software platform. In addition, they were each aware that CL was to provide service to more than just the retail automotive industry. Tola agreed that he would be compensated at a rate of $3,000 per week going forward.

**ANSWER:**    Counter-Defendants admit that BI3 agreed it would be

compensated at a rate of $3,000 per week going forward.  Counter-Defendants deny the

remaining allegations of Paragraph 17.

18.    At this same time, ABS and WK continued to negotiate their arrangement concerning CL and Tola continued his efforts on building the retail automotive part of the platform.

**ANSWER:**     Counter-Defendants admit that Tola, on behalf of BI3,

continued his efforts in building a retail automotive application.  Counter-Defendants are

without sufficient knowledge or information to form a belief as to the truth of the

remaining allegations of Paragraph 18 and therefore deny the same.

19.     On or about September 24, 2006, Hamor proposed to Tola an increase in Tola's prospective ownership of CL from 1% to 6%. Tola and Hamor further discussed the imminent incorporation of CL and the prospect of Tola serving as an officer and director of the company.  Tola was agreeable to fulfilling that role and later did so.

**ANSWER:**     Counter-Defendants admit that Hamor sent Tola an e-mail

on or about September 24, 2006, purportedly showing that Tola's prospective ownership

of CL would be increased from 1% to 6%.  Counter-Defendants admit that much later in

2007 Tola was introduced by Hamor as a Secretary and Director of CL.  Counter-

Defendants deny the remaining allegations of Paragraph 19.

20.     ABS and WK ultimately reached an understanding and business arrangement concerning AutomoAds and CL. On or around September 26, 2006, Glen Gulyas, Chief Operating Officer of ABS notified Tola that Tola's initial payment of $10,000 for services rendered would be sent from ABS and that subsequent payments would come from CL with possible participation from ABS.

**ANSWER:**     Counter-Defendants admit that on or about September 26,

2006, Tola received an e-mail from Glen Gulyas, Chief Operating Officer of ABS,

informing Tola that ABS was going to send a check for $10,000 to BI3 for services

rendered, which e-mail speaks for itself.  Counter-Defendants are without sufficient

knowledge or information to form a belief as to the truth of the remaining allegations of

Paragraph 20 and therefore deny the same.

21.     On or around September 29, 2006, BI3 and Tola, as BI3's President and sole shareholder, executed a Consulting Agreement with WK. The Consulting Agreement has an effective date of August 1, 2006. A copy of the Consulting Agreement is attached to these Counterclaims as Exhibit A.

**ANSWER:**     Counter-Defendants admit that on or about September 29, 2006, BI3 and WK Networks executed a written Consulting Agreement bearing an effective date of August 1, 2006, and that Tola executed the Consulting Agreement on behalf of BI3.  Counter-Defendants deny the remaining allegations of Paragraph 21.

22.     In the Consulting Agreement, WK agreed to retain BI3 and Tola as BI3's sole shareholder as a consultant to render services to and on behalf of WK. BI3 and Tola agreed to render such services to WK.

**ANSWER:**     Counter-Defendants admit that pursuant to the Consulting Agreement, WK agreed to retain BI3 and BI3 agreed to render services to WK.  Counter-Defendants deny the remaining allegations of Paragraph 22.

23.     Provision 5 of the Consulting Agreement states that the agreement "shall commence on the date written above and shall continue indefinitely until such time as either Consultant or the Company terminates the Agreement as provided below." BI3 and Tola have not provided written notice of termination of the Consulting Agreement. At all times relevant to this Counterclaim, the Consulting Agreement was in effect.

**ANSWER:**     Counter-Defendants admit that the language selectively quoted by Counter-Plaintiffs appears in the Consulting Agreement.  Counter-Defendants deny the remaining allegations of Paragraph 23.

24.     WK has performed all of its obligations under the terms of the Consulting Agreement, including but not limited to, compensating BI3 and Tola for all work performed under the Consulting Agreement.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 24.

25.     The Consulting Agreement contains a provision relating to "Confidential Information," Provision 7, which states, in pertinent part, as follows:

7.     Confidential Information. "Confidential Information" means nonpublic information Company designates to Consultant as being confidential. …
Confidential Information includes, without limitation, information in tangible or intangible form relating to and/or including the Company's technology, knowhow, marketing or promotional activities, business

policies or practices, and information received from others that Company is obligated to treat as confidential.

…

Consultant shall: (i) refrain from disclosing any confidential Information of Company to third parties for seven (7) years following the date that Company first discloses such Confidential Information to Consultant; (ii) take reasonable security precautions, at least as great as the precautions Consultant takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information of the Company; and (iii) refrain from using, including without limitation disclosing, reproducing, summarizing and/or distributing, Confidential Information of Company except in pursuant of Consultant's business relationship with Company, and only as otherwise provided hereunder.

…

"Trade Secret Information" means that information which Company protects in accordance with state trade secret law and which has been identified by the owner as a trade secret.

Consultant shall: (i) refrain from disclosing any Trade Secret Information to third parties for as long as the disclosing party maintains the trade secret; (ii) use no less than reasonable care to keep confidential the Trade Secret Information; and (iii) refrain from using for any purpose the Trade Secret Information except in pursuance of the business relationship between Company and Consultant, and only as otherwise provided hereunder.

**ANSWER:**    Counter-Defendants admit that the Consulting Agreement

contains the language selectively quoted by Counter-Plaintiffs.

26.    The Consulting Agreement contains a provision regarding "Intellectual Property Rights," Provision 8, which states in pertinent part:

8.    Intellectual Property Rights. Consultant shall make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assigns to the Company all right, title and interest in and to any inventions which Consultant, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to this Agreement, or that result from work done for the Company prior to or after the date of this Agreement (collectively, "Company Inventions"). Such Company Inventions shall be the exclusive property of the Company, whether patented or not.

