# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BI3, INC., an Illinois Corporation, and KENNETH TOLA, JR.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs/Counter-Defendants,** | ) | **08 CV 2384** |
| **v.** | ) | |
| | ) | |
| **ALAN B. HAMOR, WK NETWORKS, INC., a Delaware Corporation, and CAMPAIGNLOCAL, INC., a Delaware Corporation,** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| | ) | |
| | ) | **March 30, 2011** |
| | ) | |
| **Defendants/Counter-Plaintiffs.** | ) | |

## MEMORANDUM OPINION and ORDER

In 2007 and 2008 the parties' business relationship fell apart. This multi-count diversity suit represents the remains. Kenneth Tola, Jr. and BI3, Inc. (together, "the plaintiffs") allege that Alan Hamor, WK Networks, Inc., and CampaignLocal, Inc. (collectively, "the defendants"), failed to pay them money owed in connection with their work on various technology consulting projects, committing various acts of fraud and breaches of fiduciary duty along the way. The defendants filed seven counterclaims stemming from their allegations that the plaintiffs essentially stole an important client, luring it away by tortiously sharing confidential information. Currently before the court are the plaintiffs' motion for summary judgment as to the defendants' counterclaims and the defendants' motion for summary judgment as to all remaining counts of the amended complaint. For the reasons set forth below, the motions are granted in part and denied in part:

## Procedural History

Tola and BI3 filed their original ten-count complaint on April 25, 2008, seeking damages and equitable relief based on their claims for breach of contract, unjust enrichment, and fraud stemming from the defendants' alleged failure to pay them for completed technology consulting projects. (R. 1, Compl. ¶¶ 103-131.) They also sought rescission of a patent assignment related to an invention called Data Trender based on lack of consideration, failure of consideration, conversion, and breach of fiduciary duty. (Id. ¶¶ 132-206.) Less than a month later, the defendants answered the complaint and filed seven counterclaims against the plaintiffs, alleging breach of contract, misappropriation of trade secrets, breach of fiduciary duty, tortious interference with business relationships, and unjust enrichment. (R. 11, Counterclaims ¶¶ 64-129.) In June 2008, the parties consented to the jurisdiction of the assigned magistrate judge. *See* 28 U.S.C. § 636(c); (R. 20).

On April 29, 2009, the court granted the plaintiffs' motion to amend their complaint to add three counts: one for breach of fiduciary duty based on the misappropriation of a corporate opportunity, one seeking a declaratory judgment that Hamor is liable based on a corporate veil-piercing theory, and one for violation of the Stored Wire and Electronic Communications Act, 18 U.S.C. § 2701, *et seq.* (R. 48, 51.) On the defendants' motion, the court dismissed the Stored Wire and Electronic Communications Act claim pursuant to Federal Rule of Civil Procedure 12(b)(6), leaving twelve counts at play in the amended complaint. (R. 60, 61.)

In December 2009 the plaintiffs filed the current motion for summary judgment on the defendants' counterclaims. (R. 67.) The defendants filed the current motion for summary judgment on the twelve counts remaining in the amended complaint in April 2010. (R. 91.) In May 2010, the case was transferred to the undersigned magistrate judge. (R. 107.) The next month the defendants moved to dismiss six counts of the amended complaint—all related to allegations surrounding the Data Trender invention—under Rule 12(b)(7), for failure to join a necessary party.

In the summer of 2010, with the court's support, the parties engaged in settlement negotiations. As those negotiations progressed into the fall of 2010, at the parties' urging this court reserved ruling on the pending summary-judgment motions or entering a briefing schedule on the motion to dismiss. (R. 133.) When the settlement negotiations failed to bear fruit by October, the court informed the parties that it would move forward with the pending motions. (R. 134.) After allowing full briefing, on January 14, 2011, this court entered an order granting in part the defendants' motion to dismiss for failure to join a necessary party and dismissed counts four through eight. (R. 139.) Accordingly, only counts one through three and nine through twelve are subject to the defendants' current motion for summary judgment.

## Facts

It must be noted at the outset that the parties have made this court's job in resolving these motions unnecessarily difficult by omitting from their briefs any recitation of the

relevant facts. Both sides point out that they have filed the statement of undisputed facts required by Local Rule 56.1(a)(3) and "incorporate" those facts into their briefs by that singular reference. This practice deprives the court of a summation of the relevant undisputed facts and the necessary context through which to view the argument that follows. *See Malec v. Sanford*, 191 F.R.D. 581, 585-86 (N.D. Ill. 2000). In particular, the nonmoving parties' failure to include a fact statement results in a missed opportunity to explicitly identify material disputes of fact requiring a trial. *See id.* at 586. It also must be noted that in their analysis of the issues the parties failed to cite to the statements of fact required by Local Rule 56.1. Instead they cite directly to various pieces of the record, thus forcing the court to engage in a treasure hunt to discern whether the cited material is disputed. This practice diminishes the utility of the Local Rule 56.1 statements, which are intended to provide the court with a central repository of disputed and undisputed facts which support or detract from the motions for summary judgment.

One more preliminary factual matter—the defendants have argued in their reply in support of summary judgment that an entire string of paragraphs from two affidavits submitted in support of the plaintiffs' briefs should be stricken on hearsay grounds. As laid out in this court's case management procedures, motions to strike portions of an opposing party's Local Rule 56.1 statement will not be considered. Such requests are unnecessary and most often pointless. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727-28 (7th Cir. 2006). The initial portion of the defendants' reply develops an argument with

respect to only 3 of the 41 affidavit paragraphs they seek to have stricken as hearsay. They have not attempted to illustrate how any of the remaining paragraphs are material, otherwise undisputed, or constitute hearsay.[1] Where the defendants have taken the time to develop an evidentiary argument with respect to specific material testimony, the court will factor those arguments into its analysis. Where the defendants have failed to make any particularized argument, their request is underdeveloped and thus waived. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010).