Consultant acknowledges that all works of authorship developed in the course of work performed pursuant to this Agreement and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. Section 101 et seq.). To the extent that such works do not constitute works made for hire under operation of law, Consultant hereby assign all rights, title and interest in and to such works to the Company.

Consultant will provide the Company with all assistance reasonably requested by the Company to preserve its rights to the Company Inventions and to obtain and enforce United States and foreign proprietary rights relating to any and all such Company Inventions in any and all countries. To that end Consultant will, and/or will cause its employees to, execute, verify and deliver (A) such documents and perform such other acts (including appearing as a witness) as Consultant may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and/or the assignment thereof, and (B) assignments to the Company or its designee of such proprietary rights.  Consultant's obligation to assist the Company with respect to proprietary rights in any and all countries shall continue after the termination of this Agreement, so long as Consultant is compensated at then-standard rates. In the event the Company is unable for any reason, after reasonable effort, to secure Consultant and/or Consultant's employee(s) signature(s) on any document needed in connection with the actions specified hereinabove, Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultants and Consultant's employees(s) behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this section with the same legal force and effect as if executed by Consultant and/or Consultant's employee(s). Such appointment is coupled with an interest. Consultant hereby waives and quitclaims to the Company any and all claims of any nature whatsoever which Consultant now or may hereafter have for infringement of any proprietary rights assigned by Consultant to the Company.

**ANSWER:**    Counter-Defendants admit that the language selectively quoted by Counter-Plaintiffs appears in the Consulting Agreement.

27.    The Consulting Agreement further contains a provision relating to "Legal Relief," Provision 9, which states as follows:

9.    Legal Relief. In the event Consultant breaches, or threatens to breach any of the covenants expressed herein, the damages to the

Company will be difficult to quantify; therefore, the Company may apply
to a court of competent jurisdiction for injunctive or other equitable relief
to restrain such breach or threat of breach, without disentitling the
Company from any other relief in either law or equity.

**ANSWER:**    Counter-Defendants admit that the language selectively

quoted by Counter-Plaintiffs appears in the Consulting Agreement.

28. The Consulting Agreement further contains a provision relating to
"Indemnification," Provision 13, which states as follows:

13.    Indemnification. Consultant shall defend, indemnify and hold
harmless the Company and its officers, directors, employees, agents,
parent, subsidiaries and other affiliates, from and against any and all
damages, costs, liability and expense whatsoever (including attorneys'
fees and related disbursements) incurred by reason of (a) any failure by
Consultant to perform any covenant or agreement of Consultant set forth
herein; (b) injury to or death of any person or any damage to or loss of
property which is due to the negligence and/or willful acts of Consultant;
or (c) any breach by Consultant of any representation, warranty, covenant
or agreement under this Agreement. The Company shall have the right to
offset against any fees or commissions due Consultant under this
Agreement the amount of any indemnity to which the Company is entitled
under this section.

**ANSWER:**    Counter-Defendants admit that the language selectively

quoted by Counter-Plaintiffs appears in the Consulting Agreement.

29.    As evidenced by the Consulting Agreement, WK identifies and protects all
of its confidential and proprietary technology and information, intellectual property, and
trade secrets.  CL also identifies and protects all of its confidential and proprietary
technology and information, intellectual property, and trade secrets. During all times
relevant to these Counterclaims, Counter-Plaintiffs require all individuals coming into
contact with such information to execute a non-disclosure agreement and/or a consulting
agreement with provisions to protect Counter-Plaintiffs' confidential proprietary
interests.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 29.

30.    At all times relevant to this Counterclaim, WK and CL advised BI3 and
Tola of the proprietary and confidential nature of WK's and CL's technology,
information, intellectual property and trade secrets to which BI3 and Tola came into
contact. BI3 and Tola were aware that all work being performed by them for WK or at

WK's direction for CL involved such proprietary and confidential technology, information, intellectual property and trade secrets.

> **ANSWER:**    Counter-Defendants admit that Tola, on behalf of BI3 executed certain written agreements containing provisions relating to confidential and proprietary information, which agreements speak for themselves.  Counter-Defendants admit that after these agreements were signed, Hamor, instructed Tola not to speak to ABS or Nimble Communications personnel regarding the work BI3 was performing under the Consulting Agreement with WK.  Counter-Defendants deny the remaining allegations of Paragraph 30.

31.    Ultimately, the CL automotive platform launched in early December 2006. At that time, Tola was acting as an officer and director of CL. Tola continued to act and/or serve as an officer and director of CL at all times relevant to these Counterclaims subsequent to December 2006.

> **ANSWER:**    Counter-Defendants admit that the CL automotive platform launched in early December 2006.  Counter-Defendants deny the remaining allegations of Paragraph 31.

32.    In December 2006, Hamor and Tola discussed potential additions to the CL automotive platform. On or about December 15, 2006, Tola provided Hamor with a detailed project plan for the expansion of the platform. A priority line item of the proposed project plan was the development of an integrated reporting program using the ClickTracks system that CL had licensed. Tola intended to begin that development on January 1, 2007.

> **ANSWER:**    Counter-Defendants admit that Tola and Hamor had discussions about potential additions to the CL automotive platform in December 2006, and that Tola sent Hamor a project plan on December 19, 2006, which document speaks for itself.