Turning to the issues presented in the competing motions for summary judgment, the vast majority of the material facts are disputed. What follows is a fairly thin narrative of the underlying events as told through the few available undisputed facts. Tola is the president and sole stockholder of BI3, a company through which he provides internet technology consulting services. Hamor is the director and majority shareholder of WK Networks and CampaignLocal. (R. 106, Pls.' Resp. to Defs.' Facts ¶ 4.) WK Networks is a company "engaged in the business of developing software for network-based bidding and commerce systems." (R. 92-1, Defs.' Facts, Ex. A at 1.) From December 2005 through January 2007, Hamor also served as the CEO of Auto Bid Systems, Inc. ("ABS"). (R. 106, Pls.' Resp. to Defs.' Facts ¶ 6.) Tola first became acquainted with Hamor through contacts at ABS, and

---

[1] Strangely enough, in their response to the plaintiffs' motion to dismiss their counterclaims, the defendants rely on several of the same paragraphs of Tola's affidavit which they ask this court to ignore as hearsay in connection with the plaintiffs' motion. (See R. 126, Defs.' Reply at 3; R. 87, Defs.' Resp. at 13.)

eventually, Hamor recruited him to work with ABS on a project called AutomoAds. (R. 127, Defs.' Resp. to Pls.' Add'l Facts ¶ 1.) AutomoAds was a web-based advertising platform designed for the retail automotive industry. (Id. ¶ 8.) In August 2006, BI3 and WK Networks entered into a written consulting agreement ("the Consulting Agreement") for work on the AutomoAds project. (R. 106, Pls.' Resp. to Defs.' Facts ¶ 7.) The Consulting Agreement provided that WK Networks would pay BI3 $3,000 per week for its services. (R. 127, Defs.' Resp. to Pls.' Add'l Facts ¶ 4.)

By January 2007 Tola already believed that WK Networks was not living up to its obligations under the Consulting Agreement. On January 8, 2007, Tola sent Hamor an email attaching an invoice stating that WK Networks was $39,125 behind on payments owed to BI3 under the Consulting Agreement. (R. 92-4, Defs.'Facts, Ex. D at 1-2.) Nonetheless, Tola and Hamor began to discuss and negotiate the terms of additional jobs, specifically for BI3's work on budding CampaignLocal projects. (R. 127, Defs.' Resp. to Pls.' Add'l Facts ¶ 10; R. 106, Pls.' Resp. to Defs.' Facts ¶¶ 11, 13, 27.) Hamor and Tola discussed building a search engine marketing ("SEM") management platform that could be used outside the automotive industry. (R. 127, Defs.' Resp. to Pls.' Add'l Facts ¶ 8.) Tola estimated that work on the SEM marketing platform would take six to eight months. (Id.)

Whether the additional discussions and negotiations surrounding this new project led to binding agreements is a matter of vigorous disagreement. The parties agree, however, that they at least discussed payment to BI3 of $250,000 for work to be performed for

CampaignLocal from January through August 2007. (R. 106, Pls.' Resp. to Defs.' Facts ¶¶ 24-26.) They also agree that Hamor offered Tola 20% of the shares of CampaignLocal, but they disagree over whether that offer was contingent on CampaignLocal obtaining new clients. (Id. ¶ 28.) Tola also was "under the impression" that he would serve as Chief Technology Officer ("CTO") of CampaignLocal indefinitely, unless he officially resigned. (Id. ¶ 32.) Following the email and telephone exchanges in January 2007, the parties intended to have Hamor's attorney prepare a written agreement relating to that work. (Id. ¶ 24.) The written agreement was never prepared. (Id.)

Nonetheless, from January through August 2007 Tola served as a developer of CampaignLocal's software. (R. 106, Pls.' Resp. to Defs.' Facts ¶ 49.) It appears to have been a time of growing discontent among the parties. In early 2007, Hamor informed Tola that he wanted the SEM management project to expand to incorporate banner advertising, phone call tracking, and other features. (R. 127, Defs.' Resp. to Pls.' Add'l Facts ¶ 12.) CampaignLocal also brought in several additional clients during this time and Hamor asked Tola to take on new responsibilities with client and campaign management. (Id. ¶ 13.) Tola never agreed to reduced compensation, but in March and April 2007 Hamor only made partial payments for his work. (Id. ¶¶ 15-16.) In August 2007, Tola completed the development of the project Hamor had asked him to finish, transferred software and emails to Hamor's servers, and stopped working for CampaignLocal. (Id. ¶ 18.) In October 2007, Tola told Hamor that he wished to resign as CTO of CampaignLocal, and on January 24,

2008, Tola resigned in writing. (R. 88, Defs.' Resp. to Pls.' Facts ¶¶ 18-20.) When he resigned, Tola owned approximately 20% of CampaignLocal's shares. (R. 101, Pls.' Resp. to Defs' Add'l Facts ¶ 2.)

The remaining undisputed facts relate to the defendants' counter-claims, which center on Tola's and BI3's dealings with Jay Pivec and his company, Pivnet, Inc., a one-time CampaignLocal client. In November 2006, Pivnet and CampaignLocal entered into a contract for CampaignLocal to provide SEM services. (R. 88, Defs.' Resp. to Pls.' Facts ¶ 9.) In March 2007 Hamor asked Tola to serve as the primary contact on the Pivnet account. (Id. ¶ 10.) In March and early April 2007 ABS sued Hamor, WK Networks, CampaignLocal, BI3, and Tola in state court in Virginia ("the Virginia litigation"), alleging that Tola, BI3, Hamor, and WK Networks conspired to deprive ABS of the work product BI3 had created for AutomoAds and to direct those projects to WK Networks and CampaignLocal. (R. 127, Defs.' Resp. to Pls.' Add'l Facts ¶ 17.) In July 2007 Pivnet terminated its contract with CampaignLocal. (R. 88, Defs.' Resp. to Pls.' Facts ¶ 13.) Pivnet's departure left CampaignLocal without any clients. (Id. ¶ 16.)

Five days after Tola resigned from CampaignLocal, on January 29, 2008, Tola and ABS discussed settling the claims pending in the Virginia litigation. (R. 88, Defs.' Resp. to Pls.' Facts ¶¶ 20-21.) Shortly thereafter, they reached a settlement and ABS dismissed its claims against Tola; Tola also agreed to dismiss a counterclaim he had filed against ABS and a crossclaim filed against WK Networks. (Id. ¶ 22.) In February 2008, after the Virginia

claims had been dismissed, Tola and BI3 entered into a contract with ABS to perform SEM services on behalf of Pivnet. (Id. ¶¶ 25, 31.) These are the same kinds of services that CampaignLocal provided to its clients. (R. 101, Pls.' Resp. to Defs.' Add'l Facts ¶ 5.) The parties agree that based on the on-going litigation between ABS and Hamor, ABS would not have offered CampaignLocal or WK Networks the Pivnet work. (R. 88, Defs.' Resp. to Pls.' Facts ¶ 27.)