33.    Tola suggested that another developer, Earl Grant-Lawrence ("Grant-Lawrence"), be retained to perform the work necessary for the integrated reporting program using the ClickTracks system. He introduced Grant-Lawrence to Hamor in late

December 2006 and Hamor and Tola reached an agreement to contract with Grant-Lawrence to perform work for CL.

> **ANSWER:** Counter-Defendants admit that Tola suggested that CL retain Grant-Lawrence to perform certain services for CL and that Tola introduced Hamor to Grant-Lawrence. Counter-Defendants deny the remaining allegations of Paragraph 34.

34. Grant-Lawrence executed a Consulting Agreement with CL having an effective date of January 12, 2007. A copy of the CL-Grant-Lawrence Agreement is attached to these Counterclaims as Exhibit B. The Scope of Work provision of the Agreement was written by Tola and indicates that Grant-Lawrence was to build, on behalf of CL, a custom system that overcomes limitations in reporting and tracking of online data by ClickTracks.

> **ANSWER:** Counter-Defendants admit that Exhibit B appears to be a copy of a Consulting Agreement between CL and Grant-Lawrence, which agreement speaks for itself. Counter-Defendants deny the remaining allegations of Paragraph 34.

35. Thereafter, pursuant to the scope of work of the Agreement, Grant-Lawrence provided technical assistance to the ClickTracks data reporting system for CL. On or near January 19, 2007, Tola advised Hamor that Grant-Lawrence may have resolved certain persistent technical issues involving this ClickTracks system.

> **ANSWER:** Counter-Defendants admit that Grant-Lawrence provided services to CL relating to the ClickTracks data reporting system. Counter-Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 35 and therefore deny the same.

36. On February 2, 2007, Grant-Lawrence, Hamor, and Tola discussed Grant-Lawrence's proposed solution for ClickTracks. Based on these discussions, Hamor identified that the solution had potential to be patented and, subsequently, he and Tola agreed to proceed with a patent review.

**ANSWER:**    Counter-Defendants admit that, at various times, Grant-Lawrence, Hamor and Tola discussed the services Grant-Lawrence was providing for CL. Counter-Defendants deny the remaining allegations of Paragraph 36.

37.    On February 12, 2007, Hamor started the patent review process for this solution.  He first forwarded to Tola a network-level patent invented by WK to allow Tola to compare that patent to the CL tracking technology (later commercially referred to as DataTrender). Tola performed this analysis, a copy of which was provided to both Hamor and Grant-Lawrence.

**ANSWER:**    Counter-Defendants admit that Hamor sent a network-level patent to Tola to review.  Counter-Defendants deny the remaining allegations of Paragraph 37.

38.    The new tracking technology was conceived as, and clearly was, an integral part of the CL development strategy. As such, it was and is an asset of CL. At this time, the technology was being called "Transparent Tracking Solution." The technology has since taken the name "DataTrender."

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 38.

39.    The patent application process for the technology ultimately called DataTrender took place over approximately six weeks and concluded with the filing of the application on or about April 17, 2007. Hamor, Tola, and Grant-Lawrence participated in the process in varying degrees, with Hamor and Tola performing most of the patent application work.

**ANSWER:**    Counter-Defendants admit that the provisional patent application process for the technology called DataTrender took place over approximately six weeks from the time the invention was first conceptualized and that the provisional patent application was filed on or about April 17, 2007.  Counter-Defendants admit that Tola performed most of the patent application work.   Counter-Defendants deny Counter-Plaintiffs' implication that the technology referred to as DataTrender is the same technology described in previous paragraphs.  Counter-Defendants deny the remaining allegations of Paragraph 39.

40.     The legal representation for this application was provided by JLB Consulting, a firm owned by Jeff Brandt, a renowned and accomplished patent counsel. Until he passed away unexpectedly in May 2007, Mr. Brandt was a member of the Board of Directors of WK.

**ANSWER:**    Counter-Defendants admit that JLB Consulting provided certain legal representation regarding the DataTrender provisional patent application and that Jeff Brandt passed away in May 2007.  Counter-Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 40 and therefore deny the same.

41.     Tola, Hamor, and Mr. Brandt previously had worked together on another patent application in the fall of 2006. Notice of confirmation of that application's filing and assignment by Hamor and Tola to WK was forwarded to Tola on or about November 2, 2006.

**ANSWER:**    Counter-Defendants admit that, on or about November 2, 2006, Tola received an e-mail from Hamor notifying him that a provisional patent application had been filed with the United States Patent and Trademark Office titled "Methods and Systems for Developing a Location Sensitive Online Keyword Advertising Campaign," and that Tola previously had signed an assignment form related to that provisional application.  Counter-Defendants deny the remaining allegations of Paragraph 41.

42.     On April 18, 2007, Intellevate, an IP managerial service used by Mr. Brandt, sent each of the inventors a form of an assignment of rights to the technology and instructions as to how to complete the assignment. All parties executed their respective assignments and returned both a scanned version and the original notarized version of the document. All costs of the legal work and filing were borne by CL.

**ANSWER:**    Counter-Defendants admit that Tola executed the Assignment form relating to the DataTrender invention and returned it according to

certain instructions received.  Counter-Defendants deny the remaining allegations of

Paragraph 42.

43.    On May 10, 2007, Hamor forwarded to each of Tola and Grant-Lawrence the U.S. Patent and Trademark Office confirmation of the patent assignment, clearly showing that each of the three co-inventors was named.

**ANSWER:**    Counter-Defendants admit that on May 10, 2007, Hamor

forwarded to Tola and Grant-Lawrence confirmation of the patent assignment filed with

the U.S. Patent and Trademark Office.  Counter-Defendants deny the remaining

allegations of Paragraph 43.