Tola opened an account with Google in February 2008 through which Pivnet could run SEM campaigns. (R. 88, Defs.' Resp. to Pls.' Facts ¶ 29.) Tola did not start running campaigns for Pivnet until March 2008 and did not complete its set-up process for Pivnet until May or June 2008. (Id. ¶ 30.) In June 2008 the defendants entered into their own settlement agreement with ABS in the Virginia litigation and transferred all of their rights to AutomoAds and the CampaignLocal software applications to ABS. (Id. ¶ 50.)

## Analysis

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue of material fact exists when there is evidence from which a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). In reviewing a motion for summary judgment, this court draws all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010).

## I.    Defendants' Motion for Summary Judgment

As a result of the decisions dismissing counts four through eight and thirteen of the amended complaint, seven counts remain in play.  As set forth below, five of those claims involve a multitude of disputed facts, rendering summary judgment inappropriate with respect to all but counts three and nine.

### A.    Count I: Breach of Contract and Quantum Meruit

The parties agree that Illinois law applies to the plaintiffs' breach-of-contract claim. (*See also* R. 92, Defs.' Br. at 3-5; R. 109, Pls.' Resp. at 4.)  Typically that would be all the court needs to know with respect to a choice-of-law analysis, *see McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998), but here the plaintiffs have argued that the contracts in dispute are extensions of the Consulting Agreement, and the Consulting Agreement has a choice-of-law provision stating that it is to be governed by New York law. (R. 92-1, Defs.' Facts, Ex. A at 4.)  A court sitting in diversity applies the choice-of-law rules of the state in which it sits.  *See Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 856 (7th Cir. 1992).  Illinois law honors contractual choice-of-law provisions unless to do so would contravene a fundamental public policy or the state chosen bears no reasonable relationship to the parties or transaction.  *See LaSalle Bank Nat'l Ass'n v. Paramont Props.*, 588 F.Supp.2d 840, 849 (N.D. Ill. 2008).  Here the parties agree that WK Network's attorneys included the choice-of-law provision simply because the attorneys were based in New York. The undisputed facts show that this was the only connection between the parties, the contract,

and the state of New York.  Because it appears that New York law was chosen arbitrarily, this court agrees with the parties that the choice-of-law provision need not be enforced.  *See Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 755 (Ill. App. Ct. 1987).  And because the parties agree that Illinois bears the closest relationship with the parties and contract, the court will "accept this concord, without vouching for it as an original matter." *See Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1215 (7th Cir. 1997).

Turning to the merits, to establish breach of contract under Illinois law the plaintiffs must show that a valid and enforceable contract existed, that the plaintiffs performed their contractual duties but the defendants breached theirs, and that the plaintiffs were injured as a result.  *See Olympic Chevrolet, Inc. v. Gen. Motors Corp.*, 959 F. Supp. 918, 922 (N.D. Ill. 1997).  The defendants argue that they are entitled to summary judgment on count one because they did not breach the Consulting Agreement and because the parties never entered any binding agreement for work other than that detailed in the Consulting Agreement.  In response, the plaintiffs clarify that they seek to recover: (1) a balance of $39,125 that they say the defendants still owe under the terms of the Consulting Agreement; and (2) $250,000 under the terms of a subsequent oral agreement.  (R. 109, Pls.' Resp. at 4.)  The defendants argue that the oral agreement never existed and that even if it did, it is unenforceable as a matter of law.  They also argue that the disputed oral agreement is barred by Illinois's statute of frauds.

Whether the defendants breached the terms of the Consulting Agreement by failing to pay $39,125 of the amount owed under the contract is a disputed question that turns on the parties' distinct versions of what happened. According to the defendants, "WK has paid BI3 for all of the work performed pursuant to the original scope of work and has otherwise performed all of its obligations under the [Consulting] Agreement." (R. 92, Defs.' Br. at 6.) In support they cite Hamor's affidavit attesting to this fact. (Id. Ex. B ¶ 7.) But in response the plaintiffs cite evidence which conflicts with Hamor's affidavit. Specifically, they point to Hamor's deposition testimony acknowledging that money was due under the Consulting Agreement at the end of 2006 (he was "almost positive" that the amount was $31,125), and Tola's affidavit stating that in fact $39,125 was due. (R. 113-1, Hamor Dep. at 80:9-20; R. 111, Tola Aff. ¶ 19.) There is also conflicting evidence as to whether CampaignLocal's subsequent delivery of 20% of its shares discharged that debt—Hamor asserts that it did. (R. 113-1, Hamor Dep. at 80:17-81:5.) But in his affidavit Tola states that he understood, after speaking with Hamor in January 2007, that he would receive payment of the balance past due in addition to the CampaignLocal shares. (R. 111, Tola Aff. ¶ 23.) The defendants' reply includes a blanket assertion that Tola's affidavit should be disregarded as hearsay, but the relevant evidence here is not what Hamor said to Tola, but what Tola himself understood. Even if the relevant portion of Tola's affidavit is his statement that Hamor agreed to pay the past-due balance, the defendants have not developed any argument to support their hearsay position. Of particular import, they have not explained why Hamor's statements to Tola

would not fall under the "verbal acts" exception, which recognizes that statements of a declarant of his intention to enter into an agreement do not constitute hearsay. *See Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007); *Hindin/Owen/Engelke, Inc. v. GRM Indus., Inc.*, 869 F.Supp. 539, 544 (N.D. Ill. 1994). Given the disputed facts surrounding the amount owed under the Consulting Agreement, summary judgment on this aspect of count one is inappropriate.

There are also fact disputes surrounding the question of whether the parties entered into an oral agreement for BI3 to provide services beyond those outlined in the Consulting Agreement. According to the plaintiffs, the parties agreed that the defendants would give Tola 20% of CampaignLocal's shares and pay him $250,000 for building CampaignLocal applications and for serving as CTO in 2007. (R. 109, Pls.' Resp. at 18.) The defendants argue that the agreement is unenforceable because there is no evidence that Hamor accepted its overly vague and indefinite terms. But as the plaintiffs point out, in their answers to interrogatories Campaign Local admitted that "Tola had an agreement to receive a monthly payment of $12,500 from CampaignLocal beginning January 1, 2007." (R. 113-2, Ex. B at 7.) Hamor later testified that he was "pretty sure" the amount owed was $15,000 per month and he did not think the payment obligation was dependent on his cash-flow. (R. 113-1, Ex. A, Hamor Dep. at 82:5-16; 124:23-125:6.) The defendants' only response is that Hamor was acting on a mere understanding, and that "the Plaintiffs fail to recognize that a mere 'understanding' or 'agreement' does not necessarily constitute an enforceable contract."