44.    Tola was obligated to assign any interest he may have had in the technology to any assignee of WK's choosing under Tola's Consulting Agreement with WK. Grant-Lawrence was obligated to assign any interest he may have had in the technology to CL under his Agreement with CL. Neither Tola nor Grant-Lawrence voiced any objection to his assignment of rights of the technology.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 44.

45.    On April 17, 2008, new patent counsel filed a revival of the application and a missing parts document. WK paid these expenses on behalf of CL. The patent application currently is in good standing.

**ANSWER:**    Counter-Defendants are without sufficient knowledge or

information to form a belief as to the truth of the allegations of Paragraph 45 and

therefore deny the same.

46.    On March 16, 2007, Tola added a description of this new DataTrender tracking system to the final version of CL's marketing material. When the CL began looking for potential partners, licensees and acquirers, Hamor and Tola created an Overview of the technology, now called DataTrender, for use in typical commercial literature and on the Web.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 46.

47.    Early on in the development of the tracking software ultimately called "DataTrender," Tola took it upon himself to test the market for the tracking solution by contacting CL's largest customer, the Pivec Agency, Ltd. ("Pivec"). On or around February 13, 2007, Tola described the benefits of the new system to Jerome "Jay" Pivec,

a vice president with the agency. He also requested permission to test the tracking solution on the BuyAToyota website in use by Pivec's client, Central Atlantic Toyota Dealers Association. On March 5, 2007, Tola again raised with Pivec the benefits of the new CL tracking solution and then the next day solicited Hamor's input to draft a careful response to Pivec's numerous questions about the solution so that no confidential information was disclosed.

   **ANSWER:** Counter-Defendants deny the allegations of Paragraph 47.

  48. Counter-Plaintiffs have learned through email correspondence sent to the CL email administrator account, which had been previously administered by Tola, of Tola and BI3's use of confidential information, trade secrets, and other information proprietary to Counter-Plaintiffs that Tola and BI3 obtained while working at CampaignLocal for WK.

   **ANSWER:** Counter-Defendants deny the allegations of Paragraph 48.

  49. Tola was using an email address that he had established with the Pivec on April 13, 2007 while working for WK at CL and providing service to Pivec as part of the scope of his Consulting Agreement with WK.

   **ANSWER:** Counter-Defendants deny the allegations of Paragraph 49.

  50. After dealing exclusively with Tola on behalf of CL beginning on April 10, 2007, Pivec resigned its account with CL on July 17, 2007.

   **ANSWER:** Counter-Defendants deny the allegations of Paragraph 50.

  51. On or about February 25, 2008, Counter-Plaintiffs received additional emails in the CL email administrator account demonstrating that Tola has been retained by Pivec to assume the search and banner ad marketing services for that firm effective February 15, 2008.  This is the exact business of CL.

   **ANSWER:** Counter-Defendants are without sufficient knowledge or

information to form a belief as to the truth of the allegations of Paragraph 51 regarding e-

mails Counter-Plaintiffs may have received in the CL e-mail administrator account and

therefore deny the same.  Counter-Defendants deny the remaining allegations of

Paragraph 51.

  52. Search management transition is a complicated process that takes months to complete so that new campaigns can be strategized, created, and implemented. Given this correspondence dated mid-February 2008, Tola likely had been engaged in providing

the analysis, creation and setup for these search management and banner ad services to Pivec, the exact search management services performed previously by CL, months prior to February 2008.

        **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 52.

     53.    Although Counter-Defendants developed and installed an operational retail automotive platform for CL, services for which they were properly compensated, Counter-Defendants later disassembled this operating platform of CL in favor of an all-industry platform. Despite being compensated by WK and CL to do so, Counter-Defendants never completed this all-industry platform and never re-installed the previously operational retail automotive platform.

        **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 53.

     54.    As a result of these failures on the part of Counter-Defendants, CL is greatly hindered in its ability to provide media-generation marketing services to any customer. CL's business has been greatly harmed in that its automated expert media-generation system allowed it to provide unique low-cost marketing services, resulting in a significant competitive advantage in the marketplace. As a result of Counter-Defendants' actions and inactions, CL has lost its competitive advantage in the marketplace. Counter-Defendants' actions and inactions have harmed CL's business and prevent CL from marketing its proprietary retail automotive platform.

        **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 54.

     55.    Despite being compensated to do so, Counter-Defendants never developed the DataTrender software to the point that it could be marketed by CL.

        **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 55.

     56.    Hamor has demanded that Tola return the demo software relating to DataTrender. To date, Tola has refused to return the requested demo software to CL.

        **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 56.

     57.    Counter-Defendants' failure to fully develop DataTrender has damaged CL in that CL is unable to market DataTrender without being able to demonstrate the software. In addition, without being able to demonstrate and market DataTrender, CL is unable to license or divest DataTrender to a third party interested in putting the software into production.

        **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 57.

58.    In addition to DataTrender, Counter-Defendants failed to develop other software applications for which they were compensated to do so, including but not limited to, TargetIQ.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 58.

59.    Because of Counter-Defendants' failure to complete the development of these additional software applications of CL, CL is unable to market these proprietary services.  It is precisely these proprietary services, including the DataTrender concept, which provide CL with unique assets and a competitive advantage in the marketplace. Without the ability to market these applications, CL has lost existing and future business opportunities.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 59.

60.    Through Counter-Defendants' consulting engagement with WK and with CL at WK's direction, Counter-Defendants acquired CL's proprietary advertising campaign management knowledge, technology, and information and other trade secrets of CL relating to campaign strategy, creation and management. In addition, Counter-Defendants acquired the detailed knowledge of CL's tracking and results reporting mechanisms for their own benefit and for the detriment of CL.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 60.