(R. 126, Defs.' Reply at 6.) But that is not a persuasive argument for summary judgment, because a jury could reasonably infer from Hamor's testimony that he accepted and was operating under the terms outlined by the plaintiffs. *See International Bus. Lists, Inc. v. American Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998) ("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."). And because the defendants have admitted that there was an agreement for CampaignLocal to pay BI3 for the services it says it provided, there is evidence from which a reasonable jury could ascertain what the parties agreed to do. *See Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir. 1995) (applying Illinois law). The evidence suggesting that the precise contours of the agreement are ambiguous weighs in favor of denying, rather than granting, summary judgment. *See Pepper Const. Co. v. Transcontinental Ins. Co.*, 673 N.E.2d 1128, 1131 (Ill. App. Ct. 1996) (noting that summary judgment is inappropriate where contract terms are ambiguous and subject to explanation by extrinsic evidence).

The defendants argue that even if a jury were to conclude that the parties reached an oral agreement, that agreement would be unenforceable as a matter of law. First, they argue that because the Consulting Agreement includes a contractual provision stating that modifications must be submitted in writing, (*see* R. 92-1, Defs.' Facts Ex. A at 4), any oral modifications are unenforceable. But as the plaintiffs point out, Illinois law honors modifications of a contract through a subsequent oral agreement even where the written

contract includes such a provision.  *See U.S. Neurosurgical, Inc. v. City of Chicago*, 572 F.3d 325, 332 (7th Cir. 2009); *Tadros v. Kuzmak*, 660 N.E.2d 162, 170 (Ill. App. Ct. 1995). Confronted with these cases, the defendants appear to have abandoned this argument in their reply brief.  They have not attempted to explain why this case should present an exception to the Illinois rule.

The defendants also argue that the agreement fails as a matter of law because it was premised on two conditions precedent that were never fulfilled.  First, they argue that execution of a document memorializing the oral modifications was a condition precedent under the terms of a document Tola sent Hamor via email on January 1, 2007.  That document sets forth various proposed terms and conditions and states that the "new contract needs to be agreed upon and signed by the end of January, 2007 in order to prevent a disruption in those services provided by BI3."  (R. 92-4, Defs.' Facts Ex. D at 3.)  But the plaintiffs are not asking to recover on the basis of the email.  Instead, they seek to enforce a subsequent oral agreement they say the parties reached by phone after the email was sent. Hamor contests that an agreement was ever reached, but that is the subject of a factual dispute.  As explained above, Tola has presented some evidence that the conversation took place and that an agreement was reached, and the defendants have not persuasively argued that the evidence constitutes hearsay.  Nor does Tola's testimony that the parties intended to have Hamor's attorneys reduce their agreement to writing render it unenforceable.  Under Illinois law, even where the parties agree to prepare a formal written document to

memorialize the oral agreement, if the oral agreement is otherwise enforceable, "the bargain is binding even though the document has not been executed." *Ceres Ill., Inc. v. Illinois Scrap Processing, Inc.*, 500 N.E.2d 1, 5 (Ill. 1986).

The second condition precedent the defendants cite is that Hamor successfully recruit additional clients for CampaignLocal. In support of this argument they point to Tola's deposition testimony, but the page they cite says nothing about additional clients. (R. 92, Defs.' Br. at 13 (citing Ex. C, Tola Dep. at 243:4-7).) Elsewhere in his deposition Tola testified that Hamor "gave me his word that I was going to get 20 percent of the company, $250,000 for a year to be the CTO, and he promised that based on all the clients he was going to bring in." (R. 92-3, Defs.' Facts Ex. C, Tola Dep. at 239:10-13.) But that testimony does not establish that the agreement would only take effect if new clients were brought in. And in any event, the parties dispute whether the condition was fulfilled. Hamor submitted an affidavit stating that it was not. (Id. Ex. B, Hamor Aff. ¶ 10.) But in their answers to the plaintiffs' interrogatories, the defendants stated that they entered into contracts with two clients in January and February 2007, respectively. (R. 113-2, Ex. C ¶ 7.) Thus even if the defendants' assertion of the condition precedent were supported by evidence, the fact dispute regarding its fulfillment precludes summary judgment.

Finally, the defendants argue that the oral agreement is barred by Illinois's statute of fraud. But again, whether the statute of frauds applies here turns on disputed issues of material fact. As the plaintiffs point out, the statute of frauds does not bar recovery under

a contract where one side has fully performed his contractual obligations. *See Greenberger, Krauss & Tenenbaum v. Catalfo*, 687 N.E.2d 153, 159 (Ill. App. Ct. 1997). According to Tola's version of the events, he fully performed his obligations under the oral agreement before he resigned from CampaignLocal in August 2007. (R. 111, Tola Aff. ¶¶ 36, 61.) According to the defendants' view of the events, he did not. Given the fact dispute, it will be up to the jury to decide which version is more believable.

**B.     Counts II and X: Unjust Enrichment/Quantum Meruit**

Through counts two and ten of the amended complaint the plaintiffs seek to recover under a quantum-meruit theory the reasonable value of services they say they provided to the defendants related to their work on CampaignLocal (count two) and on the Data Trender invention prototype (count ten). The parties agree that Illinois law governs these counts. Under Illinois law, "[a] party seeking recovery on this theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation." *Fleissner v. Fitzgerald*, 937 N.E.2d 1152, 1159 (Ill. App. Ct. 2010). The defendants argue that they are entitled to summary judgment on these counts because the plaintiffs' allegations that express contracts govern the compensation disputes preclude recovery under a quantum meruit theory. Although the defendants are correct that the doctrine of unjust enrichment does not apply where an express contract governs the parties' relationship, *see Ramirez v. Smart Corp.*, 863 N.E.2d 800, 808-

09 (Ill. App. Ct. 2007), the plaintiffs are entitled to pursue breach of contract and unjust enrichment as alternative theories, *see Horwitz v. Sonnenschein Nath & Rosenthal LLP*, 926 N.E.2d 934, 947 (Ill. App. Ct. 2010). In fact, quantum meruit and breach of contract are often pleaded in the alternative "so that the plaintiff may recover even if the contract is unenforceable." *Weydert Homes, Inc. v. Kammes*, 917 N.E.2d 64, 73 (Ill. App. Ct. 2009). Because there are fact disputes here that require a jury to determine the existence and enforceability of the underlying contracts, as well as performance thereunder, the plaintiffs may also pursue their alternative quantum meruit at the next stage of this litigation.