61.    Counter-Defendants also obtained from CL its proprietary and confidential information, intellectual property, and trade secrets relating to banner and campaign management and tracking.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 61.

62.    CL has been damaged by Counter-Defendants in that Counter-Defendants have used the proprietary and confidential information, intellectual property, and trade secrets of CL to obtain at least one former customer of CL, Pivec. In addition, Counter-Defendants are attempting to gain a competitive advantage in the marketplace by using this confidential information of CL to acquire further potential customers.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 62.

63.    Counter-Defendants' actions have harmed and continue to harm business relationships the Counter-Plaintiffs have spent considerable time and expense to build. This harm is irreparable because client relationships are delicate and cannot be easily repaired once damaged.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 63.

## CAUSES OF ACTION

## COUNT I
## DECLARATORY JUDGMENT

64.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 63 of this Counterclaim in Count I as if fully rewritten herein.

**ANSWER:**     Counter-Defendants repeat and incorporate their response to Paragraphs 1-63 as if fully set forth herein.

65.     Despite accepting the benefits of the Consulting Agreement, BI3 and Tola have breached, inter alia, the terms of the Confidential Information and Intellectual Property Rights provisions of the Consulting Agreement.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 65.

66.     Despite the clear terms of the Consulting Agreement, and upon information and belief, BI3 and Tola have and will continue to use trade secrets and other confidential and proprietary information and intellectual property owned by WK and WK's duly appointed designee, CL, for the benefit of BI3, Tola, and third parties.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 66.

67.     In addition, BI3 and Tola have alleged in their Complaint that the Consulting Agreement is invalid and that any assignment of rights thereunder was improper. Counter-Plaintiffs deny these contentions.

**ANSWER:**     Counter-Defendants admit that they have alleged in the Complaint that the Consulting Agreement is invalid and that the Assignment of rights to Data Trender is invalid.  Counter-Defendants admit that Counter-Plaintiffs have denied these allegations.  Counter-Defendants deny any remaining allegations of Paragraph 67.

68.     An actual and justiciable controversy now exists between all of the parties regarding their respective rights and obligations under the Consulting Agreement. As such, Counter-Plaintiffs request that the Court declare the rights, status, and interests of the parties herein, and declare that the Consulting Agreement is valid and enforceable, that Counter-Plaintiffs are entitled to temporary or permanent injunctive relief, and are entitled to any such other relief to be determined by the Court pursuant to the Consulting Agreement.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 68.

69.     The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

      **ANSWER:**     Counter-Defendants deny the allegations of Paragraph 69.

70.     The public interest will not be harmed by the injunctive relief requested.

      **ANSWER:**     Counter-Defendants deny the allegations of Paragraph 70.

**WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-

Plaintiffs, WK, CL, and Hamor, take nothing by way of Count I of their Counterclaim,

for costs, and for all other just and proper relief.

**COUNT II**
**BREACH OF CONTRACT**
**(The Consulting Agreement)**

71.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 70 of this Counterclaim in Count II as if fully written herein.

      **ANSWER:**     Counter-Defendants repeat and incorporate their response

to Paragraphs 1-71 as if fully set forth herein.

72.     The Consulting Agreement, in Provision 7, prohibits BI3 and Tola from, among other things, disclosing confidential information of WK for seven (7) years following the date WK first discloses such confidential information to BI3 and Tola and using, including without limitation disclosing, reproducing, summarizing and/or distributing, WK's confidential information except in pursuance of BI3 and Tola's business relationship with WK.

      **ANSWER:**     The allegations of Paragraph 72 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-

Defendants deny the remaining allegations of Paragraph 72.

73.     The Consulting Agreement, in Provision 7, further obligates BI3 and Tola to take reasonable security precautions to keep confidential the confidential information of WK.

**ANSWER:**     The allegations of Paragraph 73 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-

Defendants deny the remaining allegations of Paragraph 73.

74.     The Consulting Agreement, in Provision 7, further obligates BI3 and Tola to notify WK immediately upon the discovery of any unauthorized use or disclosure of WK's confidential information or any breach of the Consulting Agreement by BI3 and WK and to cooperate with WK in its efforts to regain the possession of all confidential information.

**ANSWER:**     The allegations of Paragraph 74 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-

Defendants deny the remaining allegations of Paragraph 74.

75.     The Consulting Agreement, in Provision 7, further obligates BI3 and Tola to: (a) refrain from disclosing any trade secret information to third parties for as long as the disclosing party maintains the trade secret; (b) use no less than reasonable care to keep confidential the trade secret information; and (c) refrain from using for any purpose trade secret information except in the pursuance of the business relationship between WK and BI3 and Tola.

**ANSWER:**     The allegations of Paragraph 75 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-

Defendants deny the remaining allegations of Paragraph 75.

76.     The Consulting Agreement, in Provision 8, further obligates BI3 and Tola to assign to WK, or WK's designee, all right, title and interest in and to any inventions which BI3 and WK, alone or with others, may conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice in the course of work performed pursuant to the Consulting Agreement, or that result from work done for WK prior to or after the date of the Consulting Agreement.

**ANSWER:**     The allegations of Paragraph 75 state only legal conclusions to which no response is required.  To the extent a response is required, Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-Defendants deny the remaining allegations of Paragraph 75.

77.     The Consulting Agreement, in Provision 8, further obligates BI3 and Tola to assist the WK in preserving its rights to "Company Inventions" under that agreement.

**ANSWER:**     The allegations of Paragraph 77 state only legal conclusions to which no response is required.  To the extent a response is required, Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-Defendants deny the remaining allegations of Paragraph 77.