The defendants also argue that counts two and ten fail because they are pleaded as "quantum meruit/unjust enrichment" claims, and unjust enrichment requires a showing of improper conduct as defined by law. They argue that the plaintiffs' unjust enrichment claims are premised on fraud allegations that fail as a matter of law. In response, the plaintiffs point out that although the terms "quantum meruit" and "unjust enrichment" are often used interchangeably, quantum meruit—unlike unjust enrichment—is descriptive of conduct that, standing alone, justifies an action for recovery. *See Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill.App.3d 961, 929 (Ill. App. Ct. 2010); *but see Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995) (noting that unjust enrichment is not a stand-alone cause of action, and thus depends on underlying fraud, duress, etc.). The plaintiffs clarify that counts two and ten are premised on quantum meruit. (R. 109, Pls.' Resp. at 25, 38-39.) The defendants have not cited any cases in which

summary judgment was granted on a quantum meruit claim—as opposed to an unjust enrichment claim—based on the absence of a separate underlying fraud. Accordingly, they have not shown that summary judgment is appropriate with respect to counts two and ten.

### C.    Count III: Fraud

The plaintiffs' fraud claim is premised on their assertion that the defendants falsely represented to BI3 that ABS had agreed that BI3 should contract directly with WK Networks—rather than ABS—to develop the AutomoAds project. The plaintiffs allege that they never would have agreed to provide services for WK Networks on the AutomoAds project if they had known this representation was false and that the misrepresentation resulted in lost payments and litigation fees incurred after ABS sued them in the Virginia litigation. (R. 1, Compl. ¶¶ 120-131.) To prevail on a fraud claim under Illinois law—which, once again, the parties agree is controlling—the plaintiffs must show, among other things, that Hamor made a false statement of material fact and that he knew or believed the statement was untrue. *See All American Roofing, Inc. v. Zurich Am. Ins. Co.*, 934 N.E.2d 679, 690 (Ill. App. Ct. 2010). The defendants argue that they are entitled to summary judgment on count three because, according to them, the alleged misrepresentation is not a false statement. Specifically, they argue that because Hamor was the CEO of both ABS and WK Networks, he had both actual and apparent authority to enter into contracts on behalf of both companies "and thus decide which company would contract with BI3." (R. 92, Pls.' Br. at 18.)

The plaintiffs concede that there is no dispute regarding Hamor's authority to enter into contracts on behalf of ABS and WK Networks, but argue that Hamor nonetheless lied about ABS's agreement that BI3 should contract with WK Networks. Through the affidavit of Glen Guylas, ABS's former COO and current CEO, the plaintiffs have submitted evidence showing that there was a dispute between other ABS officers and Hamor as to whether WK Networks or ABS would own AutomoAds. (R. 104, Guylas Aff. ¶ 9.) According to Guylas, Hamor surreptitiously had BI3 enter a contract with WK Networks rather than ABS and his decision to do so was the subject of disagreement and argument among Hamor, Guylas, and ABS's board of directors and other shareholders. (Id.) Based on this evidence, the plaintiffs essentially argue that Hamor committed fraud by neglecting to mention that he did not have the express permission of other ABS executives and shareholders to divert the contract from ABS to WK Networks. But "[i]n order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak." *Janowiak v. Tiesi*, 932 N.E.2d 569, 579 (Ill. App. Ct. 2010). The plaintiffs have neither alleged nor developed any argument in their response to summary judgment regarding how the relationship of the parties at the time they entered the Consulting Agreement involved the requisite special relationship. (The plaintiffs' breach of fiduciary duty claims are based on Hamor's duty to CampaignLocal shareholders, but Tola did not own CampaignLocal shares until after the Consulting Agreement was executed.) Absent such a showing, summary judgment is appropriate with respect to count three.

## D.    Count IX: Breach of Fiduciary Duty

Count nine is a strangely-pleaded shareholder derivative claim alleging that Hamor breached his fiduciary duty to CampaignLocal's shareholders if he allowed the priority date for the Data Trender provisional patent application to expire.  (R. 1, Compl. ¶¶ 194-200.) In support of their summary judgment motion, the defendants have produced undisputed evidence demonstrating that the Data Trender priority date was not lost or compromised. (R. 93, Defs.' Facts, Ex. G.)  The defendants thus argue that they are entitled to summary judgment because the plaintiffs have suffered no damages.  In response the plaintiffs abandon any claim based on the lost priority date.  Instead, they argue that they have been damaged because CampaignLocal misidentified the metes and bounds of the Data Trender patent claims in its application with the United States Patent Office and because Hamor allowed the law firm which represented him in the Virginia litigation to acquire a lien against CampaignLocal's intellectual property, including the Data Trender patent application. (R. 109, Pls.' Resp. at 36-37.)  But as the defendants point out, nothing in the amended complaint would put them on notice that this is the basis of the claim.  Because the plaintiffs' only response amounts to an improper attempt to amend their complaint through arguments in opposition to the defendants' motion, *see Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002), summary judgment is appropriate with respect to count nine.

### E.    Count XI: Misappropriation of Corporate Opportunity

In count eleven the plaintiffs allege that Hamor breached his fiduciary duty to CampaignLocal shareholders by directing corporate opportunities away from CampaignLocal after Tola left the company in August 2007. Specifically, they allege that Hamor misdirected to AdWorthy—another company owned and led by Hamor—SEM management opportunities that should have belonged to CampaignLocal. (R. 51, Am. Compl. ¶¶ 207-222.) Under Illinois choice-of-law principles, the fiduciary duty claim is governed by the law of Delaware, which is the state where CampaignLocal is incorporated. *See Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 96 n.1 (Ill. App. Ct. 2002). Under Delaware law, "[t]he elements of misappropriation of corporate opportunity are: (1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation." *McGowan v. Ferro*, 859 A.2d 1012, 1038 (Del. Ch. 2004).

In moving for summary judgment on count eleven, the defendants argue that after Tola stopped working for CampaignLocal in 2011, CampaignLocal "became incapable of providing search engine marketing services" and thus "has been unable to exploit any opportunities since August 2007." (R. 92, Defs.' Br. at 33.) They assert, without citing any evidence, that "CampaignLocal lacked revenue sufficient to pay another individual to perform such services." (Id.) They argue that the claim necessarily fails because AdWorthy

did not obtain its first client until July 2008, a year after CampaignLocal stopped providing SEM management services. (Id.) But the plaintiffs have pointed to numerous facts that cast doubt on the defendants' assertions regarding their ability to exploit corporate opportunities. The plaintiffs cite evidence that Tola was never an expert in SEM management in the first place, whereas Hamor testified that he himself handled "[a]ll the search engine marketing aspects" of the business. (R. 113-1, Ex. A, Hamor Dep. at 83:9-21.) They point to evidence that by February or March 2007 a Google program called AdWords Editor essentially became a stand-in for CampaignLocal's proprietary software. (Id. at 80:18-81:23.) They cite Hamor's testimony that CampaignLocal maintained the ability to provide consulting services after Tola left, even if some of the technical resources disappeared. (Id. at 79:2-12.) That evidence, if true, deflates the argument that CampaignLocal could not exploit the corporate opportunities which, according to the plaintiffs, Hamor misdirected to AdWorthy. Accordingly, the defendants have not shown that summary judgment is warranted as to count eleven.