78.     BI3 and Tola have breached its obligations to WK under the Consulting Agreement by, among other things, disseminating confidential and proprietary information, trade secrets, and intellectual property of WK and CL to third parties.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 78.

79.     WK performed all of its obligations to BI3 and Tola under the Consulting Agreement.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 79.

80.     All work performed by BI3 and Tola for CL was at the instruction and direction of WK and was done under the Consulting Agreement.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 80.

81.     The aforesaid breaches by BI3 and Tola are causing and will continue to cause Counter-Plaintiffs harm to their businesses, including, but not limited to, loss of revenue and profits, loss of business opportunities, the loss of their competitive advantage in the marketplace, and the loss of at least one customer.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 81.

82.     Hamor, WK, and CL have been damaged as a result of BI3 and Tola's conduct.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 82.

**WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-Plaintiffs, WK, CL, and Hamor, take nothing by way of Count II of their Counterclaim, for costs, and for all other just and proper relief.

## COUNT III
## INDEMNIFICATION
## (Consulting Agreement)

83.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 82 of this Counterclaim in Count III as if fully written herein.

**ANSWER:**     Counter-Defendants repeat and incorporate their response to Paragraphs 1-83 as if fully set forth herein.

84.     In Provision 13 of the Consulting Agreement, BI3 and Tola agree to defend, indemnify and hold harmless WK from any damages, costs, liability, and expense, including attorneys fees, incurred by WK by reason of, among other things, any failure on the part of BI3 and Tola to perform any covenant or agreement of the Consulting Agreement or any breach of the Consulting Agreement by BI3 or Tola.

**ANSWER:**     The allegations of Paragraph 84 state only legal conclusions to which no response is required.  To the extent a response is required, Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-Defendants deny the remaining allegations of Paragraph 84.

85.     BI3 and Tola have breached the Consulting Agreement by, among other things, disseminating confidential and proprietary information, intellectual property, and trade secrets of WK and CL to third parties.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 85.

86.     Counter-Plaintiffs have been damaged as a result of BI3's and Tola's failure to perform the covenants and agreements of the Consulting Agreement and because of BI3's and Tola's breach of the Consulting Agreement.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 86.

87.     Pursuant to the Consulting Agreement, Counter-Plaintiffs are entitled to indemnification from BI3 and Tola, as well as payment of any and all damages suffered by Counter-Plaintiffs as a result of BI3's and Tola's failures, including but not limited to

Counter-Plaintiffs' costs, expenses, and attorneys' fees incurred in defending BI3's and Tola's Complaint and prosecuting this Counterclaim.

**ANSWER:**     The allegations of Paragraph 87 state only legal conclusions to which no response is required.  To the extent a response is required, Counter-Defendants state that the Consulting Agreement speaks for itself.  Counter-Defendants deny the remaining allegations of Paragraph 87.

**WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-Plaintiffs, WK, CL, and Hamor, take nothing by way of Count III of their Counterclaim, for costs, and for all other just and proper relief.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS

88.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 87 of this Counterclaim in Count IV as if fully rewritten herein.

**ANSWER:**     Counter-Defendants repeat and incorporate their response to Paragraphs 1-88 as if fully set forth herein.

89.     At all relevant times, there was in full force and effect in the State of Illinois a statute known as the Illinois Trade Secrets Act, 765 ILCS 1065 et seq. (the "ITSA").

**ANSWER:**     The allegations of Paragraph 89 state only legal conclusions to which no response is required.  To the extent a response is required, counter-Defendants admit that the Illinois Trade Secrets Act, 765 ILCS 1065 et seq. exists.

90.     The ITSA defines a trade secret as:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts

that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

> **ANSWER:**    Counter-Defendants admit that Counter-Plaintiffs have accurately quoted a portion of the Illinois Trade Secrets Act.

91.    BI3 and Tola have misappropriated or will inevitably use Counter-Plaintiffs' confidential and proprietary or other information which afforded Counter-Plaintiffs a commercial advantage.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 91.

92.    Such confidential and proprietary information is not known outside of Counter-Plaintiffs' business, is only known by employees, consultants, contractors, and others involved in Counter-Plaintiffs' business and is subject to measures to guard the secrecy of the information.  The information has been developed with a substantial amount of effort and investment and cannot readily be acquired or duplicated by others. The information is valuable to Counter-Plaintiffs' competitors.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 92.

93.    BI3 and Tola used and are continuing to use this confidential and proprietary information in breach of an agreement, confidence or duty, or as a result of discovery by improper means.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 93.

94.    BI3's and Tola's actions in using and disseminating Counter-Plaintiffs' confidential and proprietary trade secrets to third parties were willful and malicious.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 94.

95.    Counter-Plaintiffs have a protectable interest in ensuring the confidentiality of their trade secrets.

> **ANSWER:**    The allegations of Paragraph 95 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants deny the allegations of Paragraph 95.

96.    Counter-Plaintiffs have been damaged as a result of BI3's and Tola's conduct.  Moreover, Counter-Plaintiffs have suffered irreparable harm as a result of BI3's

and Tola's conduct and will continue to suffer irreparable harm unless BI3 and Tola are enjoined from engaging in any such further conduct.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 96.

97.    Because of the nature of BI3's and Tola's misappropriation of Counter-Plaintiffs' trade secrets, Counter-Plaintiffs have no adequate remedy at law.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 97.

98.    The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 98.

99.    The public interest will not be harmed by the injunctive relief requested.

> **ANSWER:**    Counter-Defendants deny the allegations of Paragraph 99.

**WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-Plaintiffs, WK, CL, and Hamor, take nothing by way of Count IV of their Counterclaim, for costs, and for all other just and proper relief.

### COUNT V
### BREACH OF FIDUCIARY DUTY TO CL
### (As To Counter-Defendant Tola)

100.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 99 of this Counterclaim in Count V as if fully rewritten herein.

> **ANSWER:**    Counter-Defendants repeat and incorporate their response

to Paragraphs 1-100 as if fully set forth herein.

101.    Tola owed a fiduciary duty of undivided loyalty to CL as a director and officer of CL.

> **ANSWER:**    The allegations of Paragraph 101 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants deny the allegations of Paragraph 101.

102.     Upon information and belief, Tola breached his fiduciary duty to CL by improperly using CL's confidential business information and interfering and misappropriating CL's business relationships while a director and officer of CL.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 102.

103.     CL has been damaged as a result of Tola's conduct.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 103.

104.     Unless Tola is enjoined, he will continue to breach his fiduciary duty to CL by continuing to disseminate confidential and proprietary technology and information, intellectual property, and trade secrets of CL for his own pecuniary gain, which is causing damages to CL.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 104.

105.     CL has a protectable interest in preserving the confidential nature of its proprietary technology and information, intellectual property, and trade secrets.

**ANSWER:**     The allegations of Paragraph 105 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants deny the allegations of Paragraph 105.

106.     CL will suffer irreparable harm if the injunctive relief requested is not granted.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 106.

107.     CL has no adequate remedy at law.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 107.

108.     The benefits to CL of granting the injunctive relief sought by CL outweigh any potential injury to Counter-Defendants.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 108.

109.     The public interest will not be harmed by the injunctive relief requested.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 109.

**WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-

Plaintiffs, WK, CL, and Hamor, take nothing by way of Count V of their Counterclaim,

for costs, and for all other just and proper relief.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

110.    Counter-Plaintiffs restate and reallege Paragraphs 1 through 109 of this
Counterclaim in Count VI as if fully rewritten herein.

**ANSWER:**    Counter-Defendants repeat and incorporate their response

to Paragraphs 1-109 as if fully set forth herein.

111.    At all times relevant to these Counterclaims, Counter-Plaintiffs had and
have longstanding business relationships with customers and have expended significant
time and money in developing and maintaining those customer relationships.
Consequently, Counter-Plaintiffs have a legitimate expectancy in maintaining those
customer relationships.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 111.

112.    BI3 and Tola are aware of those relationships and Counter-Plaintiffs
expectancy in maintaining its customer relationships.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 112.

113.    BI3 and Tola have maliciously and unjustly interfered with these
relationships, causing breaches in and the termination of business relationships by using
Counter-Plaintiffs' confidential information to induce customers to terminate their
business relationships with Counter-Plaintiffs.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 113.

114.    Counter-Plaintiffs have been damaged as a direct and proximate result of
BI3's and Tola's tortuous interference with Counter-Plaintiffs' business relationships
with its customers. Moreover, Counter-Plaintiffs will be irreparably harmed unless BI3
and Tola are enjoined from engaging in such conduct.

**ANSWER:**    Counter-Defendants deny the allegations of Paragraph 114.

115.    Unless BI3 and Tola are enjoined, they will continue to interfere with
Counter-Plaintiffs' business relationships by continuing to disseminate confidential and
proprietary technology and information, intellectual property, and trade secrets of

Counter-Plaintiffs for their own pecuniary gain, which is causing damages to Counter-Plaintiffs.

     **ANSWER:**  Counter-Defendants deny the allegations of Paragraph 115.

   116.  Counter-Plaintiffs have a protectable interest in preserving the confidential nature of their proprietary technology and information, intellectual property, and trade secrets.

     **ANSWER:**  The allegations of Paragraph 116 state only legal

conclusions to which no response is required.  To the extent a response is required,

Counter-Defendants deny the allegations of Paragraph 116.

   117.  Counter-Plaintiffs will suffer irreparable harm if the injunctive relief requested is not granted.

     **ANSWER:**  Counter-Defendants deny the allegations of Paragraph 117.

   118.  Counter-Plaintiffs have no adequate remedy at law for BI3's and Tola's actions in interfering with Counter-Plaintiffs' business relationships which have been ongoing and have proximately caused irreparable harm to Counter-Plaintiffs and will continue to cause substantial, irreparable harm to Counter-Plaintiffs if allowed to continue.

     **ANSWER:**  Counter-Defendants deny the allegations of Paragraph 118.

   119.  The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

     **ANSWER:**  Counter-Defendants deny the allegations of Paragraph 119.

   120.  The public interest will not be harmed by the injunctive relief requested.

     **ANSWER:**  Counter-Defendants deny the allegations of Paragraph 120.

   **WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-

Plaintiffs, WK, CL, and Hamor, take nothing by way of Count VI of their Counterclaim,

for costs, and for all other just and proper relief.

**COUNT VII**
**UNJUST ENRICHMENT**

121.     Counter-Plaintiffs restate and reallege Paragraphs 1 through 120 of this Counterclaim in Count VII as if fully rewritten herein.

**ANSWER:**     Counter-Defendants repeat and incorporate their response to Paragraphs 1-120 as if fully set forth herein.

122.     By BI3's and Tola's unlawful use of Counter-Plaintiffs' confidential and proprietary information, intellectual property, and trade secrets and the resulting interference with Counter-Plaintiffs' business relationships, BI3 and Tola are retaining the benefit associated with the work involved in the planning, development, marketing and goodwill of Counter-Plaintiffs' confidential information. BI3 and Tola are retaining that benefit to the detriment of Counter-Plaintiffs in that Counter-Plaintiffs' customers and potential customers are and will be deterred from doing business with Counter-Plaintiffs to the benefit of BI3 and Tola.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 122.