## F. Count XII: Corporate Veil-Piercing

Count twelve seeks a declaratory judgment that Hamor is personally liable for any judgment awarded against WK Networks and CampaignLocal under a corporate veil-piercing theory. (R. 51, Am. Compl. ¶¶ 238-242.) Under the internal affairs doctrine, "matters relating to a corporation's internal governance should be controlled exclusively by the state of incorporation." *Newell Co. v. Petersen*, 758 N.E.2d 903, 923 (Ill. App. Ct. 2001). To

prevail on a claim to pierce the corporate veil under Delaware law, the plaintiffs "must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008). The factors relevant to making the determination are remarkably fact-intensive and include such questions as whether the company is undercapitalized, whether it failed to observe corporate formalities, and whether it is "merely a facade for the operations of the dominant stockholder." *Id.* at 529. As the plaintiffs point out in opposition to summary judgment on this claim, there are a number of facts in the record which would support the plaintiffs' claim, including Hamor's testimony regarding his businesses' lack of regular meetings, failure to pay dividends, undercapitalization, and co-mingling of credit accounts. (R. 109, Pls.' Resp. at 46-47.) Confronted with those facts, the defendants do not address this count in their reply. Given the evidence cited by the plaintiffs, summary judgment with respect to count twelve is denied.

## II.     Plaintiffs' Motion for Summary Judgment On Counter-Claims

In broad terms, the defendants' seven counterclaims allege that in 2007 and 2008 Tola and BI3 used CampaignLocal's proprietary and confidential intellectual property to lure away one of CampaignLocal's former clients, Pivnet. The plaintiffs have moved for summary judgment on all seven of the counterclaims. For the following reasons, the motion is granted in part and denied in part.

**A. Counterclaims One and Three: Declaratory Judgment & Indemnification**

In counterclaim one the defendants seek a declaratory judgment stating that the Consulting Agreement is valid and enforceable and defining the parties' rights and obligations thereunder. In count three the defendants seek to enforce the Consulting Agreement's indemnification provision, which states that the plaintiffs will indemnify WK Networks for damages stemming from any breach of the Consulting Agreement. Although the plaintiffs seek summary judgment with respect to these counts, they make no substantive argument in their opening brief other than to assert that the claims must fail because they are "essentially derivative" of the other counterclaims on which the plaintiffs seek summary judgment. (R. 69, Pls.' Mem. at 25.) With respect to the indemnification clause, that is correct—the plaintiffs are only liable for indemnification if they are liable for breaching the Consulting Agreement. Because summary judgment is entered against the defendants on their counterclaim for breach of the Consulting Agreement as explained below, summary judgment is also appropriate with respect to their counterclaim for indemnification.

But with respect to the defendants' claim for a declaratory judgment that the Consulting Agreement is valid, the plaintiffs concede in their reply brief that the success of this claim does not necessarily depend on the viability of the other counterclaims. For example, the Consulting Agreement could be found enforceable and thus have implications for the *plaintiffs'* breach-of-contract claims even though the defendants' counterclaim based on breach of the Consulting Agreement is precluded. Accordingly, summary judgment is

denied with respect to counterclaim one (declaratory judgment) and granted with respect to counterclaim three (indemnification).

**B.    Counterclaim Two: Breach of Contract**

Count two of the defendants' counterclaims alleges that the plaintiffs breached the Consulting Agreement's confidentiality provision by disseminating confidential and proprietary information to third parties.  (R. 11, Ans. ¶¶ 71-82.)  The confidentiality provision prohibits BI3 from disclosing to third parties any of WK Networks' confidential information for a period of seven years and from "disclosing any Trade Secret Information to third parties for as long as the disclosing party maintains the trade secret." (R. 92-1, Defs.' Facts Ex. A at 2.)  The Consulting Agreement defines confidential information as "non-public information [WK Networks] designates to [BI3] as being confidential."  (Id. Ex. A at 1.)  It specifies that "[s]uch designation of confidentiality shall be by writing or marking for written materials and verbally at the time of disclosure, or in a summary written document following a verbal disclosure, for non-written material." (Id. Ex. A at 1-2.)  It defines "Trade Secret Information" as "information which [WK Networks] protects in accordance with state trade secret law and which has been identified by the owner as a trade secret."  (Id. Ex. A at 2.)

The plaintiffs argue that they are entitled to summary judgment on counterclaim two because none of the information that BI3 is alleged to have shared with third parties qualifies as confidential information or trade secret information as defined by the Consulting

Agreement. In their opposition to summary judgment, the defendants rely on Hamor's deposition testimony describing confidential information he believes Tola shared with Pivnet. Specifically, he testified that "there's a number of reports that were the actual CampaignLocal reports that were sent back and forth by [Tola] to Pivec well after [Tola] was gone from CampaignLocal" and that "[t]here were another series of exchanges, email exchanges that showed that Pivec was using the exact URL tracking technology that CampaignLocal had created." (R. 87-1, Ex. B, Hamor Dep. at 84:13-87:4.) He also identified a report involving a detailed analysis of the Buy-A-Toyota website as being generated by using CampaignLocal technology. (Id.) Thus the only evidence that the defendants raise in opposition to summary judgment involves reports—all but one unidentified with any specificity—which they assert were generated by or relate to CampaignLocal technology.

The evidence to which the defendants point is insufficient to raise a genuine issue of material fact for two main reasons. First, the Consulting Agreement was entered into between BI3 and WK Networks. Not only is CampaignLocal not a party to the Consulting Agreement, but there is no reference to CampaignLocal anywhere in the document. (R. 92-1 Ex. A.) The confidentiality provision explicitly defines the protected information as that which relates to WK Networks's technology. (Id. Ex. A at 2.) Hamor testified that he does not view the confidential information of CampaignLocal to be the confidential information of WK Networks. (R. 114-1, Ex. A, Hamor Dep. at 150:10-151:1.) The defendants simply

27

have not explained how the plaintiffs could violate the Consulting Agreement by sharing CampaignLocal's confidential information. Second, the defendants have cited no evidence showing that any of the information the plaintiffs may have shared was marked as confidential. The Consulting Agreement clearly defines confidential information as that which is designated as confidential "by writing or marking for written materials and verbally at the time of disclosure . . . for non-written materials." (R. 92-1, Ex. A at 1-2.) The absence of evidence that any of the information which Hamor identified to vindicate this counterclaim was designated as confidential further supports the entry of summary judgment with respect to counterclaim two.