123.     BI3's and Tola's retention of the benefit violates the principles of justice, equity and good conscience.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 122.

124.     Unless BI3 and Tola are enjoined, they will continue to interfere with Counter-Plaintiffs' business relationships by continuing to disseminate confidential and proprietary technology and information, intellectual property, and trade secrets of Counter-Plaintiffs for their own pecuniary gain, which is causing damages to Counter-Plaintiffs.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 124.

125.     Counter-Plaintiffs have a protectable interest in preserving the confidential nature of their proprietary technology and information, intellectual property, and trade secrets.

**ANSWER:**     The allegations of Paragraph 125 state only legal conclusions to which no response is required.  To the extent a response is required, Counter-Defendants deny the allegations of Paragraph 125.

126.     Counter-Plaintiffs will suffer irreparable harm if the injunctive relief requested is not granted.

**ANSWER:**     Counter-Defendants deny the allegations of Paragraph 126.

127. Counter-Plaintiffs have no adequate remedy at law for BI3's and Tola's actions in interfering with Counter-Plaintiffs' business relationships which have been ongoing and have proximately caused irreparable harm to Counter-Plaintiffs and will continue to cause substantial, irreparable harm to Counter-Plaintiffs if allowed to continue.

**ANSWER:** Counter-Defendants deny the allegations of Paragraph 127.

128. The benefits to Counter-Plaintiffs of granting the injunctive relief sought by Counter-Plaintiffs outweigh any potential injury to Counter-Defendants.

**ANSWER:** Counter-Defendants deny the allegations of Paragraph 128.

129. The public interest will not be harmed by the injunctive relief requested.

**ANSWER:** Counter-Defendants deny the allegations of Paragraph 129.

**WHEREFORE,** Counter-Defendants, Tola and BI3, request that Counter-Plaintiffs, WK, CL, and Hamor, take nothing by way of Count VII of their Counterclaim, for costs, and for all other just and proper relief.

## AFFIRMATIVE DEFENSES

Counter-Defendants BI3, Inc., and Kenneth C. Tola, by counsel, Edward G. Zaknoen of Zaknoen & Zaknoen LLC, for their Affirmative Defenses to the Counterclaims of Counter-Plaintiffs Alan B. Hamor, WK Networks, Inc., and CampaignLocal Inc., state as follows:

### First Affirmative Defense

1. Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, to the extent that Counter-Plaintiffs' Counterclaim fails to state claims upon which relief may be granted.

### Second Affirmative Defense

2.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, based upon the doctrines of estoppel, waiver, laches, or unclean hands.

### Third Affirmative Defense

3.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because Counter-Defendants effectively terminated the Consulting Agreement.

### Fourth Affirmative Defense

4.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because the Consulting Agreement is invalid due to fraud.

### Fifth Affirmative Defense

5.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because the Consulting Agreement was modified or superseded by subsequent agreements.

### Sixth Affirmative Defense

6.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, due to material breaches of the Consulting Agreement by Counter-Defendants.

### Seventh Affirmative Defense

7.      Counter-Plaintiffs' claims may be barred, in whole or in part, because Counter-Plaintiffs lacked contractual privity with Counter-Defendants.

### Eighth Affirmative Defense

8.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because Tola resigned as a Secretary and Director of CampaignLocal, Inc.

### Ninth Affirmative Defense

9.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, to the extent that Counter-Plaintiffs failed to avoid, minimize, or mitigate any of Counter-Plaintiffs' alleged damages.

### Tenth Affirmative Defense

10.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because of duress.

### Eleventh Affirmative Defense

11.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because Counter-Plaintiffs actions were illegal.

### Twelfth Affirmative Defense

12.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, due to failure of consideration.

### Thirteenth Affirmative Defense

13.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, due to lack of consideration.

### Fourteenth Affirmative Defense

14.      Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, due to failure of conditions precedent or conditions subsequent.

### Fifteenth Affirmative Defense

15.     Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because, on information and belief, Counter-Defendant CampaignLocal, Inc., effectively ceased business operations in or around July 2007.

### Sixteenth Affirmative Defense

16.     Counter-Plaintiffs' claims against Counter-Defendants may be barred, in whole or in part, because Counter-Defendants owed no duty to Counter-Plaintiffs.

### JURY DEMAND

Counter-Plaintiffs demand trial by jury on all claims triable to a jury.

Respectfully submitted,

_____
Joseph J. Zaknoen
Zaknoen & Zaknoen LLC
Attorneys for Plaintiffs

Joseph J. Zaknoen (Atty. No. 6208253)
Edward G. Zaknoen (Atty. No. 6239683)
Zaknoen & Zaknoen LLC
161 N. Clark St., Suite 4700
Chicago, Illinois 60601
(312) 523-2191
(312) 523-2001 (fax)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an Attorney, hereby certifies that a true and correct copy of the foregoing <u>Plaintiffs/Counter-Defendants' BI3, Inc., and Kenneth C. Tola's Answer and Affirmative Defenses to Counterclaims of Alan B. Hamor, WK Networks, Inc., and CampaignLocal, Inc</u> was served electronically using the CM/ECF system upon counsel of record.


Date:   June 11, 2008                          <u>s/  Joseph J. Zaknoen</u>

                                               Zaknoen & Zaknoen LLC
                                               161 North Clark Street
                                               Suite 4700
                                               Chicago, Illinois 60601
                                               Ph.  312-523-2191
                                               Fax  312-523-2001