### C.    Counterclaim IV: Illinois Trade Secrets Act

The defendants allege through counterclaim four that the plaintiffs misappropriated trade secrets by sharing the defendants' proprietary information in violation of the Illinois Trade Secrets Act , 765 ILCS 1065/1, *et seq*. To prevail on their claim under the Trade Secrets Act, the defendants must establish that the plaintiffs misappropriated for use in their business particular information which qualifies as a trade secret. *See System Dev. Servs., Inc. v. Haarmann*, 907 N.E.2d 63, 72 (Ill. App. Ct. 2009). The plaintiffs argue that they are entitled to summary judgment on this counterclaim because the defendants have not identified any information which qualifies as a trade secret. They further argue that even if Hamor's vague references to "reports" and "tracking technology" qualified as trade secrets, there is no evidence that the plaintiffs used those technologies in their dealings with Pivnet.

The Trade Secrets Act defines a trade secret as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Whether information qualifies as a trade secret turns largely on the degree of its secrecy. *Pope v. Alberto-Culver Co.*, 694 N.E. 2d 615, 617 (Ill. App. Ct. 1998). Excluded from protection is "information not generally known to the public but clearly understood in a particular industry." *Service Ctrs. of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1136 (Ill. App. Ct. 1989). Thus the party seeking protection under the Trade Secrets Act "must establish that the information was known only to him and such limited other persons to whom it may be necessary to confide it." *System Dev. Servs.*, 907 N.E.2d at 73 (internal quotation omitted).

The entire universe of evidence to which the defendants point to identify the trade secrets at the heart of their counterclaim consists of two paragraphs from Hamor's affidavit. (See R. 87, Pls.' Resp. at 10.) Given the brevity of this evidence, the court will quote it in its entirety:

> In approximately January 2007, [CampaignLocal] created and developed URL tracking technology for use in its business. [CampaignLocal] licensed such technology to its client Pivnet, Inc. from April 2007 to June 2007. [CampaignLocal]'s technologies and methodologies used to create huge numbers of relevant keywords, structure and manage campaigns and bidding, plus track and report on campaign performance for search engine marketing campaigns were some of the most technologically advanced and sophisticated

> available in the marketplace from 2006 and thereafter. Elements of that
> system were also the subject of a patent application.

(R. 87-1 Hamor Aff. ¶¶ 7, 10.) The alluded-to patent application is not attached to the

affidavit, nor is there any follow-up testimony or citations to sealed submissions to identify

what particular technology is subject to the patent application Hamor references here.

Similarly lacking is any evidence to identify the precise "URL tracking technology" or

"elements of that system" to which Hamor refers. Without this information the defendants

simply cannot meet their burden of demonstrating that the technologies Hamor mentions in

his affidavit (in the vaguest of terms) are a mater of secret rather than general knowledge in

the industry. *See Serv. Ctrs. of Chicago,* 535 N.E.2d at 1136. Nor is it sufficient to

demonstrate that the information's secrecy was what gave CampaignLocal a competitive

edge. *See Sys. Dev. Servs.*, 907 N.E.2d at 73. Because the defendants have failed to point

to evidence that could convince a trier of fact of their version of the events, summary

judgment is appropriate with respect to counterclaim four. *See Johnson v. Cambridge Indus.,*

*Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

### D.    Counts V & VI: Breach of Fiduciary Duty & Tortious Interference

Counterclaims five and six stem from the defendants' allegations that Tola breached

his fiduciary duty to CampaignLocal by tortiously steering away Pivnet, its only client as of

mid-2007. The claims are based on the defendants' theory that "ABS and Tola entered into

a sort of quid pro quo agreement whereby ABS would release Tola/BI3 from the Virginia

litigation if Tola/BI3 obtained Pivnet, Inc. as a client for ABS." (R. 87, Defs.' Resp. at 12.)

The plaintiffs argue that they are entitled to summary judgment on these counterclaims for two reasons. First, they assert that it is undisputed that Pivnet and Tola began working together only after Tola resigned from CampaignLocal. They assert that there is no evidence that Tola and Pivnet were in contact before that regarding plans to work together outside of CampaignLocal. Second, they argue that under the undisputed evidence CampaignLocal had no legitimate expectation in doing business with Pivnet. Specifically, they point out that Pivnet terminated its contract with CampaignLocal in July 2007 and by the time it resumed working with the plaintiffs, CampaignLocal was both inoperable and embroiled in the Virginia litigation with ABS, in which Pivnet was an investor.

To establish a breach of fiduciary duty under Delaware law, the defendants (as counter-claimants) must show that Tola owed CampaignLocal a fiduciary duty and that he breached that duty. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). It is well-settled that corporate officers and directors owe fiduciary duties of care and loyalty to the corporation. *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009). Delaware law also recognizes that a minority shareholder in a corporation may owe it a fiduciary duty in some situations, but the party seeking to enforce the duty "must establish the *actual exercise* of control over the corporation's conduct by that otherwise minority stockholder." *See Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) (emphasis in original). Here, the parties agree that Tola owed CampaignLocal a fiduciary duty of loyalty in his role as a director and officer up until he resigned in January 2008, but disagree as to whether he

continued to owe such a duty after that based on his role as a minority shareholder. In support of their assertion that Tola exercised actual control over CampaignLocal after he resigned, the defendants point to evidence that he controlled the development of technology (CampaignLocal's major asset) and served as the client contact for Pivnet. (R. 87, Defs.' Resp. at 12.) But the undisputed facts show that CampaignLocal lost Pivnet as a client and Tola stopped working on CampaignLocal's technology months before he resigned. (R. 88, Defs.' Resp. to Pls.' Facts ¶¶ 13, 20-21.) There simply is no evidence that Tola continued to exert any control over CampaignLocal after he resigned from his position as CTO.

Given the absence of evidence that Tola's fiduciary duty lingered after his January 2008 resignation from CampaignLocal, the question becomes whether there is any evidence that he breached his duty by soliciting Pivnet before that date. *See Beard*, 8 A.3d at 602 (noting that a breach of fiduciary duty occurs when a fiduciary solicits an employer's customers before the cessation of his employment). As evidence that he did, the defendants rely almost entirely on what they consider the suspicious timing of the following events. In April 2007 Pivnet was working with CampaignLocal and set up a personal email account for Tola at Pivnet. Shortly thereafter, the parties learned that they had been sued by ABS in the Virginia litigation. Approximately three months later, in July 2007, Pivnet terminated its relationship with CampaignLocal. Around the same time, Tola stopped working for CampaignLocal. In January 2008 Tola, BI3 and ABS dropped the claims they had filed against each other in the Virginia litigation even though no money changed hands. On

January 24, 2008, Tola officially resigned from CampaignLocal. At the end of February 2008, Tola and BI3 contracted with ABS to provide SEM services to Pivnet, allowing ABS to regain Pivnet as a client. (R. 87, Defs.' Resp. at 12-13.) The defendants argue that a reasonable jury could infer from this string of events that Tola and ABS agreed before Tola resigned from CampaignLocal to collaborate to steer Pivnet away from CampaignLocal and to ABS.

Whether suspicious timing alone is enough to nudge a party past summary judgment "depends on context." *See Loudermilk v. Best Pallet Co., LLC*, __ F.3d __, 2011 WL 563765, at *2 (7th Cir. Feb. 18, 2011). The closer events are in time the more reasonable an inference "that the first caused the second." *Id.* Here the relevant events played out over the course of many months and the defendants have not pointed to any additional facts from which a reasonable jury could infer that there is a causal connection between Pivnet's departure and Tola's settlement with ABS. *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link."). That is because "inferences relying on mere speculation or conjecture will not suffice" to clear the summary-judgment hurdle. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Here, in arguing that more than conjecture is at play, the defendants point to additional evidence consisting of 417 pages of emails, 397 of which are not included in the record before the court. (The defendants cite them as "*[s]ee*

33

emails produced by Defendants as Bates Nos. D000353-770.") According to the defendants, those emails give rise to an inference that by the time Tola began working with Pivnet and ABS, they "were well beyond the planning stage of their business venture," and thus must have "begun discussions regarding a potential business opportunity well before Tola resigned as director of [CampaignLocal]." (R. 87, Defs. Resp. at 13.) But without the actual emails, there is no way to verify whether or not they actually support the inference the defendants describe.

Nor are the twenty pages of emails that *were* provided sufficient to support an inference that Tola began working with Pivnet surreptitiously before resigning from CampaignLocal or otherwise re-directed its business to ABS. (*See* R. 87-4, Ex. D.) The defendants do not explain how the emails support that inference or what specific messages are relevant to their position. The emails are dated from February 15-19, 2008, and are between Jay Pivec, a Pivnet employee, and Tola. In the first email, Pivec states that Tola "will be taking the realm [*sic*] of our search campaign beginning 2-15." (Id. Ex. D at 3.) One email dated February 19, 2008, attaches an analysis report of the BuyAToyota.com website, but beyond their blanket assertion that the emails show that Tola must have been working with Pivec earlier, the defendants do not explain how the analysis supports their position. They cite no evidence from which a jury could gauge, for example, whether it would be unusual for Tola to be able to generate the ten-page report within four days of beginning his work for Pivnet. Nor do the portions of Hamor's deposition that the

defendants point to in support of other aspects of their opposition help them here. Hamor simply testified regarding his suspicion that the alluded-to reports must have been made using CampaignLocal software, but he says nothing about the length of time they take to generate or any evidence that Tola produced them before resigning. (R. 87-2, Ex. B, Hamor Dep. at 84-95.) In fact, elsewhere in his deposition Hamor admitted that he did not know whether Tola was involved in a conspiracy to steer away Pivnet beginning in April 2007, but that the documents "will tell the story." (R. 76-3, Hamor Dep. at 104:18-105:12.) Given the absence of such documents or any other evidence establishing that Tola began working for Pivnet or otherwise steered it from CampaignLocal while he was still a fiduciary of CampaignLocal, the plaintiffs are entitled to summary judgment on the defendants' breach of fiduciary duty counterclaim.

The absence of evidence of a causal connection between the timing of the cited events and Tola's February 2008 contract with Pivnet is also fatal to the defendants' tortious interference counterclaim. To establish tortious interference with their business relationship with Pivnet, the defendants would have to show, among other things, that the plaintiffs intentionally induced Pivnet to end its contract with CampaignLocal or otherwise interfered with their valid business relationship. *See Dopkeen v. Whitaker*, 926 N.E.2d 794, 797 (Ill. App. Ct. 2010); *Mucklow v. John Marshall Law Sch.*, 531 N.E.2d 941, 947 (Ill. App. Ct. 1988). It is undisputed, however, that Pivnet severed its contract with CampaignLocal in July 2007. (R. 88, Defs.' Resp. to Pls.' Facts ¶ 13.) And for the same reason the evidence

35

is insufficient to establish that Tola breached his fiduciary duty, it is insufficient to show that he was behind Pivnet's decision to end the contract with CampaignLocal. Moreover, the defendants have admitted that ABS would not have offered the Pivnet work to CampaignLocal during the time when Tola was brought on board because ABS and CampaignLocal were still embroiled in the Virginia Litigation. (R. 88, Defs.' Resp. to Pls.' Facts ¶ 27.) Accordingly, summary judgment is appropriate on the tortious interference counterclaim as well.

### E.     Counterclaim VII:  Unjust Enrichment

Through counterclaim seven the defendants allege that the plaintiffs obtained an unjust benefit relating to their claimed unlawful use of CampaignLocal's technology and interference with its relationship with Pivnet. But as the defendants acknowledged in their brief in opposition to the plaintiffs' summary-judgment motion, unjust enrichment is not a stand-alone claim. *See Martis v. Grinnell Mut. Reins. Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009). "Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct." *Id.* (quotations omitted). Because the unjust enrichment claim is derivative of the counterclaims on which summary judgment is warranted, the plaintiffs are entitled to summary judgment on the unjust enrichment counterclaim as well. *See id.* (upholding dismissal of unjust enrichment claim where underlying fraud claim dismissed as well).

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment as to the amended complaint and the plaintiffs' motion for summary judgment as to the counterclaims are granted in part and denied in part. The defendants are entitled to summary judgment on counts three and nine of the amended complaint. The plaintiffs are entitled to summary judgment on counts two through seven of the defendants' counterclaims. The motions for summary judgment are denied with respect to count one of the counterclaims and counts one, two, ten, eleven, and twelve of the amended complaint.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**